1                     UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF MISSISSIPPI
2

3  QUINTEZ WREN HODGES              .        Cause No. 1:07CV66
                                    .
4        Plaintiff                  .        Oxford, Mississippi
                                    .        March 30, 2010
5            v.                     .        10:00 a.m.
                                    .
6  CHRISTOPHER EPPS, ET AL.         .
                                    .
7        Defendants                 .
   . . . . . . . . . . . . . . . . . .
8

9

                          EVIDENTIARY HEARING
10            BEFORE THE HONORABLE MICHAEL P. MILLS
                 UNITED STATES CHIEF DISTRICT JUDGE
11

12
   APPEARANCES:
13
   For the Petitioner:        FRANCES P. KAO, ESQ.
14                            JUSTIN LEE HEATHER, ESQ.
                              Frances P. Kao, Attorney
15                            155 North Wacker Drive
                              Suite 2700
16                            Chicago, Illinois 60606-1720

17                            ROBERT B. MCDUFF, ESQ.
                              Robert B. McDuff, Attorney
18                            767 North Congress Street
                              Jackson, Mississippi 39202
19
   For the Respondents:       PATRICK JOSEPH MCNAMARA, JR., ESQ.
20                            Mississippi Attorney General's Office
                              Post Office Box 220
21                            Jackson, Mississippi 39205-0220

22 Court Reporter:            Rita Davis Sisk, FCRR, RPR
                              911 Jackson Avenue, Room 369
23                            Oxford, Mississippi  38865
                              (662) 416-2038
24
   Proceedings recorded by mechanical stenography, transcript
25 produced by computer.

```
1                          INDEX

2                      Opening Argument

3       Mr. McDuff.......................................3

4       Mr. McNamara...................................19

5


6                      Direct   Cross   Redirect

7   WITNESSES FOR THE
        PETITIONER:
8
    Forrest Allgood          24        45
9   Jim Kitchens             49        60        65
    Mike Miller -
10      By Video             67
    Linda Hodges             77        87
11  Wren Blair               91       105
    Renise Hodges           110
12  LaKasha Hodges Porter   119


13  EXHIBITS:                              Marked   Received

14
    Petitioner's Exhibit Nos. 1 through 35..........23        23
15  Petitioner's Exhibit Nos. 35A through 35T.......23        23
    Petitioner's Exhibit Nos. 35V through 35 GG.....23        23
16  Respondent's Exhibit Nos. 36 through 39.........23        23
    Petitioner's Exhibit No. 32.....................119      119
17

18  THE COURT:          Recessed..............................125

19
    CERTIFICATE OF COURT REPORTER............................125
20

21

22

23

24

25
```

```
 1  (CALL TO ORDER OF THE COURT)

 2            THE COURT:  Madam Clerk, would you call the docket,

 3  please.

 4            THE COURTROOM DEPUTY:  Court calls Cause No.

 5  1:07CV66, Quintez Wren Hodges v. Christopher Epps, et al.  This

 6  is an evidentiary hearing.

 7            THE COURT:  All right.  Who speaks for the

 8  petitioner?

 9            MR. MCDUFF:  Your Honor, Robert McDuff, along with

10  Frances Kao and Justin Heather for the petitioner.

11            THE COURT:  All right.  Are you ready to proceed?

12            MR. MCDUFF:  We are, Your Honor.

13            THE COURT:  And for the respondent?

14            MR. MCNAMARA:  Patrick McNamara from the Mississippi

15  Attorney General's Office for the respondent, ready to proceed,

16  Your Honor.

17            THE COURT:  All right.  And do you have the defendant

18  in the courtroom, Mr. McDuff?

19            MR. MCDUFF:  He is, Your Honor.

20            THE COURT:  Are you ready to proceed with your

21  opening statement?

22            MR. MCDUFF:  Yes.

23            THE COURT:  All right.  You may.

24            MR. MCDUFF:  Thank you, Your Honor.  You granted an

25  evidentiary hearing on three issues, ineffective assistance at
```

1   sentencing, prosecutorial misconduct, and the presentation of

2   false testimony and the jury instruction and form of the

3   verdict.

4        The case involves a lawyer named Mike Miller with no

5   experience.  He'd never tried a case in circuit court.  He'd

6   only been out of law school one year.  He took over a death

7   penalty case a month before trial in a situation where the case

8   was not anywhere close to being ready for trial.

9        And the lawyer who had been Court appointed two years

10  earlier, Carrie Jourdan, told him when he took the case that it

11  was not ready for trial; and that, among the other things that

12  needed to be done, was investigation of mitigation in case

13  there was a penalty phase.  Now, Ms. Jourdan will be here to

14  testify tomorrow.

15       But the fact that it wasn't ready was apparent to the

16  defendant's mother, and the evidence and depositions that have

17  already been taken show the defendant's mother was concerned

18  about the fact that the case had not been prepared within the

19  past two years and was looking for someone to take it from the

20  lawyer who had been working on it the past two years and hadn't

21  prepared it.

22       Unfortunately, the person who was willing to take the case

23  for the price she could afford was Mike Miller.  Now, he took

24  it at a time when the evidence shows -- the depositions are

25  clear on this -- he was involved in drug use, including crystal

1　methamphetamine, smoking crack cocaine, marijuana, smoking it

2　at lunch breaks during the trial; was abusing a prescription

3　for Xanax.  He admits that he was taking Adderall and Valium

4　during the trial for panic attacks.

5　　　He declined to answer questions about his drug use during

6　his deposition, claiming the Fifth Amendment.  But other

7　witnesses attest to this.  And he has serious mental problems.

8　He was working out of his trailer in Caledonia.  He didn't have

9　an office.

10　　　He was -- his paralegal says at times, while he was

11　preparing for trial, during the three weeks before trial, she'd

12　come over, he'd still be asleep at two in the afternoon.  He

13　was paranoid.  He had shot holes in the floor of his trailer.

14　And he told his paralegal he had shot them because he thought

15　people were around spying on him outside his trailer.  He

16　thought the KKK was after him.

17　　　A year and a half later -- and this is public record -- he

18　was committed by his parents.  And the commitment papers show

19　methamphetamine use, cocaine use, paranoia.  He thought the CIA

20　was after him, the FBI, the KKK; but these problems were

21　affecting him at the time of trial and in the month when he was

22　suppose to be getting ready for trial.

23　　　And he admits in his deposition that during the trial "not

24　only was I probably unqualified to do this defense, but I was

25　operating under extreme disability."

 1       Now, shortly after he entered the case, the judge in

 2  Lowndes County met with him on Monday, August the 20th, 2001.

 3  This was 20 days before the trial was to start.  He had just

 4  entered his appearance.  And the judge said, you know, "I've

 5  got concerns about whether you're qualified to handle this

 6  case."  And Mr. Miller told him that he was going to get more

 7  experienced co-counsel, and he asked for a continuance.

 8       And the judge said, "Okay.  It's Monday.  File your motion

 9  for a continuance tomorrow, Tuesday, or by Wednesday at the

10  latest; and we'll have an immediate hearing on it.  The motion

11  for continuance was filed on Friday at 4:30 p.m., and the judge

12  didn't even know about it.  He first learned about it the

13  subsequent Monday, August 27th, a week after he had told

14  Mr. Miller to file his motion.

15       The judge promptly sets a hearing for 1 p.m. that Monday

16  afternoon, sent word through Mr. Miller's secretary.  She

17  contacted Miller.  Miller told her to call the judge and say he

18  was sick .  So the judge sets a hearing for the next day,

19  Tuesday.  They call and tell the secretary.  She tells Miller.

20  Miller gets her to write a letter to the judge saying he is

21  sick; he had a little doctor's note attached saying he would

22  not be available to work until August 31st, the next Friday.

23       And remember, the clock is counting down to the trial.

24  It's scheduled for September 10th.  So the judge says, "All

25  right.  I'm going to set a hearing on Friday August 31st," when

1    you say you can come back.  So they're all there for the

2    hearing, the judge, the prosecutor; Miller doesn't show up.

3        Miller says, "Well, I can do a hearing next Tuesday."  So

4    the judge sets a hearing for next Tuesday, September 4th; and

5    the judge denied his motion.  All this time, of course, he's

6    not out there investigating the case or investigating

7    mitigation.

8        He did bring in a co-counsel named Guy Rogers from Jackson

9    who had been involved in two death penalty cases.  And one of

10   them, the case had pled and never went to trial.  The other, he

11   sat second chair during the trial.

12       But Guy Rogers entered the case with explicit

13   understanding that Mr. Miller was going to do the

14   investigation, including the mitigation investigation.  And he

15   entered it with the explicit assurance from Mr. Miller that an

16   investigation had been done.

17       Now, Rogers says he had doubts about that; but those were

18   the conditions under which he entered the case.  And Judge, we

19   have -- his deposition has not been taken because he's had to

20   cancel the two times we've had it scheduled by agreement of

21   Mr. McNamara.  His affidavits are in evidence.  And of course,

22   Mr. McNamara reserves the right for us to depose him after the

23   trial at a convenient time, as we've discussed with you.

24       The bottom line is, no mitigation investigation was

25   conducted.  They filed some foreign motions, Mr. Rogers and

DAILY COPY

1  Mr. Miller, they got out of a book and changed the names; and

2  that was about it.

3       Seven days before trial, Miller told the Judge, "There's

4  been very little background investigation done."  And this

5  absence of mitigation is confirmed by everyone.  It's confirmed

6  by Miller; it's confirmed by Guy Rogers.  It's confirmed by the

7  paralegal, Brandy Wagoner.  And as is predictable, the trial is

8  a disaster, particularly in the mitigation phase.

9       Rogers says that, at the end of the day, he went back to

10 his hotel, because he'd told Miller to take care of the

11 investigation work.  Miller says, at the end of the day, he

12 would go home to his trailer and stare at the wall, because he

13 was having panic attacks and anxiety attacks and other problems

14 that are clear from his deposition.

15      Miller said he was having a hard time concentrating.  His

16 notes from the trial -- they're very interesting.  His trial

17 notes included phrases like, "This is too much"; "This is far

18 too much"; I want to go home," "losing my mind."

19      Rogers, his co-counsel says that Miller fluctuated.  Said

20 he would have moments when he just thought he was going to win

21 the case with a grand theory and with the brilliance of his

22 cross-examination, and then other moments during the same trial

23 of intense depression where he was banging his fist on the

24 table, banging his head against the wall.

25      Rogers said, other than the time together in court, they

1   met once during the course of the death penalty trial to talk

2   about preparation; and that was on the morning during the trial

3   where he says Miller came to his hotel.  And Rogers said to

4   him, "What are you going to do to save your client's life?

5   There's been a minimal amount of mitigation done, what are you

6   going to do?"  And Miller didn't have an answer.

7        Now, Miller had his paralegal call Dr. Phillip Meredith at

8   Whitfield.  Much earlier in the case, the Court had ordered an

9   examination at Whitfield; and Dr. Meredith had written the

10  report, found him competent, found him sane.  And Miller had

11  the paralegal call Dr. Meredith and say, "We'd like you to come

12  tomorrow to testify."

13       And Dr. Meredith says, "Well, you know, I can't come on

14  one day's notice."  And, so, Miller and Rogers approached the

15  judge at the beginning of the very short penalty phase in this

16  case; and they said, "We tried to get Meredith here; he won't

17  come on one day's notice.  But we don't think his testimony

18  would help, anyway."

19       And they were right; it wouldn't have helped.  Because no

20  one had bothered to send Dr. Meredith, at Whitfield, any of the

21  mitigating information about Mr. Miller, any of the records

22  about him and about his family and about all the mitigation

23  that our expert, Dr. Antoinette Kavanaugh, will be talking

24  about when she testifies here tomorrow.

25       And, so, they're in a situation, really, where Rogers said

DAILY COPY

1   to the jury in the closing argument, "The defendant does not

2   have a lot of mitigation to put forth before you today."  And

3   that was true.

4        Now, when the jury learns during the guilt phase about a

5   murder that's been committed by the defendant during the worse

6   thing he's ever done in his life and they don't hear anything

7   positive, in the penalty phase, the death penalty is

8   practically a foregone conclusion.  And that's what happened

9   here.

10       But not only that, not only did they not put forth

11  anything positive, they opened the door during the penalty

12  phase to devastating evidence from the prosecution.  Because

13  Miller decided at the last minute, on the spur of the moment --

14  and Guy Rogers affirms this -- that Miller just decided to call

15  five family members without any preparation.

16       And, so, they got up there; and they just started talking

17  without any guidance.  And they opened the door for the

18  district attorney, Forrest Allgood, to come in with prior

19  arrests that had not been adjudicated and that were clearly not

20  admissible.

21       As the Court knows, under the Mississippi statute, the

22  only prior offenses that can be admitted are convictions of

23  violent crimes -- there weren't any in this case -- and a

24  conviction to show that a person was under a sentence of

25  imprisonment at the time the murder occurred.

1        And in this case, there had been a burglary conviction for

2    which Mr. Hodges had been sentenced to the RID program.  That

3    was the only thing that was admissible in terms of his prior

4    troubles with the law, at the penalty phase.  And Mr. Allgood

5    put that in at the beginning of the penalty phase.

6        And then, because of Mr. Miller putting these people on

7    the stand with no preparation, the door was opened.  And

8    Mr. Allgood came in on cross-examination, and he put in that

9    the defendant had unadjudicated arrests for -- two for escape,

10   one for burglary of a school and one for an alleged sexual

11   assault that was never prosecuted because the victim chose not

12   to prosecute it.

13       In addition to all of this harmful evidence coming in, the

14   jury was never told that the victim's mother -- the victim was

15   named Isaac Johnson, the victim of the murder -- didn't want

16   Quintez Hodges to get the death penalty.  There was a victim

17   impact statement that had been sitting in the file for two

18   years prior to trial in which she said, "I do not want him to

19   get the death penalty.  I want him to get life without parole,

20   but not the death penalty."

21       She'd been a witness in the guilt phase.  If somebody had

22   bothered to read the file, they could have subpoenaed her to

23   stay around for the penalty phase; and she could have testified

24   to that.  But she didn't.

25       The other thing the jury didn't hear -- and our expert

1 will talk more about this tomorrow -- but very briefly, that

2 Mr. Hodges grew up in a home where his mother was a severe

3 alcoholic. She was 45 years old when he was born. He had

4 eight older siblings. When he was 2, 3, 4 years old, she was

5 repeatedly admitted to the hospital because of extreme

6 intoxication and acute alcoholism. She was a bootlegger. She

7 suffered from severe depression.

8       They lived in extreme poverty. She was not married to his

9 father. The father never lived there. There's mental illness

10 in the family. It's a chaotic house, with children of his

11 older siblings there, with his grandmother living there, who

12 had Alzheimer's. And it's documented in the public record time

13 after time this was a home where he basically had no parental

14 attention, where his parents weren't taking care of him.

15       Now, the jury didn't get to hear that. And the other

16 thing they didn't get to hear in the context of mitigation was

17 that he became involved with a woman named Cora Johnson. She

18 got pregnant. She had a baby. Sometimes she told him it was

19 his; sometimes she told him it wasn't his.

20       She taunted him in letters, talking about her sexual

21 involvement with other men. At the same time, she was sending

22 him letters saying, "I want you to get a job so we can have a

23 family," the family that he never had.

24       So he went to the RID program for that burglary conviction

25 I mentioned a minute ago, and he had all these letters coming

DAILY COPY

1  in and out.  And he got out and he immediately got a job, as

2  she had told him to do so they could have a family together.

3  He immediately got a job.

4       A week and a half later, he called her house, was told

5  that she had company.  He went over there later to see her, to

6  confront her; we don't know.  Her brother, Isaac Johnson, was

7  there.  As Mr. Hodges told the police in a statement that was

8  admitted into evidence, he and Isaac Johnson were talking.

9  Isaac Johnson said he had a gun.

10       He thought Isaac Johnson reached for something he thought

11  was a gun, and he shot him.  Then he took Cora Johnson, the

12  woman with whom he was involved, and the child, who she told

13  was his.  They went to Alabama and then, eventually, came back;

14  and he turned himself in.

15       Now, a little bit of this was heard by the jury.  I

16  mentioned all these letters.  There were two years' worth of

17  letters.  A very small portion of those were heard by the jury

18  at the guilt phase.  The Judge wouldn't let the rest in because

19  Mr. Miller hadn't disclosed them to the prosecution in time.

20  But they were just heard in the context of cross-examining Cora

21  Johnson during the guilt phase.

22       They were never presented as part of the mitigation case

23  about what in this relationship led him to go over there that

24  night where he shot Isaac Johnson and what led him to then take

25  Cora and the child off to Alabama.

1      Our expert is going to talk about that, about the role --

2  about, really, the whole -- the whole context of the mitigation

3  and how growing up with an alcoholic mother in a family with no

4  father and basically with parents who aren't taking care of you

5  and depression and mental illness and chaos -- how that can

6  really affect a person's emotional growth, a person's judgment,

7  a person's maturity in a way that -- negatively affected in a

8  way that most of us don't have to deal with.

9      And talk about how his desire for a family of the type he

10 didn't have was part of this whole complicated mix when he was

11 getting taunted with these letters.  And how he was haunted by

12 Cora, but how he wanted to be with her and be with his child.

13 And how this all came together as part of the tragic events of

14 that night.

15     And that's not to say it excuses it.  It's not to say that

16 everybody that grows up in the situations he grew up in commits

17 a murder.  But it is important in helping the jury understand

18 the context of how this young man got in the position that he

19 did.  And it was never presented to the jury at all.

20     Now, very briefly, the prosecutorial misconduct.  In the

21 sentencing phase, when Mr. Hodges was on the stand, the

22 defendant, Forrest Allgood asked him on cross, "You appeared in

23 Court before another judge; is that correct?"  Talking about

24 the earlier conviction for the burglary.

25     "Yes, sir."

1       "And you pled guilty to a charge of burglary at

2   Ms. Tatum's house; is that right?"

3       "Yes, sir."

4       "And during the course of that plea process, at one point

5   in time, your lawyer stood up and told the judge that Ms. Tatum

6   didn't want you to go to the penitentiary, didn't he?"

7       "Not in my presence."

8       "You didn't see that?"

9       "No, sir."

10      "Isn't it true that the assistant district attorney who

11  was handling the case, Jim Kitchens, stood up and affirmed that

12  that was so, that that was in fact what Ms. Tatum requested;

13  didn't he do that?"

14      "No, sir."

15      "You don't recall that happening at all?"

16      "No, sir."

17      "Do you recall that the State of Mississippi asked and

18  sought that you be sent to the penitentiary for 15 years?  Do

19  you recall that."

20      "I didn't know nothing about it."

21      "You didn't know nothing about that either?"

22      He ultimately got sentenced to the RID program in that

23  case.  And Mr. Allgood, in his closing, said to the jury, "In

24  November of 1998, whether he wants to acknowledge it or not, he

25  was given a huge measure of grace because rather than being

DAILY COPY

1  sent to the penitentiary for 15 years, as the State of

2  Mississippi was seeking, he received intercession from the most

3  unlikeliest of sources.  And through her goodwill and through

4  her efforts, this defendant was sentenced instead to the

5  functional equivalent of probation."

6      And the reason he could say that was because after he

7  asked Mr. Hodges those questions, he called then Assistant

8  District Attorney Jim Kitchens to affirm that all these things

9  had happened in court, that everyone had told the judge that

10 Ms. Tatum didn't want him to go to the penitentiary and the

11 State was seeking 15 years.

12     And, so, not only did this portray Mr. Hodges as someone

13 who killed Bessie Tatum's son, that was the mother of Isaac

14 Johnson, but that he was so -- that he wouldn't even

15 acknowledge in open court before the jury that she had actually

16 recommended that he not go to prison for an earlier -- had

17 asked that he not go to prison for an earlier offense.

18     Well, you know, when the jury doesn't hear any mitigating

19 evidence, that's pretty powerful stuff.  And they didn't hear,

20 and they sentenced him to death.

21     The problem is, it wasn't true.  Defense counsel, at the

22 time, didn't know this was going to come up.  He had not

23 ordered a transcript of that burglary proceeding.  But

24 Mr. Hodges' appellate lawyer did order it.  And it turned out

25 none of those things happened, certainly didn't happen in open

1  court where Mr. Hodges was present.

2       Now, they may try to say today that it happened in

3  chambers, whatever.  It didn't happen in open court when

4  Mr. Hodges was there.  The basis for those questions were

5  completely unfounded.  Jim Kitchens' testimony was not true.

6  And it was part of the sort of impact of prejudice that all

7  fell on Mr. Hodges.

8       And let me sort of conclude with this, Your Honor, the

9  overall prejudice is this, because of ineffective assistance of

10  counsel at trial, the jury learned of prior arrests that were

11  completely inadmissible under Mississippi law that normally

12  would cause a reversal of a death sentence if admitted because

13  of improper questions and untrue testimony from the DA's

14  office.

15       The jury was led to believe that Quintez Hodges knew of

16  Bessie Tatum's benevolence in his earlier burglary case and

17  wouldn't even acknowledge it on the witness stand.  But because

18  of the ineffective assistance of counsel, the jury didn't learn

19  that that same Bessie Tatum did not want him to get the death

20  penalty.

21       And because of their ineffective assistance, they didn't

22  learn of the wealth of mitigating evidence that might have

23  helped explain why he was where he was and why he did what he

24  did on that day.

25       And then finally, on top of all of that, the jury was

1  instructed, contrary to Mississippi law, that they had three

2  options, death, life without parole, and life with parole, even

3  though life with parole had been rescinded back in 1994.

4       In addition, they were told that if they couldn't reach a

5  unanimous verdict he would be sentenced to life with parole;

6  and that was what was really problematic about this.  Because

7  it meant, in a situation where the jurors are deadlocked

8  between death and life without parole, the jurors who voted for

9  life without parole are going to have an incentive to agree to

10  death because they're concerned if they don't reach agreement

11  he will be sentenced to life with parole, because that's what

12  they were told.  But it was completely untrue under Mississippi

13  law.

14       Now, had the prior arrests not been admitted at trial, had

15  the prosecution not presented false evidence to the jury, had

16  the mitigation evidence been presented, had the jury been told

17  that Bessie Tatum did not want Quintez Hodges to get the death

18  sentence for the death of her son and had the jury been

19  properly instructed that the only options, as is required under

20  Mississippi law and under the United States Supreme Court

21  precedent, that the only options were death and life without

22  parole, there's a significant possibility certainly sufficient

23  to undermine confidence in the outcome, what the Supreme

24  Court's called a reasonable probability.

25       There is a significant possibility that at least one juror

1  would not have voted for death.  And that's why, at the

2  conclusion of this hearing, I believe the evidence will

3  demonstrate that the writ should be granted.  Thank you.

4          **THE COURT:**  Thank you.

5      Mr. McNamara.

6          **MR. MCNAMARA:**  Your Honor, very briefly, I'll just

7  address -- can't address everything that was just put forward.

8  There's a great deal of embellishment on the part of Mr. McDuff

9  as to what the record actually reads; but I would say, starting

10 with the accusation of misconduct by the prosecutors in this

11 case, I believe the evidence here today is going to show -- and

12 I believe it has shown today -- Mr. Allgood is expected to

13 testify.

14     He will say he assigned this case to Jim Kitchens, his

15 assistant at the time.  He told Mr. Kitchens he wanted 15 years

16 as part of a plea bargain for this defendant.  Mr. Kitchens

17 took that.  He presented it to the defense attorney; he

18 presented it to the Court.  The defendant, Mr. Hodges, at that

19 time, refused to take it.  Therefore, they went forward with an

20 open plea before the Court.

21     The evidence will show, the testimony will show today,

22 that that is exactly what happened.  There was no one -- there

23 was no misconduct.  There was no false information that was put

24 before that Court or any other.  The only difference, when

25 Mr. Kitchens came to the -- testified at the sentencing hearing

1    in this case, he misspoke as far as he was the speaker of the

2    words.

3        What the facts show is that he and Mr. Rogillio, who,

4    Mr. Rogillio, actually did the plea colloquy, that they were

5    seated together; that it was their practice to sort of take one

6    at a time.  One will do a plea; the other will do a plea.

7        Mr. Kitchens spoke as though he had had the speaking role.

8    He did not.  But he was present at all times, and he was the

9    one that had at all times conveyed this information, none of it

10   being false.

11       As far as the form of the verdict, at this time, Your

12   Honor, I would just say that the State -- the respondents would

13   argue along the lines of what is contained in the brief that

14   the Mississippi Supreme Court found it to be error but harmless

15   error in what was presented.

16       The ineffective assistance of counsel, Mr. McDuff relies

17   very, very heavily on the affidavits and statements of

18   co-counsel, Guy Rogers.  As he has stated, Mr. Rogers has been

19   scheduled twice at the request of the petitioner at days that

20   were suitable to him.  He failed to show up for both of those.

21       We are now looking to reschedule for a time after this

22   hearing.  And I don't believe you can truly look at the facts

23   of this ineffective assistance of counsel until there is some

24   true testimony by Mr. Rogers as to that element.  That's all I

25   have, Your Honor.

1              **THE COURT:**  All right.  Thank you.  Do you wish for

2   the Rule to be invoked?

3              **MR. MCDUFF:**  Yes, sir.

4              **THE COURT:**  All right.  The Rule has been invoked,

5   and that means that anyone who is going to testify in this

6   proceeding and is not seated at counsel table or needed as an

7   expert must remain outside the courtroom until such time as you

8   have testified.  I do not know to whom the Rule applies, so

9   I'll ask the attorneys to help me enforce the Rule.

10             **MR. MCDUFF:**  Yes.

11             **THE COURT:**  Are you ready to proceed?

12             **MR. MCDUFF:**  Yes, sir, Your Honor.  First, we'd like

13  to move into evidence the exhibits, most of which have been

14  agreed to.  Exhibits 1 through 35 have been agreed to for

15  admission.

16             **THE COURT:**  Have you had those premarked?

17             **MR. MCDUFF:**  Yes, sir.  Exhibits 35A through 35T.

18  Now, with respect to 35U, Mr. McNamara has an objection based,

19  I believe, on relevance at this point.  He's going to review

20  that overnight, and we'll report back to the Court.  That will

21  not come up until tomorrow.  Then exhibits for admission --

22  Exhibits 35V through 35GG are agreed for admission.

23             **THE COURT:**  Did you say V through G?

24             **MR. MCDUFF:**  I'm sorry.  35V, as in Victor, through

25  double G.

1          **THE COURT:**  Okay.

2          **MR. MCDUFF:**  And then there are two exhibits that

3   Mr. McNamara presently has objection to on relevance, 35 double

4   H and 35 double L. I'm sorry.  Double H through double L.  That

5   would be double H, double I, double J and double L.  And he's

6   going to review those tonight as well.  And then the

7   respondents have Exhibits 36, 37, 38, and 39 to which we've

8   agreed for admission.

9          **THE COURT:**  All right.  Are you in agreement,

10  Mr. McNamara, of what he just presented?

11         **MR. MCNAMARA:**  Yes, Your Honor, with the exception of

12  Exhibit 10, which is the deposition of Guy Rogers, which has

13  not yet been taken into account.  And I would note that -- I'm

14  sorry.  That's all I have, Your Honor.

15         **THE COURT:**  All right.  The matters called out will

16  be admitted into the record at this time with the reservation

17  of the Government on the exhibits that were mentioned.  And

18  we'll take those up whenever they come up; or if you can reach

19  an agreement prior to that time, simply make your announcement.

20  Do you have the exhibits?

21         **MR. MCDUFF:**  Yes, sir.  We've placed all the ones

22  that have been agreed upon in two notebooks right here.

23         **THE COURT:**  All right.  Sallie, do you have that?

24         **THE COURTROOM DEPUTY:**  Yes.

25         **THE COURT:**  All right.

1   (EXHIBIT NOS. 1 THROUGH 35, 35A THROUGH 35T, 35V THROUGH 35GG,

2        36, 37, 38 AND 39 WERE RECEIVED INTO EVIDENCE)

3        **THE COURT:**  Anything else, gentlemen?

4        **MR. MCDUFF:**  The only other thing is, Your Honor, I

5   neglected to mention in my opening we're going to start with

6   Mr. Allgood and Mr. Kitchens on the misconduct issue.

7        We've told Mr. McNamara after that, if he wants to take

8   his witness on that issue out of turn, that's fine with us.

9   And he says if he calls a witness he'll do so then.  Then we'll

10  have the Mr. Miller deposition excerpts that we discussed.

11  After which, we will be presenting some lay witnesses.

12       Tomorrow morning or sometime tomorrow, Carrie Jourdan will

13  be here.  She couldn't be here today, and then we will have the

14  remaining lay witnesses and Dr. Kavanaugh, our expert,

15  tomorrow.

16       **THE COURT:**  Do you anticipate finishing tomorrow?

17       **MR. MCDUFF:**  I think so.  It's conceivable we could

18  go over into Thursday, but I think we'll finish tomorrow.

19       **THE COURT:**  All right.  Are we ready to proceed?

20       **MR. MCDUFF:**  Yes, Your Honor.  Our first witness is

21  Forrest Allgood.

22       **THE COURT:**  If you'll get Mr. Allgood.  Charlie, you

23  want to get him?

24       (THE WITNESS IS SWORN)

25       **FORREST ALLGOOD, PETITIONER'S WITNESS, SWORN**

**DAILY COPY**

1                          **DIRECT EXAMINATION**

2     **BY MR. MCDUFF:**

3     Q.    Good morning, Mr. Allgood.

4     A.    Good Morning.

5     Q.    State your name for the record, please.

6     A.    I'm Forrest Allgood.

7     Q.    Okay.  And what's your current position?

8     A.    I'm a district attorney of the 16th circuit court

9     district.

10    Q.    And how long have you been a district attorney?

11    A.    Since 1989.

12    Q.    Okay.  And how long were you practicing law prior to that

13    time?

14    A.    Since 1978.

15    Q.    Okay.  From 1978 to 1989, were any of those years in the

16    district attorney's office?

17    A.    All of them.

18    Q.    All of them.  Okay.  Mr. Allgood, how many death penalty

19    cases have you tried?

20    A.    You know, I really don't know.  It'd be in double digits.

21    Q.    Okay.  You remember the trial of Quintez Hodges?

22    A.    I do.

23    Q.    Okay.  And, Mr. Allgood, at the beginning of the penalty

24    phase in that case, you -- do you recall that you presented

25    evidence about a burglary for which Mr. Hodges had been

1  convicted and sentenced to the RID program?

2  A.    I did.

3  Q.    And do you recall that in your -- the affirmative part,

4  the aggravation part of the penalty phase, you introduced that

5  to prove one of the aggravating factors under Mississippi law,

6  which is that the defendant was under a sentence of

7  imprisonment at the time of the murder?

8  A.    I introduced the copy of his conviction in that portion,

9  in the affirmative portion.

10  Q.    Right.  And is it correct that under Mississippi law, the

11  only prior -- the only prior convictions that can come in --

12           **MR. MCNAMARA:**  I object, Your Honor.

13           **THE COURT:**  Yes, sir?

14           **MR. MCNAMARA:**  To the relevance of this.  We --

15  specifically, we were here to cover any claim of prosecutorial

16  conduct only so far as the giving of false testimony.

17           **THE COURT:**  What's your response?

18           **MR. MCDUFF:**  Your Honor, this actually relates to the

19  ineffective assistance of counsel.

20           **THE COURT:**  Through this witness?

21           **MR. MCDUFF:**  Yes, sir.  Relates to the defense

22  opening the door to allow admission of otherwise inadmissible

23  arrests.

24           **THE COURT:**  Overruled.  You may proceed.

25  **BY MR. MCDUFF:**

1  Q.    Now, in the aggravation phase of the death penalty case,

2  you can introduce convictions for violent offenses; is that

3  correct?

4  A.    As I understood it, you could introduce convictions for

5  being under a sentence of imprisonment.

6  Q.    Correct.

7  A.    When you are -- commit capital murder.

8  Q.    And also for violent offenses, right?

9  A.    Yes, and for violent offenses.

10 Q.    Okay.  And this burglary didn't qualify as a violent

11 offense but did qualify as a sentence of imprisonment?

12 A.    It was still a sentence of imprisonment because he had

13 received the sentence to the RID program.  Under our law, under

14 probation, they consider that a sentence of imprisonment.

15 Q.    I understand.  And you did not introduce, in aggravation,

16 any prior unadjudicated arrests, did you?

17 A.    No.

18 Q.    Okay.  During cross-examination of witnesses that had been

19 put up by Mr. Miller in mitigation, you went into some -- you

20 raised some prior unadjudicated arrests; did you not?

21 A.    I believe the way that worked out, I didn't raise it.  The

22 defendant, when he testified, and his mother, when she

23 testified, both made comments -- his mother in particular made

24 comments to the effect "he was a good boy" and things of that

25 nature.

1      Which, when she started talking about him being a good

2  boy, well, the law says that I can go into that and ask her

3  about his other indiscretions.  And that's what, I guess you'd

4  say, opened the door.  It was something -- if memory serves --

5  his mother said.  And then when Mr. Hodges got on the witness

6  stand, he may have -- he may have also made some remarks in

7  that vein.

8  Q.   Okay.  Mr. Allgood, I want to show you very briefly --

9  this is part of the record in this case.  It's not one of the

10  exhibits in evidence here, but it's part of the record.  This

11  is -- prior to Mr. Hodges testifying, his mother testifying,

12  there were some other family lay witnesses who testified.  One

13  of them was Lisa Hodges.

14  A.   Oh, sorry.  You know, I don't remember the names.  I know

15  there were several family members that did testify.  Normally,

16  in capital litigation, when we come to the sentencing phase,

17  family members are the standard source of mitigation for the

18  capital defendant, that's customary.

19  Q.   And you brought in the fact, during that

20  cross-examination, that Mr. Hodges had escaped from the Lowndes

21  County jail on two occasions, right?

22  A.   Yes.  Because that was something that had been addressed

23  when she started talking about, I think, that he was respectful

24  of authority and things of that nature.  And when she responded

25  that she perceived that he was respectful to authority, I asked

**DAILY COPY**

1   her if escaping from jail indicated a respect for authority.

2   And that, I think, was the context.

3   Q.   Basically, Mr. Miller opened the door, through the

4   witness, for you to ask about that?

5   A.   Well, no.  I believe that's on cross-examination.

6   Q.   Right.  That's what I'm saying.

7   A.   Whether I would -- whether you would say that Mr. Miller

8   opened the door or not, I think the witness is the one that

9   said that.  I don't recall Mr. Miller saying anything in

10  particular.  You've got the transcript.  I'm sure you've got

11  that before the Court.

12       You know, witnesses -- witnesses' testimony -- and you

13  know this; you've tried a bunch of cases -- it's not

14  choreographed.  I mean, they may tell you one thing in the

15  witness room.  They get on the witness stand, and they say

16  something else altogether.  And I don't know, quite frankly, if

17  what was elicited was volunteered by the witness or whether it

18  was something Mr. Miller delved into.

19  Q.   You don't know because you weren't present during any

20  meetings Mr. Miller might have had with these witnesses?

21  A.   I was not.

22  Q.   As far as you know, Mr. Miller didn't have any meetings

23  with these witnesses.

24  A.   I have no idea what he did.

25  Q.   All right.  And just one more.  This is the

1   cross-examination of Chris Hodges.  You asked about an arrest

2   for crime of burglary -- crime for burglary and attempted

3   sexual battery.  And again, would that have been a situation,

4   to your recollection, where the door was opened on direct

5   examination?

6   A.    If I can have the Court's indulgence just one minute to

7   read this.  (Perusing document.)  You know, once again, it's

8   difficult for me to say.  I know the context that the

9   question's being asked in.  The context was, of course, the

10  family was maintaining that the victim -- well, the victim of

11  the kidnapping was the source of all the evil.

12       That, actually, Mr. Hodges was well-behaved, was a, quote,

13  good boy, unquote, until he met Cora Johnson.  And when he met

14  Cora Johnson, he went crazy.  That's essentially what the

15  family of the defendant was maintaining.  And they were fairly

16  uniform in that in some respects.

17       And you see that here.  This witness has just got through

18  testifying that she was the source of the trouble.  And when he

19  added that -- once again, when they asserted that, that gave me

20  the leeway to go into that.  Now, was that elicited by

21  Mr. Miller; or was that his mitigation strategy?  You know, I

22  can't say that.  I know what was said on the witness stand.

23  Q.    You don't even know if he had a mitigation strategy?

24  A.    Once again, I was not present at any meetings that counsel

25  had with his witnesses; and I could not say.

1  Q.    And the attempted sexual battery you were talking about

2  there was of a woman name Latasha Martin; is that correct?

3  A.    I believe that's correct.  She was one of the

4  burglaries -- there were three, I believe, if memory serves me

5  correct, 2 or 3 burglaries.  And that charge -- that charge

6  stemmed from one of the burglaries.  He broke into the house;

7  and if memory serves me correct, he was smelling her panties or

8  something like that.  And she was in --

9  Q.    Excuse me for interrupting you.  I'm just asking you --

10  not about what you recall that you were told by somebody else

11  about the facts.  But that was allegedly the woman named

12  Latasha Martin; is that correct?

13  A.    Yes.

14  Q.    Okay.  Thank you.  Now, Mr. Allgood, during the penalty

15  phase, Mr. Hodges testified.  And on cross-examination, you

16  asked him a few questions.  And if you'd give me just one

17  moment, I want to put those on the screen.

18      Okay.  Mr. Allgood, this is from page 1016 of petitioner's

19  Exhibit 1.  And you were asking Mr. Hodges about his earlier

20  plea to the adjudicated burglary for which he was sentenced to

21  the RID program.  And you asked him, beginning here at line 13,

22  "You appeared in Court before another judge; is that correct?"

23      "Yes, sir."

24      "And you pled guilty to a charge of Mrs. Tatum's house; is

25  that right?"

1    And by the way, this is the same Bessie Tatum who was the

2 mother of the man who ultimately got killed, Isaac Johnson,

3 correct?

4 A.    That's correct.

5 Q.    Okay.  But now we're talking about the prior offense of

6 burglary, alleged burglary of her house to which he pled

7 guilty.  And then beginning with line 19, "And during the

8 course of that plea process, at one point in time, your lawyer

9 stood up and told the judge that Ms. Tatum did not want you to

10 go to the penitentiary, didn't he?"

11    Answer, "Not in my presence."

12    Question, "You didn't see that?"

13    Answer, "No, sir."

14    Question, "Isn't it true that also the assistant district

15 attorney who is handling the case, Jim Kitchens, stood up and

16 affirmed that that was so, that that was in fact what Ms. Tatum

17 requested?  Didn't he do that?"

18    "No, sir."

19    "You don't recall that happening at all?"

20    "No, sir."

21    "Do you recall that the State of Mississippi asked and

22 sought that you be sent to the penitentiary for 15 years?  Do

23 you recall that?"

24    "I don't know nothing about that."

25    "You didn't know nothing about that either."

DIRECT - ALLGOOD                Volume I, page  32

1      Was that what you asked him; was that how he answered?

2   A.    I did ask him that.   That is the transcript.   Let me give

3   you an explanation.

4   Q.    Well, I haven't asked you a question other than that.   My

5   question is this:   You weren't there in Court that day when he

6   was sentenced on this RID charge that you were asking him

7   about, were you?

8   A.    No, Mr. McDuff.   Let me explain what happened.

9   Q.    Let me ask you a question and then -- and then when it

10  comes --

11        **MR. MCDUFF:**   Your Honor, I ask he be allowed

12  to explain his answer.

13        **THE COURT:**   He will be allowed, but I'll allow

14  Mr. McDuff first to lay the foundation for his questions.

15      And then you'll have the right to respond.

16        **THE WITNESS:**   Thank you, Your Honor.

17  BY MR. MCDUFF:

18  Q.    Now, before you asked these questions, did you find any

19  sort of document in your file regarding that burglary case to

20  tell you these things were true and these things happened in

21  court that day?

22  A.    No.   I talked to Jim Kitchens.

23  Q.    Okay.   Did you bother to get a transcript of what happened

24  that day?

25  A.    There wasn't a transcript, I believe, at that time.

1  Q.    But you could have ordered one, couldn't you?  Did you

2  bother to order one?

3  A.    I did not order one, no.

4  Q.    Okay.  So you'd talked to Mr. Kitchens.  And when you'd

5  finished with this examination of Mr. Hodges, you immediately

6  told the judge that you had one witness in rebuttal; and that

7  you needed about 15 minutes to prepare.  Is that correct?

8  A.    I believe those were close to my exact words.

9  Q.    That witness was Jim Kitchens?

10  A.    That's correct.

11  Q.    Now, when had you talked to him?

12          **THE WITNESS:**  Well, if Your Honor please, may I be

13  allowed?

14          **THE COURT:**  You may.

15          **THE WITNESS:**  On the day this guilty plea took place

16  in 1998, I was in trial upstairs.  We frequently handed cases

17  off between us.  We're a small DA's office.  There was me and,

18  I think at that time, there were just three other lawyers in

19  the office.  I couldn't be present on every case that I

20  assigned to myself.  We assigned cases in the office.

21      I was in a hurry.  I had very strong feelings about this

22  case.  This man had two burglary charges and a sexual battery

23  or three burglary charges and a sexual battery; I cannot recall

24  which.  And I felt very strongly that he was dangerous.  On one

25  of those occasions, that he had --

1  **BY MR. MCDUFF:**

2  Q.   Mr. Allgood, I'm asking you now about your conversation

3  with Mr. Kitchens, please --

4  A.   And I'm getting there, Mr. McDuff.  On one of those

5  occasions, he had been found, as I said, smelling the panties

6  of the girl that got transferred --

7  Q.   With all respect, Mr. Allgood, you're not answering my

8  questions.  What did you say to Jim Kitchens?

9       **MR. MCNAMARA:**  Your Honor, the Court gave him leave

10  to explain his answer, Your Honor.

11      **THE COURT:**  He can explain his answer.  But he can't

12  launch into a narrative, Mr. Allgood.

13      **THE WITNESS:**  Yes, sir.

14      **THE COURT:**  So I'll ask that you keep your response

15  relevant to his question.

16      **THE WITNESS:**  I'll jump ahead then, Your Honor.

17      **THE COURT:**  All right.

18      **THE WITNESS:**  When I gave the file to Jim Kitchens on

19  that day, I told him he had to handle the guilty plea because I

20  was in that trial.  I told him I wanted nothing less than

21  15 years.  That was what my goal was.  I went ahead and did my

22  trial.  What transpired downstairs, I wasn't there to see.

23      **MR. MCDUFF:**  Okay.

24      **THE WITNESS:**  Subsequent to that, when this

25  particular matter came to the fore, so to speak, in the capital

1  sentencing phase, I talked to Jim probably -- I know it would

2  have been before the sentencing phase started, sometime like

3  that.  He was in a grand jury, if memory serves me correct,

4  down in Noxubee County.

5       And I either talked to him on the phone or maybe I talked

6  to him in the evening.  But I talked to him about the facts and

7  circumstances that had occurred at that guilty plea.  You see

8  things coming.  And I saw it coming.  And I figured Jim was

9  going to wind up being a witness.

10       Scott, at that time -- Scott Rogillio no longer worked for

11  me, if memory serves me correct.

12  Q.   And that's -- Rogillio, spell that for the court reporter.

13  A.   R-o-g-i-l-l-i-o.

14  Q.   Okay.  He was another assistant district attorney, though?

15  A.   He was another assistant district attorney.

16  Q.   All right.  So you spoke to Mr. Kitchens about it prior to

17  the beginning of the sentencing phase?

18  A.   Yes.

19  Q.   And then after you asked Mr. Hodges these questions about

20  "didn't your lawyer stand up in Court and tell Ms. Tatum that

21  you didn't want to go to the penitentiary and isn't it true

22  that Jim Kitchens also said that, and didn't the State of

23  Mississippi ask for and seek a 15-year penitentiary sentence,"

24  after he denied that, you had Mr. Kitchens on the stand to

25  rebut that, didn't you?

1  A.    I did.

2  Q.    And you called him as a witness, and Mr. Kitchens said

3  those things were true?

4  A.    I believe that's exactly right.

5  Q.    But they weren't true, were they?

6  A.    No.  They were true.

7  Q.    They were true?

8  A.    Yes.  The only difference --

9  Q.    Those things were said in court on the plea hearing that

10  day?

11  A.    Yes.  The only difference is that Jim Kitchens was not the

12  one who did the allocution.  Several years had passed.  It's

13  not surprising that he didn't recall actually who it was that

14  did the guilty plea.

15  Q.    And that was the only thing that was incorrect about what

16  he testified to under oath under questions from you?

17  A.    As far as I know.

18            __MR. MCDUFF:__  One moment, Your Honor.

19  __BY MR. MCDUFF:__

20  Q.    Okay.  This is Petitioner's Exhibit 3, Mr. Allgood.  This

21  is your direct examination of Mr. Kitchens -- I'm sorry -- at

22  the capital murder trial.  And Mr. Kitchens is saying that he

23  met with Bill Bambach, which was Mr. Hodges' attorney on the

24  burglary case.

25        Mr. Bambach said he talked with Ms. Tatum, who was the

1 victim of the burglary; and that she'd informed him that she

2 didn't want Mr. Hodges to go to the penitentiary.  He verified

3 the information by speaking to Ms. Tatum in the law library.

4 A.    And as far as I know, every bit of that is correct.

5 Q.    She said she didn't want him to go to the penitentiary --

6        MR. MCNAMARA:  I'm going to object, Your Honor.  He's

7 asking him -- Mr. Kitchens is available to testify.  This is

8 his testimony.  I believe he'd be the proper witness to go over

9 this with.  He's asking the witness to verify something that

10 there's another witness here that can do that for him.

11        THE COURT:  All right.  Your response?

12        MR. MCDUFF:  It's testimony that Mr. Allgood put on

13 the stand after having talked to Mr. Kitchens.  He put it on.

14 So he says the only thing that was different --

15        THE COURT:  Overruled.

16        MR. MCDUFF:  Thank you, Your Honor.

17 BY MR. MCDUFF:

18 Q.    Okay.  And you asked Mr. Kitchens to explain what the

19 Court was apprised of.  And Mr. Kitchens answered, "At the plea

20 hearing, after Quintez Hodges pled guilty to the charge that we

21 were there that day on, he put on a couple of witnesses to ask

22 for something less than what we were asking for because we were

23 asking that he go to the penitentiary."

24        "For how long?"

25        "Fifteen years."

1      "And what occurred at the conclusion of that?"

2      "At the conclusion of that hearing, Mr. Bambach stated to

3  the Court, Your Honor, Ms. Tatum, the victim's mom in this

4  burglary has indicated to me that she does not wish that

5  Quintez Hodges be sent to the penitentiary because he is the

6  father of her soon to be born grandchild."

7      "And what did you impart to the Court at that particular

8  point in time?"

9      "The Court asked me if that was in fact the case; and I

10  said, "Yes, Your Honor, it is.  I have spoken with Ms. Tatum

11  earlier that day, and she in fact indicated that she did not

12  want him to go to the penitentiary."

13      So that's what you called Mr. Kitchens up to the stand to

14  tell the jury.  Is that correct?

15  A.    Yes.

16  Q.    Okay.

17  A.    And as far as I know, every bit of that is true.  That is

18  what Jim related to me, and I believed him.

19  Q.    That's what he told you?

20  A.    Yes.

21  Q.    Now, I want to show you Petitioner's Exhibit 4, which is a

22  transcript.  It was subsequently obtained of the guilty plea

23  and the sentence.  It's 18 pages long.  And you'll see, sir,

24  before Judge Howard, November 17th, Mr. Rogillio was the

25  assistant district attorney.  Mr. Kitchens is not mentioned

1   there.

2   A.   But that doesn't mean Mr. Kitchens wasn't there.

3   Q.   I understand. And I want to go to page 5. Mr. Kitchens

4   had said that he had spoken to Bessie Tatum that day, and she'd

5   told him she didn't want him to go to the penitentiary. And I

6   want you to look down here, line 21, "Yes, sir, and we had --

7   the victim in this case, Bessie Tatum, Judge, I've been trying

8   to get in touch with her to have her here for aggravation.

9   I -- I can't get ahold of her." That was what Mr. Rogillio

10   said on November 17th?

11   A.   As I recall -- and I may be in error on this, and you

12   correct me. As I recall -- because the sentencing was actually

13   held on a separate day; was it not?

14   Q.   That's correct. This was November 17th when it was the

15   plea hearing in open court.

16   A.   At the sentencing phase, did not Ms. Tatum State that she

17   did not want him to go to the penitentiary?

18   Q.   Three days later they held the sentencing phase,

19   November 20th.

20      Okay. Here we go, November 20th, the sentencing. And

21   here's M. Rogillio's -- Mr. Kitchens had testified that he met

22   with Bessie Tatum in the library that morning, and she told him

23   she didn't want him to go to the penitentiary. Mr. Kitchens

24   doesn't speak here.

25      Mr. Rogillio says, "Your Honor, I talked to the witness in

1   this case yesterday, Ms. Bessie Tatum.  She expressed to me,

2   while she would have liked to have been here, she couldn't.

3   She had to work in Aberdeen.  She did say, though, she would

4   like her victim's impact statement to speak for her.  Although

5   she did say also, Your Honor, quite frankly, that her anger

6   towards him has somewhat subsided; but she still feels that he

7   should be punished."

8        Now the victim impact statement is Exhibit 6.  Here's the

9   first page of it.  It deals with the theft of a ring, alleged

10  theft of a ring.  And then here's the second page.  It says, "I

11  do not know the punishment he should have; I just want him out

12  of my family's life."

13       So Mr. Allgood, when you questioned Mr. Hodges about

14  Bessie Tatum, about it being stated in open court where

15  Mr. Hodges could hear that Bessie Tatum didn't want him to go

16  to the penitentiary and that the State wanted him to go to the

17  penitentiary for 15 years, and when Jim Kitchens got up and

18  testified about it, that wasn't true, was it?  That's not what

19  happened.

20  A.   Mr. McDuff, I'm still going to disagree with you.  As I

21  understand it, at some point, Ms. Tatum told the judge she

22  wanted him to get the RID program.  I've talked to Ms. Tatum

23  myself.  I talked to her before this trial.  I've talked to her

24  numerous times since the trial.  She wanted him to get the RID

25  program.  She expressed that, as I understand it, to the judge

1      Everything that happens in these things, Mr. McDuff, is

2  not on the record.  There are things that happen without the

3  courtroom.  For example, Jim Kitchens talking to Ms. Tatum,

4  having a conversation with the judge in chambers, things like

5  that are not put on the record.

6  Q.   Were you there that day?

7  A.   No, I was not.

8  Q.   Okay.

9  A.   Once again, I talked to Jim Kitchens.  I have no reason to

10 disbelieve him.  The man has never lied to me.

11 Q.   One other thing I want to show you, and then we'll

12 conclude.  Here's Mr. Bambach, again on November 20th.

13 Remember, Mr. Kitchens had testified under oath when you were

14 questioning that Mr. Bambach had told the judge that he'd

15 spoken with Bessie Tatum; and that she didn't want him to go to

16 the penitentiary.

17      Here it is, "Your Honor, our office was called yesterday

18 when I was not there; but Ms. Tatum had told my secretary that

19 she'd discovered her daughter was continuing a one-sided letter

20 campaign."  Never said what Bessie Tatum wanted about the RID

21 program or the penitentiary or anything else.

22      And I guess, Mr. Allgood, my question -- my final question

23 to you is this -- actually, two more questions.  You obviously

24 thought that what happened that day, during that burglary

25 sentencing, and what had been said in open court in front of

1  Mr. Hodges was important enough to put that on in evidence

2  before the capital jury in this sentencing phase; is that

3  correct?

4  A.   Obviously so.

5  Q.   Now, when something in the penalty phase of a capital case

6  is so important that you call an assistant district attorney

7  from your office as a witness under oath, shouldn't the judge

8  and the defense lawyer and the jury be able to rely on it being

9  true?

10 A.   Well, if you would allow me to say so, it was true.  And

11 yes, they should rely on it being true.

12 Q.   And how do you know it's true when all of the things that

13 you cross-examined Mr. Hodges about and all of the things that

14 Mr. Kitchens testified under oath to that Bambach told the

15 judge in open court, that Bessie Tatum did not want him to go

16 to the penitentiary; that Jim Kitchens told him in open court

17 that Bessie Tatum didn't want him to go to the penitentiary;

18 that the State sought a sentence of 15 years, with none of that

19 being in the transcript of what actually happened, how do you

20 know it was true?

21 A.   Does that mean it didn't occur, Mr. McDuff?  Of course

22 not.

23 Q.   It means it did not occur in open court, which was the

24 basis of your question to Mr. Hodges.  And that was the

25 substance of Jim Kitchens' testimony; isn't that correct?

1  A.    Just because it didn't occur in open court doesn't mean it

2  did not occur.  It occurred.

3  Q.    How do you know it occurred?

4  A.    After the guilty plea took place --

5  Q.    How do you know it occurred?

6  A.    I'll tell you.  After the guilty plea took place, one of

7  my first questions to Jim Kitchens when I saw him again was,

8  "What happened?  What did he get?"  Because I was acutely

9  interested in that case.  And at that time, Jim told me

10 substantially what he testified to subsequently in this

11 hearing.

12      He told me that Ms. Tatum showed up and took the part of

13 the defendant.  He told me that Ms. Tatum wanted the defendant

14 to go to the RID program.  He told me that although they asked

15 for 15 years, they were sitting over at the table drawing on

16 the -- I say *they*.

17      Scott and Jim were sitting at counsel table actually

18 doodling, guessing at which one was coming closer to what

19 Howard would do, the sentencing judge would do.  One was

20 putting eight years down; one was putting ISP or RID or

21 something like that down.  And that the Judge went with the

22 victim, with Ms. Tatum, and gave him the RID program.  That was

23 all imparted to me, I would assume, on the 20th.

24      Because it was shortly thereafter -- I know as soon as it

25 happened, I wanted to know what happened in that case.  So when

1  Jim Kitchens tells me again at the time of the sentencing

2  phase, in September of '01, that just reinforces what I already

3  knew to be true, what I had already heard back in '98 or '99,

4  whenever that guilty plea took place.  And everything that I

5  know about that hearing is what is related to me by either Jim

6  Kitchens or Scott Rogillio because, no, I was not there.

7  Q.   And if Kitchens was telling you the truth to such an

8  extent that you can rely on it and he told you that Bessie

9  Tatum was down there that day, why in the world would it say in

10 the transcript on November 17th, Mr. Rogillio say, "Your Honor,

11 I can't reach her."  And why would it say on November the 20th,

12 "Your Honor, I spoke to her yesterday; and she said she wanted

13 the victim impact statement to speak for itself.  But she wants

14 him to be punished"?

15 A.   Well, if you're asking me why, I would suggest -- to me,

16 it suggests that he talked to her before the hearing, the

17 sentencing hearing on the 20th; and that she wasn't physically

18 present in the courtroom.

19 Q.   And Mr. Rogillio would have accurately related to the

20 judge what he had been told, correct?

21 A.   We're talking about two different times.  You're talking

22 about the guilty plea on the 17th with that question.

23 Q.   I'm talking about both.  If Mr. Rogillio said something to

24 the judge about what Ms. Tatum told him, you would expect it to

25 be accurate, correct?

1  A.    I would expect for Scott to believe it to be true, yes.

2            **MR. MCDUFF:**  No further questions.

3            **THE COURT:**  All right.  Do you wish to question the

4  witness, Mr. McNamara?

5                         **CROSS-EXAMINATION**

6  **BY MR. MCNAMARA:**

7  Q.    Mr. Allgood, your testimony before that the Hodges'

8  burglary of Ms. Tatum's home, that was originally -- you had

9  assigned that to yourself?

10  A.    Yes.

11  Q.    And you subsequently gave it to Jim Kitchens to handle?

12  A.    Well, yeah, I handed him the file and asked him to go do a

13  guilty plea and gave him about a five second briefing on the

14  thing because I had to be over in a trial myself.

15       And that wasn't uncommon.  That's not the ideal way to do

16  business, but that was not uncommon with us because there was

17  not many of us in the office.  And it's a hectic environment

18  and, you know, that was best as could be done at the moment.

19  Q.    Okay.  And as you stated earlier, you gave him explicit

20  instructions that he was to ask for 15 years; is that correct?

21  A.    I wanted 15 years.

22  Q.    Okay.  And he went off to the hearing.  So he and --

23  there's been stated that he and Mr. Rogillio did this together.

24  Was it unusual for them to handle cases together in the

25  courtroom?

1  A.    We did that kind of thing all the time; and it was

2  invariably impromptu, invariably one of those things that just

3  cropped up.  But it would happen frequently that two of us

4  would find ourselves in the courtroom together, and we would do

5  things together.  We were -- I mean, we knew what the other one

6  would be doing without even saying so a lot because we worked a

7  lot together.

8  Q.    Okay.  The offer of 15 years was made.  It was rejected.

9  In your office at that time, or possibly at this time, when

10  someone rejects the guilty plea, what is the next process if

11  they're going to enter a plea in court?

12  A.    Well, I know what I was willing to do.  The Latasha

13  Martin, as I recall, she had been --

14          **MR. MCDUFF:**  Objection to relevance and to hearsay.

15          **MR. MCNAMARA:**  This was gone into on direct, Your

16  Honor.

17          **THE COURT:**  As to Ms. Martin?  Did he say Ms. Martin?

18          **MR. MCNAMARA:**  Yes.  Latasha Martin, Your Honor.

19          **THE COURT:**  Did you go into this, Mr. McDuff?

20          **MR. MCDUFF:**  No, sir.

21          **THE COURT:**  I don't recall Ms. Martin.

22          **MR. MCNAMARA:**  This was the one where the -- the

23  attempted sexual battery.  It was discussed at length, and Mr.

24  Allgood was questioned at length about the --

25          **MR. MCDUFF:**  I discussed it in the context of opening

1  the door during the aggravation stage --

2              **THE JUDGE:**  You opened that door also, Mr. McDuff.

3              **MR. MCDUFF:**  Thank you, Your Honor.

4              **THE COURT:**  Overruled.

5              **THE WITNESS:**  Latasha Martin was, as I recall, an

6  airman in the United States Air Force; and she had been

7  transferred to Guam or someplace over on the Asian rim.  And I

8  knew that case wasn't going to fly because we'd lost her

9  functionally.  We'd never get her back.

10      And you know, I was anxious that we get a substantial

11  sentence out of the burglaries.  I was willing to let him plead

12  to one count and retire the others, which is what we did.

13  **BY MR. MCNAMARA:**

14  Q.   Okay.  And 15 years was the offer, correct?

15  A.   Fifteen years was what I wanted.  Fifteen years was what

16  was communicated to defense counsel, or what should have been

17  communicated to defense counsel.  And ultimately, defense

18  counsel did what several defense counsel will do when they

19  receive an offer that's unpalatable, they elected to plead

20  open.

21      Open, in our context -- I don't know what it means in this

22  Court -- but that just means a plea without benefit of a plea

23  bargain, throw themselves on the mercy of the court; that's the

24  TV and movie phrase they use all the time.

25              **MR. MCNAMARA:**  Okay.  I may have to ask your help on

1  this, Mr. McDuff.

2          **MR. MCDUFF:**  Do it this way.

3  **BY MR. MCNAMARA:**

4  Q.   Okay.  I refer to what is in evidence as Exhibit 31,

5  Ms. Bessie Tatum's -- a section of her deposition that she gave

6  in regards to this case, this hearing.

7          **MR. MCDUFF:**  Your Honor, I'm going to object to that.

8  The deposition is in evidence.  It's hearsay with respect to

9  Mr. Allgood.

10          **THE COURT:**  Is Mr. Allgood doing the questions here?

11  Who's doing the questioning, Mr. McNamara?

12          **MR. MCNAMARA:**  I'm sorry, Your Honor?

13          **THE COURT:**  Who's doing the questioning in this

14  document?

15          **MR. MCNAMARA:**  I am, Your Honor.

16          **THE COURT:**  No.  In the exhibit that you're

17  presenting.

18          **MR. MCNAMARA:**  That would be me, Your Honor.  I'll

19  withdraw it for now.

20          **THE COURT:**  Sustained.

21          **MR. MCNAMARA:**  I'll just refer the Court to it for

22  its own reading.

23          **THE COURT:**  Sustained.

24          **MR. MCNAMARA:**  That's all I have, Your Honor.

25          **THE COURT:**  Okay.  Any redirect?

 1            **MR. MCDUFF:**  Nothing, Your Honor.

 2             **THE COURT:**  All right.  You may step down.  Is he

 3  free to go?

 4            **MR. MCDUFF:**  He is.

 5            **THE COURT:**  Who would you call next?

 6            **MR. MCDUFF:**  Jim Kitchens.

 7       (THE WITNESS IS SWORN)

 8         **JIM KITCHENS, PETITIONER'S WITNESS, SWORN**

 9                   **DIRECT EXAMINATION**

10  **BY MR. MCDUFF:**

11  Q.   Good morning.

12  A.   Good morning.

13  Q.   State your name for the record.

14  A.   James Thomas Kitchens, Jr.

15  Q.   What is your current position?

16  A.   I am a circuit judge in the 16th judicial district.

17  Q.   How long have you been a circuit judge?

18  A.   A little over seven years now.

19  Q.   Okay.  And prior to that time, what was your occupation?

20  A.   I was an assistant district attorney from July of 1996

21  until December of 2002.

22  Q.   Okay.  And in 1998, you were involved in -- you apparently

23  were present during a plea hearing for a burglary case

24  involving Quintez Hodges; is that correct?

25  A.   I was.

DIRECT - KITCHENS                    Volume I, page  50

1   Q.    Okay.  And in September 2001, you actually were called as

2   a witness to testify at the penalty phase of Mr. Hodges'

3   capital murder case; is that correct?

4   A.    I was.

5   Q.    Okay.  Judge Kitchens, I want to refer you to what's

6   Petitioner's Exhibit 3, which is a transcript of your testimony

7   in the capital murder case.  And I'm going to go to page 1027.

8   And I want to start out -- excuse me one second.  Actually, I

9   want to start on page 1026.

10      You're being questioned by Mr. Allgood.  And you said that

11  you met with Bill Bambach, who was Mr. Hodges' attorney on the

12  burglary case.  You were talking about that.

13  A.    Right.

14  Q.    And you said -- excuse me.  Question, "When you met with

15  Mr. Bill Bambach, what information did you receive insofar as

16  the wishes of the victim in this particular case?"

17      Answer, "Apparently, Mr. Bambach had talked to Ms. Tatum,

18  who was the victim of the burglary that he was pleading guilty

19  to on that day; and he had informed me that she did not want

20  Quintez Hodges to go to the penitentiary."

21      Question, "And what effort did you make to verify that

22  information?"

23      Answer, "I got with Ms. Tatum, I believe, in the library,

24  right in here.  And I spoke to her, and I talked to her about

25  the case and about my concerns and about her -- now we'll go to

 1    page 1027 -- about her concerns.  And she said that she did not

 2    want him to go to the penitentiary."

 3         Question, "Now, subsequently, at the plea hearing, explain

 4    for the ladies and gentlemen of the jury what happened insofar

 5    as that is concerned, that is, insofar as whether or not the

 6    Court was apprised, and by who the Court was apprised, of that

 7    information."

 8         Answer, "At the plea hearing, after Quintez Hodges pled

 9    guilty to the charge that we were there that day on, the

10    burglary, he put on a couple of witnesses to ask for something

11    less than what we were asking for because we were asking that

12    he go to the penitentiary."

13         Question, "For how long?"

14         "For 15 years."

15         "And what occurred at the conclusion of that?"

16         "At the conclusion of that hearing, Mr. Bambach stated to

17    the Court, 'Your Honor, Ms. Tatum, the victim's mom in this

18    burglary, has indicated to me that she does not wish that

19    Quintez Hodges be sent to the penitentiary because he is the

20    father of her soon to be born grandchild.'"

21         Question, "And what did you impart to the Court at that

22    particular point in time?"

23         Answer, "The Court asked me if that was in fact the case;

24    and I said, "Yes, Your Honor, it is.  I have spoken with

25    Ms. Tatum earlier this day, and she in fact indicated that she

1  did not want him to go to the penitentiary."

2      Now, that's what you testified to at the capital murder

3  trial; is that correct?

4  A.   That's right.

5  Q.   Now, have you since read -- oh, actually, before I get to

6  that, let me ask you this:  Before you were going on the stand

7  to testify at this capital murder trial, did you attempt to

8  obtain from the court reporter a transcript of what happened

9  that day during that burglary plea?

10  A.   Are you talking about November 17th or the November 20th

11  hearings?

12  Q.   Yeah.  I'm talking about when you were -- before you

13  testified in the capital murder trial, did you go to the court

14  reporter and ask for a transcript of what happened at that

15  guilty plea and sentencing that you were about to testify

16  about?

17  A.   No.  As I --

18  Q.   Did you go to the court reporter and ask her to read it to

19  you?

20  A.   Mr. McDuff, as I recall, this happened the week of

21  September 11th, 2001, this trial.

22  Q.   Before you explain, let me ask you the question:  Did you

23  ask the court reporter to read it to you?

24  A.   No.  No.  Because I --

25  Q.   Okay.  Go ahead.

1  A.    Because as far as I know, it had not been transcribed.

2  And quite frankly, I didn't even know for certain I was going

3  to be called as a witness.  I was handling the court term in

4  Noxubee County because Mr. Allgood and Ms. Favor was in Lowndes

5  County trying this case.

6      So I got a call while I was in Noxubee County from

7  Mr. Allgood saying, "Hey, come up here.  I need to put you on

8  the stand about Quintez Hodges."  So that was pretty much the

9  advance notice I got, as I recall, about being called to

10  testify in the case.  I know I didn't talk to Ms. Burnette.

11  Q.    Ms. Burnette was the court reporter?

12  A.    Kathleen Burnette was Judge Howard's court reporter at

13  that time.

14  Q.    Okay.  And, Judge Kitchens, you had subsequently read the

15  transcript of what happened on November 17th and November 20th;

16  is that correct?

17  A.    That's right.

18  Q.    Now, was your testimony before the capital jury wrong?

19  A.    I did not do the plea colloquy; Mr. Rogillio's the one

20  that did the actual plea colloquy.  So insofar as that goes,

21  yes, it was.  Now, so that you'll know, and so that Judge Mills

22  and everybody else will know, there was a lot of discussion

23  that we had with Judge Howard; and I was involved in all of

24  this, as he's on the bench.  But Judge Howard's court reporter

25  was a pen writer.  She didn't take everything down.  And a lot

1  of times there was discussions at the bench, and that's what we

2  were doing.

3       So, yeah, it was wrong insofar as I didn't do the plea

4  colloquy; and it was wrong -- it was actually Mr. Rogillio that

5  told the judge that the victim, Ms. Tatum, didn't want Quintez

6  to go to prison.  I thought it was Mr. Bambach.

7       But like I said, I had not had the transcript read to me

8  nor did I read it, because I don't think it was even done at

9  that time.  I think y'all had that done on appeal, as I recall.

10  Q.   Okay.  Let's go to that transcript.  This is petitioner's

11  Exhibit 4.  And is it correct that the guilty plea was done on

12  November 17th and subsequently the sentencing was held on

13  November 20th?  Is that correct?

14  A.   That's right.  That's at least what those documents

15  indicate, and I have no reason to dispute that.

16  Q.   Now, you had told the capital jury that -- at the plea

17  hearing, you had spoken to Ms. Tatum in the library that

18  morning?

19  A.   Right.

20  Q.   Is that true?  Had you spoken to her in the library that

21  morning?

22  A.   I'd either spoken to her in the library that morning or

23  either the day before in the library.

24  Q.   Okay.

25  A.   But I --

1  Q.   Go ahead.

2  A.   There's been a lot of cases since then.  There were a lot

3  of cases I'd had in between them.  But my recollection is I'd

4  spoken to her that morning, Mr. McDuff, the 20th.

5  Q.   And the transcript shows that Mr. Rogillio conducted the

6  hearing.  You're saying you were there as well in that hearing,

7  in the plea hearing?

8  A.   Yeah.  Yeah.  Yeah.

9  Q.   Okay.  All right, page 5, I want you to look down at line

10  21.  Mr. Rogillio, "Yes, sir, and we had -- the victim in this

11  case, Ms. Bessie Tatum, Judge, I've been trying to get in touch

12  with her to have her here for aggravation.  I -- I can't get

13  ahold of her."  Now, at some point, did you stand up and say,

14  "Wait a minute, Judge; I actually spoke to her in the library;

15  or I spoke to her the day before?

16  A.   What day is this part of the transcript?

17  Q.   This is November 17th.

18  A.   No.  I didn't talk to her on the 17th.  I either talked to

19  her on the 19th or the 20th.  If you were talking about the

20  17th, then I misunderstood your question.  No, we did not talk

21  to her that morning, the 17th.

22  Q.   On the day of the plea hearing, you did not talk to her?

23  A.   No.  It was either the 20th or the 19th when we spoke with

24  her.  I want to say it was on the morning of actual sentencing

25  hearing, the 20th.  But somewhere in this plea colloquy, I

1  think on the 20th, Mr. Rogillio indicates that he had talked to

2  her the day before; and that -- that may have been.  He may

3  have talked to her also.

4      But I talked to her -- I want to say that I remember it

5  being the morning of the 20th in the law library, which was

6  outside of the second floor courtroom, which is where we were

7  on the September 2001 day.

8      This guilty plea was done in the downstairs courtroom in

9  Lowndes County on the 17th and the 20th.  But when I testified

10 in his death penalty case, we were upstairs; and the law

11 library is right outside of that courtroom.  But, no, I did not

12 talk to her on the 17th.

13 Q.   Okay.  So let's go to the 20th.  Right here is the

14 sentencing (indicating.)  Now, you testified for the jury that

15 she had told you, and that you had communicated to the judge,

16 that she did not want him to go to the penitentiary.

17      This is what Mr. Rogillio says in open court, "Your Honor,

18 I talked to the victim in this case yesterday, Ms. Bessie

19 Tatum.  She expressed to me that while she would have liked to

20 be here she couldn't; she had to be at work in Aberdeen.  She

21 did say, though, that she would like her victim's impact

22 statement to speak for itself.  Although she did also say, Your

23 Honor, quite frankly, that -- excuse me -- her anger towards

24 him has somewhat subsided, but she still feels that he should

25 be punished."

1      Now, Judge Kitchens, did you stand up and say, "I just

2   talked to her in the library this morning," or "I talked to her

3   in the library yesterday; and she said she doesn't want him to

4   go to the penitentiary at all"?

5   A.    No, I did not stand up; and there's a couple of reasons

6   for that.  One, I didn't know whether Mr. Rogillio had spoken

7   to her the day before or not; but also -- I don't think you do

8   much practice in my district, and I don't know how much you've

9   ever done in front of Judge Howard.  You do not speak off the

10  record if you're not the one doing the plea colloquy with Judge

11  Howard.  You don't do it.

12      Now, in my courtroom, I will let people speak; and I will

13  identify them.  But Howard's courtroom, if you start the plea

14  colloquy, you're the one that does it, nobody else.  You don't

15  interrupt or he will embarrass you.  He is my cojudge, and

16  that's the way he does it.  I do it differently.

17      So, no, I didn't stand up because I didn't care to be

18  chewed out that day; and I wasn't with Mr. Rogillio every

19  moment of the intervening time period.  So I don't know whether

20  he talked to Ms. Tatum the day before or not.

21  Q.    Is there any indication in this transcript -- you've read

22  it -- that you tugged on Mr. Rogillio's arm and said, "Wait a

23  minute; I talked to her today in the library; I talked to her

24  yesterday in the library; tell the judge that she told me she

25  doesn't want him to go to the penitentiary."  Was that ever

1  said in this hearing?

2  A.    Mr. McDuff, no, I didn't pull his sleeve.  But we relayed

3  to the judge that she didn't want him to go to prison.  She did

4  not want Mr. Hodges to go to prison.  She thought he was the

5  father of her soon to be born grandchild and that's what she

6  said.

7  Q.    And your recollection today is that you related it to him

8  at the bench?

9  A.    Yeah.  We had a number of conversations; and I recall we

10  went back into chambers at one point, Bill Bambach, myself,

11  Mr. Rogillio, and the judge, in the downstairs chambers.

12  Q.    Okay.  Now, you had also testified, in front of the jury

13  in the capital case, that Mr. Bambach had told the judge, in

14  open court, that Ms. Tatum wanted him not to go to the

15  penitentiary.

16      And I want to go to page 11, September 20th hearing.

17  Mr. Bambach speaking to the judge, "Your Honor, our office was

18  called yesterday when I was not there; but Ms. Tatum had told

19  my secretary that she had discovered that her daughter was

20  continuing a one-sided letter campaign to the defendant..."

21  And it goes on and on and on.

22      And he never says there -- and you've read the transcript.

23  He never says there that Ms. Tatum had told him that she didn't

24  want Mr. Hodges to go to the penitentiary, does he?

25  A.    He does not say specifically, no, Ms. Tatum does not want

1   him to go to prison.  What he does is he minimizes the burglary

2   because it's a family friend, that kind of thing.  But the

3   reason we even knew to talk to Ms. Tatum was because

4   Mr. Bambach had told us to begin with, "Ms. Tatum doesn't want

5   him to go to prison."

6   Q.   But he didn't tell that to the judge in open court as you

7   had testified before the capital murder jury, did he?

8   A.   I think that's what he's telling right there.

9   Q.   Where does he say, "Judge, she doesn't want him to go to

10  the penitentiary"?

11  A.   Mr. McDuff, he doesn't say it in those words; but what

12  he's saying is those are family friends.  This is -- the

13  daughter's got a continuing one-sided relationship with him.

14  No, he doesn't say exactly, "No, she doesn't want him to go to

15  prison."

16  Q.   Okay.  Now, you also testified before the capital murder

17  jury that the State asked Judge Howard, in open court, at the

18  plea hearing, to sentence the defendant to 15 years.  Where, in

19  this transcript, which you've read, November 17th or

20  November 20th, did you or Mr. Rogillio or anybody else

21  representing the State of Mississippi ask the judge to impose a

22  15-year sentence on Mr. Hodges?

23  A.   I've reviewed this.  I don't see where it's on this record

24  where we said 15 years.  Like I said, we talked to the judge at

25  the bench.  We talked to him in chambers.  He knew what the

 1  State had recommended.

 2          **MR. MCDUFF:**  One moment, Your Honor.

 3      Nothing further, Your Honor.

 4          **THE COURT:**  All right.  Any cross?

 5                    **CROSS-EXAMINATION**

 6  **BY MR. MCNAMARA:**

 7  Q.   Judge Kitchens, in this burglary of Ms. Tatum's home,

 8  you're saying it was 1998?

 9  A.   Yes, sir.  That's when the guilty plea was.  I don't

10  recall when the alleged -- well, not the alleged.  I don't

11  recall when the burglary occurred.  I assume it was sometime in

12  1998.

13  Q.   But you became aware of it because you were assigned by

14  Mr. Allgood to handle the plea?

15  A.   As I recall, Mr. McNamara, what happened on the morning of

16  17th, Mr. Allgood was in trial on some case or going to be in

17  trial.  I lived in Lowndes County.  I was the only assistant DA

18  that lived in Lowndes County.  I got to the office early

19  because I usually did.

20      I got to the office, was upstairs.  He called me back to

21  his office and said, "Jim, I've got this guy, Quintez Hodges;

22  he's got several burglaries.  He's going to plead this morning.

23  His attorney is -- is -- he said Wambam, as I recall,

24  Mr. Bambach; that was his nickname for Mr. Bambach.

25      "I want 15 years.  This guy's a bad guy."  And he kind of

1  explained a little bit about the charges, gave me the files,

2  and sent me on my way to the courthouse to do the plea in front

3  of Judge Howard.

4      At some point, Scott and I hook up; and Scott ends up

5  doing the plea colloquy.  So yeah, he -- the case was assigned

6  to Mr. Allgood, but it was kind of a common practice when

7  somebody -- when you were tied up in a trial, you get somebody

8  else to do your pleas.  That was not uncommon.

9  Q.    Do you recall Mr. Allgood instructed you to request

10 15 years?

11 A.    Yeah, that's what he wanted.  The guy was looking at 3 to

12 25 on each of the burglaries if we'd gone to trial, seven years

13 on the school burglary, and I don't remember what the attempted

14 sexual battery carried at that time.  I think it was maybe up

15 to 20 years, something to that effect.  So he was looking, at

16 least on the face of the indictments, a lot of time.  And

17 that's what Mr. Allgood wanted, 15 years.  It's where I got the

18 15 from.

19 Q.    Okay.  And that offer of 15 years, your testimony is you

20 did convey that to the defense counsel and to the trial court

21 judge?

22 A.    Yeah.

23 Q.    Or sentencing judge?

24 A.    Yeah.  That's why Mr. Bambach pled open.  He pled open

25 because he didn't like the recommendation.  He wasn't wanting

1  more time; he was wanting less time or no time.

2  Q.    Okay.  And in the -- was it unusual for yourself and

3  Mr. Rogillio to work together on these type hearings?

4  A.    No.  Scott and I did a number of death penalty cases

5  together.  And I mean, he and I are friends; and we were

6  friends back then.  And we tried cases together, and we would

7  do pleas for each other and rotate back and forth.  So, no, it

8  was not uncommon for us to work together on things.

9  Q.    Let me see if you can identify -- this is Respondent's

10  Exhibit 36.  And I'm not able to focus it just now.

11  A.    I think it's reversed on there too, Mr. McNamara.

12  Q.    I got it wrong?

13  A.    There we go.

14  Q.    I'm sorry.  All right.  Can you identify that?

15  A.    Yeah.  That appears to be a copy of the manila file folder

16  on the burglary of Ms. Tatum's home, 98-430-CR-1 is the Lowndes

17  County Circuit Court cause number.  And it's got on it some

18  handwriting.

19       There's a dot.  I don't know if y'all have got the

20  original.  But that dot would have been color coded.  Mr.

21  Allgood's dot was blue.  So any case assigned to Mr. Allgood

22  would have a blue dot.  I was the green dot case guy.

23  Mr. Rogillio had the orange dots.  Ms. Purnell had the pink

24  dots.  And Robert Ruby had the yellow dots.  And that's how we

25  knew -- you could pick up a file, and that's how you knew who

1  it was assigned to.

2      Ms. Purnell was given the pink dot not because she was a

3  female, it was just that was the color she inherited.  Before

4  that, it was Rob Ray's color.

5  Q.   I'd asked you on there -- there's some scribbling and

6  numbers.  Could you explain to the Court the significance of

7  that, please?

8  A.   Sure.  The handwriting in kind of the upper left corner,

9  1195, it says PG, 7 years MDOC, recommended RID.  I think

10  that's what that says or received, r-e-c-c.  It's a little bit

11  bright or dim.  That's actually what the judge sentenced

12  Mr. Tatum to on this case.  And that was written down

13  concurrently on the file as the judge was basically handing

14  down his sentence.

15      The scribbling in the lower right-hand corner, the eight

16  years is Mr. Rogillio's handwriting.  You see that 8 Y-R-S,

17  that's Scott's handwriting; and he's underlined it.  That ISP

18  is my handwriting.  What we were doing is we were sitting there

19  trying to figure out -- as Judge Howard was talking about what

20  he was going to give him -- Scott was guessing Howard was going

21  to give him eight years.  I was guessing he was going to put

22  him on house arrest.

23      What Scott thought was that, essentially, he would split

24  the baby.  He would give him half of 15 years or almost a

25  little over half; that's where the eight years came from.  I

1  knew Judge Howard probably wasn't going to send him to prison,

2  one, because he knew the victim didn't want him to go to

3  prison --

4            **MR. MCDUFF:**  Objection, Your Honor.

5            **THE COURT:**  Anyways, the ISP is what I thought Judge

6  Howard was going to give him, which is house arrest.

7  **BY MR. MCNAMARA:**

8  Q.   You testified a moment ago that the offer of 15 years was

9  conveyed to the defense and to the judge; is that correct?

10  A.   That's right.

11  Q.   Even though it does not appear in that transcript of the

12  plea colloquy?

13  A.   That's correct.

14  Q.   I'd asked you also, in your conversation with Ms. Tatum,

15  with Bessie Tatum, did you, as well, inform the defense and the

16  Court of Ms. Tatum's desire that he not be sent to prison?

17  A.   We did.  We told the Court and Ms. Tatum and Mr. Bambach.

18  Mr. Bambach's the one that told us she didn't want him to go to

19  prison.

20  Q.   And you confirmed that?

21  A.   Yeah.

22  Q.   So the Court was fully informed?

23  A.   Absolutely.

24            **MR. MCNAMARA:**  That's all I have, Your Honor.

25            **THE COURT:**  All right.  Any redirect?

1          **MR. MCDUFF:**  Briefly, Your Honor.

2                    **REDIRECT EXAMINATION**

3   **BY MR. MCDUFF:**

4   Q.   Judge Kitchens, you testified that you had been summoned

5   by Mr. Allgood, or been called by Mr. Allgood, to come from

6   Noxubee County, where you were in Court, to be available to

7   testify at this capital hearing.

8        Are you aware of any effort made by Mr. Allgood to call

9   the court reporter, Kathleen Butler, from the prior burglary

10  proceeding, to be available to testify so that she could give

11  the capital jury an accurate rendition of what happened in open

12  Court that day?

13  A.   Mr. McDuff, all I know is I was in Court in Noxubee

14  County; and he calls me.

15  Q.   The question is very simple.  Are you aware of any effort

16  by Mr. Allgood to have the court reporter available to testify

17  to the capital jury?

18  A.   Do I have personal knowledge of any conversations he had

19  with Ms. Burnette?  No.

20  Q.   Okay.  Thank you.

21  A.   No.

22          **THE COURT:**  All right.  Is this witness finally

23  excused?

24          **MR. MCDUFF:**  He is, Your Honor.

25          **THE COURT:**  You're free to go.

1              **THE WITNESS:**  Thank you.

2              **MR. MCNAMARA:**  Your Honor, I don't intend to call any

3  witness out of turn at this time.

4              **THE COURT:**  Okay.  Mr. McDuff, would you like to

5  start with a new witness or would this be a good time to take

6  our recess?

7              **MR. MCDUFF:**  This would be a good time to take a

8  recess, Your Honor.

9              **THE COURT:**  All right.  Would one o'clock be a

10 reasonable time?  It's about 11:35 now.

11             **MR. MCDUFF:**  Certainly.

12             **THE COURT:**  Okay.  Let's take our noon recess.  I'll

13 ask the attorneys to be back at one o'clock.  The Court will be

14 in recess.

15    (LUNCH RECESS AT 11:41 a.m. UNTIL 1:00 P.M.)

16    (CALL TO ORDER OF THE COURT).

17             **THE COURT:**  Are we ready to proceed?

18             **MR. MCDUFF:**  We are, Your Honor.

19             **THE COURT:**  You ready, Mr. McNamara?

20             **MR. MCNAMARA:**  Yes, Your Honor.

21             **THE COURT:**  Who would you call next?

22             **MS. KAO:**  Your Honor, our next witness will be the

23 20-minute videotape of Mr. Michael Miller.  And Mr. McNamara

24 and I have agreed that the problematic portions we will mute

25 while the video is playing.  There has been a copy that's been

 1 filed with all of those things redacted, and I think that's

 2 been agreeable to Mr. McNamara.  And in addition, at the end of

 3 the hearing, we will provide a brand-new disk with these

 4 excerpts but with all of the offending pieces bleeped out,

 5 essentially.

 6          **THE COURT:**  And I appreciate the way y'all have

 7 handled that; I sure do.

 8          **MS. KAO:**  Thank you.

 9          **THE COURT:**  All right.  How do you wish to present

10 the deposition?  It is a deposition, isn't it?

11          **MS. KAO:**  It is a deposition, and we will do it by

12 videotape.

13          **THE COURT:**  All right.  You may at this time, if

14 you're prepared to go forward.

15     (VIDEOTAPE EXCERPTS PLAYED OF MIKE MILLER'S DEPOSITION).

16 Q.   In the last sentence of paragraph, you indicated, "I have

17 spoken to Mr. Hodges and several family members but have not

18 had time to conduct an investigation."  Do you see that, sir?

19 A.   Yes.

20 Q.   Okay.  At the time of August of 2001, after you took the

21 case, did you set out a plan, have a plan of how you might

22 investigate the underlying facts of this case?

23 A.   You know, there -- at some point, I'm going to have to

24 describe to you that there's some -- you know, maybe when you

25 get to the point about the trial, but I had some real bad

1  personal problems come up during this trial.

2      And I just -- one of the -- there came a point where I

3  began to have a personality disintegration.  And I ended up

4  being committed in Lowndes County Chancery Court, and I had to

5  go to the hospital for ten days or nine days.  And that was the

6  end of my legal practice there.  That was in January of 2003.

7      But what led to that, besides bipolar disorder and also

8  abuse of substances, what led to that was -- the genesis of

9  where my personality started to just disintegrate and splinter

10 was this trial.  And what happened is one of the witnesses for

11 the -- for the prosecution had sexually abused me when I was

12 five years old, in kindergarten.  And I recovered that memory.

13     I had suppressed that memory of that sexual abuse from

14 1979 until 2001.  And it came back and my head started swimming

15 with all those thoughts and just -- I mean, I fell apart

16 emotionally.  After the trial, the first thing I did was I

17 began to drink heavily.  And I just tried to put -- sort of put

18 all the -- the genie back in the bottle and quit thinking about

19 it and escape from it all.

20     But -- and I'll go ahead and tell you this too, if it's

21 okay.  When -- the only -- I received one thing in the mail

22 from Forrest Allgood, the district attorney; and it was a copy

23 of a -- this was in August of 2001.  I believe late August, to

24 the best of my recollection.  (Pause.)

25     And I went to the post-office box that I kept on Military

1   Road in Columbus, and I answered my mail and got my mail out.

2   And I was -- I noticed it was from the district attorney; and I

3   said, "Well, I better open this."  And, so, I opened it in the

4   parking lot.

5        And I'm standing there under the parking lot lights and I

6   open it, and it's this drawing (pause) of the same person that

7   sexually abused me when I was at First Presbyterian

8   Kindergarten when I was five years old.  And at that moment, I

9   pretty much felt like my heart stopped beating.  And I started

10  sweating, and I started having real bad flashbacks.

11       Because up until that time, the only thing that would

12  happen is -- the only memory I had of kindergarten -- and I

13  have a photographic memory, by the way, for the most part, a

14  pretty good memory.  It's a blessing and a curse.

15       But the only memory I had of kindergarten was after the

16  abuse took place.  It was when this (pause).  After he came and

17  visited the preschool, the only thing I remember about our

18  kindergarten -- the only thing I remember is afterwards, after

19  the sexual abuse had taken place, standing on the playground by

20  the swing set and feeling like the only person in the entire

21  universe, feeling just so alone.

22       And he had told me that I should never tell anyone because

23  bad things happen to people who tell this stuff.  And he had

24  a -- you know, he had his badge and his gun.  So I just want

25  to -- I just wanted to say that because during this trial, I

1    mean, yeah, there's all these papers and all this -- and I know

2    it's important.  I mean, God knows I know it's important.

3        But where my mind was at, I was in the midst of crumbling

4    internally.  And I had no one to talk to about it.  I felt

5    like -- I felt like if I were to report the crime at that time

6    that they would have arrested me.  That's how I felt.  And I

7    guess, you know, that's where my mind was at.

8        So not only was I probably unqualified to do this defense

9    and, you know, maybe not even a very good lawyer; but I was

10   operating under an extreme disability that had just sort of

11   happened.  And I still deal with it every day.  I think about

12   those things every day, and I occasionally have flashbacks.

13       And I'm not a lawyer anymore, and I apologize to the Court

14   because I'm not dressed as a lawyer.  But I'm not a lawyer.

15   And I never intend to be a lawyer again.

16       I just -- you know, I have -- right now I'm trying to get

17   disability because I find myself unable to work, unable to deal

18   with things.  And I'm having a little bit of a hard time

19   dealing with this.  I don't want to be here today.  But I want

20   you to know the truth, and that's the truth.  And that's where

21   my head was at during this trial; and, so, I wanted you to know

22   that.  (Pause).

23   Q.   Sir, you indicated that you have been diagnosed with a

24   bipolar condition; is that correct?

25   A.   Yes.  Bipolar disorder rapid cycling, manic depressive.

1  Q.    Sir, in the period of 2001 only, around about the time

2  just before you took on the Hodges case and during the trial up

3  through the end of the year, were you receiving any treatment

4  for your bipolar condition?

5  A.    Not at that time, not for bipolar.  I felt like I -- I was

6  having panic attacks and extreme anxiety, and I was also having

7  trouble concentrating.  So I was -- I ended up being diagnosed

8  with ADD and also anxiety disorder.  And, so, I was -- I was

9  being treated for those, but not for manic depression, no.

10 Q.    In the treatment for ADD, as well as the anxiety disorder,

11 were you prescribed any medication during that 2001 time frame?

12 A.    Yes.  I was taking medication.

13 Q.    Can you, as you're sitting here today, recall what

14 medication?

15 A.    Yes.  It was Adderall for the ADD and Valium for the panic

16 attacks and anxiety.

17 Q.    And were you taking Adderall and Valium to control the ADD

18 and anxiety disorder during the trial of Quintez Hodges in

19 August -- in September of 2001?

20 A.    Yes, I believe so.  (Pause. )

21 Q.    And again, the -- you had indicated earlier that your

22 psychotic break started to occur during the trial of Quintez

23 Hodges for a variety of reasons.  Is that fair?

24 A.    Yes.  I'm going to go ahead and say that the entire year

25 of 2002 was just a lost year, more or less.  I mean, I recall

1   things that happened, but my personality started to

2   disintegrate during the time that I recovered that child

3   abuse -- that molestation situation.

4        And it just -- it finally got away from me, you know.  I

5   tried to hold it all together.  I tried real hard to hold it

6   all together, but it -- to no avail.  I mean, I'm still trying

7   to hold things together.  And it's -- you know, I don't think

8   anybody's out to get me.

9        I will admit that, you know, as far as -- I've been very

10  reticent to describe that abuse to any official figure because

11  I felt like I would be retaliated against.  And I still have,

12  you know, a little bit of fear that I'll be retaliated against.

13       But I mean, I'm not quite as paranoid as I use to be.  But

14  I -- you know, I haven't lived in Mississippi since -- the last

15  I ever lived in Mississippi was -- I left there in September of

16  2004, and I've lived here in Marshall County, Tennessee since

17  then.  And I -- you know, that's -- I don't think I'll ever go

18  back to Mississippi, if I can help it.

19  Q.   Sir, do you recall how long the trial day was, what time

20  trial started and what time did it end?

21  A.   Trial started, I believe, at nine and went until very late

22  in the day.  It went -- it went from nine until six, seven,

23  eight o'clock sometimes.  It was a very grueling situation.

24  Q.   And after the trial date concluded, did you then spend the

25  rest of the evening preparing for the next day?

1  A.    Yes.

2  Q.    Did you spend your evenings trying to do whatever

3  investigation you could undertake?

4  A.    No, not really.  I want to go back to what I stated

5  earlier about the state of my mind at that time.  My mind was

6  just self-destructing.  I was beginning to have a lot of

7  flashbacks and a lot of real hard times dealing with this

8  situation.

9        And I believe, I was furious at the way the situation was

10 playing itself out.  I felt that the die was cast, and that I

11 was stuffed right in there with Quintez; and it was just a

12 train rolling over.  That's what I felt like.

13       And that there wasn't much you could do at the end of the

14 day which was almost, you know, by that time, dark, even though

15 it was summer.  You get out and you go home and you try to eat

16 something.  And you sit there and stare at the wall and try not

17 to think about it.  Or if you've got witnesses coming up, to

18 try to figure out what you might ask them.

19       I mean, it was just -- it was an impossible situation.  I

20 mean, I was having -- I was having some -- starting to have

21 some real bad personal thoughts.  And, you know, I will also

22 say that when I was committed, you know, those commitment

23 papers that you had earlier, what they didn't say is what I had

24 told other people, I had been somewhat suicidal.

25       But I was also thinking about killing -- (pause.)  And I

1  think I started thinking about that during this trial.  And I

2  can't say how serious I got to thinking about that but -- yeah,

3  I mean, my mind was in a real bad spot.

4  Q.    And as you said earlier, you believe you started having a

5  psychotic break during the course of the trial?

6  A.    Yes.  I believe that it -- like I said earlier, as soon as

7  the trial was over, I began to abuse alcohol to an extreme

8  amount and just tried to blot out every memory that I had.  But

9  ultimately, they kept resurfacing; and I ended up in the

10 hospital.

11 Q.    Now, sir, Exhibit 13, do you recognize the handwriting in

12 Exhibit 13?

13 A.    Yes.

14 Q.    And whose handwriting is that?

15 A.    That's my handwriting.

16 Q.    And are these notes that you took during the trial of

17 Quintez Hodges in September of 2001?

18 A.    Yeah.  A couple of them might be Buddy's handwriting.  It

19 was notes that we took while we were sitting at the defense

20 table.  This is -- I took -- this is mostly my notebook,

21 though, yeah.  This is the trial -- this is what we were

22 writing in the trial, yes.

23 Q.    So all these notes are from the September 10 through 14

24 time period of 2001?

25 A.    Yes.

1  Q.    Sir, I'm going to ask you to turn to the first page that

2  I've flagged with a little blue flag there.

3  A.    Okay.

4  Q.    And I hope it's the right one.  Great.  If you could --

5  the notes that I'm going to ask you about are all of the margin

6  notes.

7  A.    Okay.

8  Q.    And the first one, would you -- since it's your

9  handwriting, I'm going to ask you to read that into the record,

10  please.

11  A.    All right.  It says, "What am I doing here, God?  I will

12  get to leave, right?  Will I rest?  Ever or forever?  Am I

13  taking a stand for evil?  Or am I taking this pain for a good

14  reason?"

15  Q.    Sir, as you're sitting here today, do you recall what this

16  note was about?

17  A.    This note was about me losing my mind because I'm sitting

18  across from people that I feel like hate me, and they -- you

19  know, they've thrown this witness in my face that sexually

20  molested me when I was five years old; and I'm drowning in

21  these memories.  And I don't know what to think about anything.

22      So I'm sitting here in this case, and I've already taken a

23  ton of abuse from the judge, the district attorney.  They're

24  all -- it's just -- it was an atmosphere of absolute hate, and

25  I was having a hard time dealing with it.

1  Q.    Could you also similarly read into the record the next

2  note that you have written on the bottom of this page?

3  A.    Okay.  It says "reason," and it's got an arrow down to

4  "lies."  "Bullet holes and dead bodies.  Money.  Well, it ain't

5  worth this degree of hell.  This is too much.  This is far too

6  much.  I want to go home."  And then it spells h-o-m-e,

7  h-o-m-e, h-o-m-e.

8       And then it says, "So, the rules of court and evidence

9  prevent the truth from ever being heard in the court of man.

10 Then what the heck am I doing here?  Losing my mind -- losing

11 my soul -- losing my God -- losing myself."

12 Q.    If you could turn to the next page.  I'm going to ask you

13 to read into the record the single note that appears on that

14 page.

15 A.    It says, "Do I enjoy this -- let me start over.  "Do I

16 enjoy this kind of work?  Not this bullshit.  Not this

17 bullshit.  It seems that there is no end in sight.  However,

18 this too shall pass."

19 Q.    Now, at the time, in August of 2001 and September of 2001,

20 were you using alcohol?

21 A.    Yes.

22 Q.    And would you say, as you're sitting here today, that your

23 alcohol use during that time was heavy alcohol use?

24 A.    During the trial, no.  I didn't drink during the trial, to

25 the best of my recollection.  Prior to that, yes, I did -- I

1  mean, I never drank just because I wanted to say hello to a

2  friend.  It was always I drank to get drunk.  So yeah, it was

3  probably that.

4  Q.   And this was both before the trial and after the trial?

5  A.   Yes.  but I don't think I drank during the trial.  I don't

6  think I went to court hung over at all.

7  Q.   Now, during the August 2001 and September 2001 time frame,

8  were you taking any illegal drugs?

9  A.   I'm going to refuse to answer that question on the basis

10  of the Fifth Amendment.

11  (END OF VIDEOTAPE EXCERPTS PLAYED OF MIKE MILLER'S DEPOSITION)

12          **MS. KAO:**  Those are all the excerpts that we have,

13  Your Honor.

14          **THE COURT:**  All right.  Mr. McNamara, did you have

15  any excerpts to present at this time?

16          **MR. MCNAMARA:**  No, I did not, Your Honor.

17          **THE COURT:**  Thank you.  Would this conclude this

18  witness?

19          **MS. KAO:**  Yes, Your Honor.

20          **THE COURT:**  All right.  Who would you call next?

21          **MS. KAO:**  The petitioner calls Ms. Linda Hodges.

22      (THE WITNESS IS SWORN)

23          **LINDA HODGES, PETITIONER'S WITNESS, SWORN**

24                **DIRECT EXAMINATION**

25  **BY MS. KAO:**

1  Q.   Ma'am, can you please state your full name for the record.

2  A.   Linda Faye Hodges.

3  Q.   Good afternoon, Ms. Hodges.

4  A.   Hi.

5  Q.   Where do you currently live?

6  A.   2229 Eighth Avenue South, Columbus, Mississippi.

7  Q.   And are you currently employed?

8  A.   Yes.

9  Q.   And where are you employed?

10  A.   MUW (inaudible).

11  Q.   And what is your job there?

12  A.   I'm a supervisor.

13  Q.   Ma'am, are you familiar with Quintez Hodges?

14  A.   Yes.

15  Q.   And what is your relationship to Mr. Hodges?

16  A.   He is my brother.

17  Q.   And what is the age difference between you and Mr. Hodges?

18  A.   Twenty-two years.

19  Q.   Did you share the same mother?

20  A.   Yes.

21  Q.   And what is your mother's name?

22  A.   Johnnie Pearl Hodges.

23  Q.   Is Ms. Johnnie Pearl Hodges still alive today?

24  A.   No.

25  Q.   When did she pass?

1   A.    March 6th, 2003.

2   Q.    And what is your father's name?

3   A.    Clovis Hodges.

4   Q.    Is that also Mr. Quintez Hodge's father?

5   A.    No.

6   Q.    Who is?

7   A.    Wren Blair.

8   Q.    Now, do you and Mr. Quintez Hodges have other brothers and

9   sisters?

10  A.    Yes.

11  Q.    Would you be able to tell me their names, please?

12  A.    Johnny, Charlie, Jerome, Lisa, Martha, JoAnn, myself,

13  Sharon.

14  Q.    And what is the -- who is the next youngest brother or

15  sister up from Mr. Quintez Hodges?

16  A.    JoAnn.

17  Q.    And what is the difference, to the best of your knowledge,

18  in age between Ms. JoAnn Latz and Mr. Quintez Hodges?

19  A.    I think about 11 or 12 years.

20  Q.    Okay.  Now, how old was your mother when she had

21  Mr. Quintez Hodges?

22  A.    I would say probably middle 50s.

23  Q.    And are all of your brothers and sisters still alive?

24  A.    Yes.

25  Q.    Are all of your brothers and sisters still alive?

1   A.   No.  I'm sorry.

2   Q.   Okay.  And which ones have passed away?

3   A.   Johnny and Sharon.

4   Q.   Are you the oldest child?

5   A.   I'm the oldest sister.

6   Q.   Okay.  How many of the brothers and sisters were there

7   before you?

8   A.   Three.

9   Q.   Okay.  How much interaction did you have with Quintez when

10  you were growing up?

11  A.   I had a lot of interaction with him when he was growing

12  up.

13  Q.   What did you do with him?

14  A.   Well, we would baby-sit, take him to daycare, pick him up

15  from school, you know, just hang out, really.

16  Q.   Okay.  Now, when you were growing up, who lived in your

17  household?

18  A.   Jerome, Charlie, Johnny, Sharon, myself, Lisa, and Renee.

19  Q.   Okay.  And did your father live in your household as well?

20  A.   No.

21  Q.   Did he live -- did he ever live with your brothers and

22  sisters, the first eight, and your mother?

23  A.   Yes.  When we was younger.

24  Q.   Okay.  And how old were you when your father ultimately

25  left the home?

1    A.    I would say probably like --

2                **MR. MCNAMARA:**   Your Honor, I would object to the

3    relevance.   This household does not contain Quintez Hodges.

4                **THE COURT:**   I'm going to sustain the objection.

5                **MS. KAO:**   All right.

6    **BY MS. KAO:**

7    Q.    Ms. Hodges, did your mother have male companions after

8    your father left?

9    A.    Yes.

10   Q.    To the best of your knowledge, who were they?

11   A.    Wren Blair was the last one.   Frank Leonard, and Bo

12   Diddley.

13   Q.    And the gentleman that you call Bo Diddley, is that

14   Mr. Joseph Griffin?

15   A.    Yes.

16   Q.    And was Mr. Griffin your mother's companion up to the

17   point that she passed?

18   A.    Yes.

19                **MR. MCNAMARA:**   Object to leading, Your Honor.

20                **THE COURT:**   Sustained.

21   **BY MS. KAO:**

22   Q.    Okay.   Can you tell me how long Mr. Griffin lived in your

23   household?

24   A.    He lived there probably 5 or 6 years, up until she passed.

25   Q.    Tell me what you recall about Mr. Blair, that would be

1   Mr. Hodges' father?

2   A.    Well, at one point, he was in -- he and my mother was in a

3   relationship.  At first, I think he was okay.  Later on, I

4   don't know what happened.

5            **MR. MCNAMARA:**  I'd object, Your Honor.  There's no

6   basis, no foundation been laid, for this testimony as far as to

7   where she does have this knowledge of Mr. Blair.

8            **THE COURT:**  I'm going to sustain your objection.  But

9   I'll allow you to lay the foundation.

10           **MS. KAO:**  All right.

11  **BY MS. KAO:**

12  Q.    Ms. Hodges, when your mother was seeing Mr. Blair, did you

13  have contact with him?

14  A.    Yes.

15  Q.    And were you in the home periodically to observe the

16  relationship between them?

17  A.    Yes.

18  Q.    Okay.  And with that in mind, based on your observations,

19  could you tell me how their relationship was?

20  A.    It was okay at times; and other times, it wasn't.

21  Q.    Ma'am, who provided financial support for your family when

22  you were growing up?

23  A.    My mother.

24  Q.    And can you tell me how she supported the family?

25  A.    When we was growing up, we lived and we worked on farms

1   and stuff to get our vegetables and things.  And we -- she

2   had -- a family friend had land, and he grew vegetables and

3   cucumbers.  And we would gather those, and he would take them

4   and sell them and share the money with her to get us what we

5   needed.

6   Q.    Okay.  And did she do anything else in order to raise

7   money for the family?

8   A.    At one point, she sold liquor out of her home.

9   Q.    Out of the home you said?

10   A.    Yes.

11   Q.    And who would she sell liquor to?

12   A.    She had very few customers.  There was just a few

13   customers that she had that would come by on a regular basis.

14   Q.    And what would they do after they purchased that liquor?

15   A.    Some would sit and drink and others would go.

16   Q.    Okay.  And when you say "some would sit and drink," where

17   would they be sitting and drinking?

18   A.    She had an area off the kitchen.

19   Q.    Okay.  How long was she selling liquor out of the home?

20   A.    I would say she did it probably -- maybe a year or a

21   little over a year.

22   Q.    And why did she stop?

23   A.    She got busted.

24   Q.    Can you tell me the level of discipline that was imposed

25   by you and your brothers on your -- on you and your brothers

1  and sisters when you lived with your mother?

2  A.    If we suppose to been did something or didn't do our

3  chores or whatever, she whooped us.  I mean, we had regular

4  punishment.

5  Q.    Now, in addition to -- did you ever observe your mother

6  drinking alcohol?

7  A.    Yes.

8  Q.    Can you tell me the frequency of her alcohol use?

9  A.    It wasn't regular.  I would say probably once to three

10  times -- 3 to 4 times a year.

11  Q.    Okay.  And how heavy would that use be, based on your

12  observation?

13  A.    Well, at some point, she would go into the hospital; and

14  the doctor would help her.  And other times, if she started to

15  drink, we would pay attention.  And, like, myself and my

16  sister, we would go over; and we would get her and take care of

17  the kids.

18  Q.    Okay.  And how old were you when you began to observe

19  these -- her drinking and when she had to be taken to the

20  hospital?

21  A.    I would say I was, like, 12 to 13.

22  Q.    Okay.  And did this continue for a period of time, or did

23  it end pretty quickly?

24  A.    It went on for a little while.

25  Q.    Okay.  What was your mother like when she would drink a

1   lot during these episodes?

2   A.   She would do her every day -- basically, everyday needs of

3   taking care of her family.  Her drinking would allow her not to

4   take care of herself.

5   Q.   Okay.  And, now, you indicated that you would try to take

6   care of her when she was drinking.  Can you tell me how she

7   behaved towards you during these episodes?

8   A.   At first, she would fuss; and she didn't want to

9   cooperate.  And then again, she would change her mind; and we

10  could get her to cooperate.

11  Q.   Now, by the time Mr. Quintez Hodges was born, which of

12  your brothers and sisters still remained at home living at

13  home?

14  A.   JoAnn and Quintez.

15  Q.   Okay.  And when Quintez was growing up, do you know who

16  lived with him and your mother in that household?

17  A.   Yes.

18  Q.   And who were they?

19  A.   JoAnn, Renise -- not Renise, Kasha and Quintez and my

20  nephew, Christian.

21  Q.   Okay.  And your mother lived there as well?

22  A.   Yes.

23  Q.   And what do you recall about Mr. Joseph Griffin; was he

24  there?

25  A.   He was there some, yes.

**DAILY COPY**               DIRECT  -  LINDA HODGES          Volume I, page  86

1   Q.   Now, at the time when Quintez was born, where were you

2   living?

3   A.   I was living over in Sanfield (phonetic), over where I

4   live at now.

5   Q.   And did you go and visit your mother and Quintez?

6   A.   Yes.

7   Q.   How frequently were you at the home?

8   A.   Basically every day.

9   Q.   And based on your observation, were your other sisters in

10  that home as well visiting?

11  A.   Yes.

12  Q.   And how frequently would they be there?

13  A.   Basically every day.

14  Q.   Now, after Mr. Blair left your mother, did you ever have

15  occasion to hear her talking about him?

16  A.   Occasionally, yes.

17  Q.   And can you tell me to the best of your recollection

18  what --

19          **MR. MCNAMARA:**  Object to the hearsay, Your Honor.

20          **THE COURT:**  Sustained.

21  **BY MS. KAO:**

22  Q.   Ms. Hodges, do you know who represented Quintez Hodges in

23  his criminal trial?

24  A.   No.

25  Q.   Did you have contact with Mr. Quintez Hodges's lawyers at

1  any time prior to the trial?

2  A.    No.

3  Q.    Did you have contact with Mr. Hodges's lawyers at any time

4  during the trial?

5  A.    No.

6  Q.    Did anybody ever come and talk to you about your family or

7  about Mr. Hodges?

8  A.    No.

9  Q.    And did you ever receive a subpoena to attend the trial?

10  A.    No.

11  Q.    Were you able to attend any part of that trial?

12  A.    No.

13  Q.    Did you ever go over to the courtroom?

14  A.    Yes.

15  Q.    And when would that be?

16  A.    On my lunch break or on my breaks.

17  Q.    On your breaks?  Thank you, Ms. Hodges.

18           **MS. KAO:**  Your Honor, I have no questions at this

19  point.

20           **THE COURT:**  All right.

21           **MR. MCNAMARA:**  If it please the Court.

22                      **CROSS-EXAMINATION**

23  **BY MR. MCNAMARA:**

24  Q.    Ms. Hodges, I've just got a few questions.

25  A.    Okay.

1  Q.   Did you -- prior to testifying here today, did you spend

2  time with your brother's attorneys getting ready for your

3  testimony today?

4  A.   Yes.

5  Q.   About how much time?

6  A.   I really don't know.

7  Q.   One day, one hour?

8  A.   Probably -- I would say altogether probably a day.

9  Q.   And y'all went over the questions they expected to be

10 asking you here today?

11 A.   Yes.

12 Q.   You had already moved out of the home before Quintez

13 Hodges was born; is that correct?

14 A.   Yes.

15 Q.   Okay.  And just from the way you described it, so your

16 mother had problems; is that correct?

17 A.   She used to drink.  I wouldn't say that she actually had

18 problems.  I would say that she drank.

19 Q.   Okay.  Well, it sounds like -- but then at times, you and

20 your sisters -- and times the family would come together; and

21 y'all would help each other out, right?

22 A.   Yes.

23 Q.   And your testimony a minute ago was like y'all would kind

24 of come in and take over the overseeing of the children?

25 A.   Yes.

CROSS  -  LINDA HODGES          Volume I, page  89

1  Q.   And Quintez Hodges would be one of those children?

2  A.   Yes.

3  Q.   Okay.  Did you -- you said that no one -- I'm sorry.

4  Where did you live during this time, after Quintez was born?

5  A.   I said I lived where I live at now.  But actually, I was

6  right around the corner.

7  Q.   Okay.  And, so, you would go by the house most every day?

8  A.   Every day.

9  Q.   Okay.  At the time that he was arrested and charged with

10 the crime of killing Isaac Johnson, where were you living then?

11 A.   I was living in east Columbus.

12 Q.   Okay.  You say that no one, none of his attorneys, ever

13 contacted you?

14 A.   No.

15 Q.   Were you aware at the time that he was -- did you know he

16 had been arrested and put in jail?

17 A.   Yes, I -- yes.

18 Q.   Did you know that he was looking at the possibility of

19 facing the death penalty?

20 A.   No.

21 Q.   Did you ever speak to your mother about this?

22 A.   Yes.

23 Q.   And she never informed you of that?

24 A.   No.

25 Q.   But you did know he was charged with murder?

1  A.    Yes.

2  Q.    And you felt that you had information that you could give

3  to the attorneys they could use at the trial?

4  A.    Yes.

5  Q.    And you say none of them ever contacted you?

6  A.    No.

7  Q.    What stopped you from contacting them?

8  A.    I didn't contact them because they was contacting my

9  mother.  And I felt like I was supporting my mother as well as

10  my brother.  So I never contacted them because they was getting

11  paid to do what they needed to do.

12  Q.    Did you ever share with your mother any information that

13  you thought you knew of that she needed to tell to the lawyers?

14  A.    No.

15          **MR. MCNAMARA:**  That's all I have, Your Honor.

16          **THE COURT:**  All right.  Any redirect?

17          **MS. KAO:**  Nothing, Your Honor.

18          **THE COURT:**  Okay.  You may step down.  Is she

19  excused?

20          **MS. KAO:**  Yes, Your Honor.

21          **THE COURT:**  She can remain in the courtroom?

22          **MS. KAO:**  Yes, Your Honor.

23          **THE COURT:**  Who would you call next?

24          **MR. HEATHER:**  We would call Wren Blair, sir.

25          **THE COURT:**  Blair?

1          **MR. HEATHER:**  Blair.

2      (THE WITNESS IS SWORN).

3          **MR. HEATHER:**  Your Honor, I'll be referring to

4  Exhibit 23 during the course of this examination.

5          **WREN BLAIR, PETITIONER'S WITNESS, SWORN**

6              **DIRECT EXAMINATION**

7  **BY MR. HEATHER:**

8  Q.   Mr. Blair, will you please tell us your full name?

9  A.   Wren Blair.

10 Q.   How old are you, sir?

11 A.   Seventy.

12 Q.   Do you know Quintez Hodges?

13 A.   Yes.

14 Q.   How do you know him?

15 A.   He's my son.

16 Q.   Who is Quintez's mother?

17 A.   Johnnie Pearl Hodges.

18 Q.   Were you ever married to Ms. Johnnie Pearl Hodges?

19 A.   No, I wasn't.

20 Q.   Where do you currently live, sir?

21 A.   I didn't hear.

22 Q.   Where do you currently live?

23 A.   4129 Drake Hill Road, Brooksville, Mississippi.

24 Q.   Are you currently married?

25 A.   Yes, I am.

1  Q.    And to whom are you married?

2  A.    Eula Pearl Hopsey.

3  Q.    When did you marry her, sir?

4  A.    1993.

5  Q.    Are you currently employed?

6  A.    No.

7  Q.    Are you currently retired?

8  A.    Yes.

9  Q.    Where did you work before you retired?

10  A.    Sanderson Plumbing.

11  Q.    How long did you work there?

12  A.    Thirty-one years.

13  Q.    When did you first meet Ms. Johnnie Pearl Hodges?

14  A.    In 1978.

15  Q.    How long did you see her romantically?

16  A.    Off and on, '89.

17  Q.    Did you live with Ms. Johnnie Pearl while you were seeing

18  each other?

19  A.    Some.

20  Q.    And how long did you live with her?

21  A.    From, well, like I said, from about '87 -- not '87 --

22  yeah, '80 -- I say seven years.

23  Q.    How old was Quintez when you last lived with Ms. Johnnie

24  Pearl?

25  A.    He was 16.  I think 16.  I'm not sure.

1   Q.    Sixteen?

2   A.    I'm thinking that.

3   Q.    The last time you lived with Ms. Johnnie Pearl?

4   A.    I'm thinking, now.

5   Q.    You said sometimes you lived with Ms. Johnnie Pearl,

6   right?

7   A.    Right.

8   Q.    While you lived with Ms. Johnnie Pearl, did you have your

9   own home?

10  A.    Yes, I did.

11  Q.    Why did you have a separate home?

12  A.    I'm not hearing clearly.

13  Q.    Why did you have a separate home, sir?

14  A.    Why did I have what, now?

15  Q.    Why did you have a separate home?

16  A.    Well, I just -- you know, I wasn't ready to settle down,

17  you know, so.

18  Q.    Why did you sometimes leave Ms. Johnnie Pearl's home?

19  A.    Well, we had problems.

20  Q.    What kind of problems did you have?

21  A.    Well, sometimes drinking problems, wasn't on my part.

22  She'd get to drinking; I couldn't get along.

23  Q.    What would happen when you couldn't get along with her?

24  A.    I had no choice but to leave.

25  Q.    Did she ask you to leave?

1  A.    No.  But the things that was happening, I had to leave in

2  order to keep from getting in trouble or getting myself hurt.

3  Q.    What kind of things are you referring to?

4  A.    Well, throwing my clothes out.

5  Q.    Anything else?

6  A.    Well, if I'd stayed, you know, it would have been a

7  problem.  So I just -- when I got out -- when I'd get out, I

8  just got out.

9  Q.    How often did you leave her home?

10 A.    Well, we might go three months and then the same thing

11 will come up again.

12 Q.    And how long would you be gone when you moved out?

13 A.    Well, maybe a couple of weeks.

14 Q.    Did Ms. Johnnie Pearl smoke?

15 A.    Yes, she did.

16 Q.    How much did she smoke?

17 A.    How often did she smoke?

18 Q.    How much did she smoke, yes, sir.

19 A.    Well, I just never really did pay that much attention.

20 But she smoked, you know.

21 Q.    And earlier, you said Ms. Johnnie Pearl drank; is that

22 correct?

23 A.    Yeah.  When she -- for some reason, she'd do that.

24 Q.    How would you describe her drinking habits?

25 A.    Well, just all nervous, just all her nerves.  She just

1    like she didn't drink.  Because, I mean, I don't know what

2    would set it off; but when she'd do it, she'd do it.  And

3    sometimes like seven -- about 6 or 7 days.  Sometimes she'd do

4    it until she'd just get sick.

5    Q.    And what would happen when she got sick?

6    A.    Sometimes she had to go to the doctor.

7    Q.    How did she act when she was drinking?

8    A.    She was mean.

9    Q.    Can you tell us what you mean by mean?

10   A.    I mean, she just -- she just didn't get along hardly with

11   nobody.  Of course, her kids know that.

12   Q.    Give us any examples of her being mean to yourself.

13   A.    Mean to who, me?

14   Q.    To you, yes, sir.

15   A.    Pardon?

16   Q.    To you, sir.

17   A.    Oh, yeah.

18   Q.    How was she mean to you?

19   A.    Well, she's always saying bad things or making me feel

20   bad, like somebody I had went with in the past and was my

21   mind --

22          **MR. MCNAMARA:**  Your Honor, I would object to the

23   relevance of this.  As far as she being mean to her -- the

24   father of her child, and the child's not involved.

25          **THE COURT:**  I'm going to sustain that.  Sustained.

1 | **BY MR. HEATHER:**

2 | Q.    Did you and Ms. Johnnie Pearl have disagreements after

3 | Quintez was born?

4 | A.    Yes, we did.

5 | Q.    Did she drink after Quintez was born?

6 | A.    Yes, she did.

7 | Q.    Did she throw you out of the house after Quintez was born?

8 | A.    Well, yeah, sometimes she did.

9 | Q.    Sometimes these events happened in front of Quintez?

10 | A.    Pardon?

11 | Q.    Did these events sometimes happen in front of Quintez?

12 | A.    Well, sometimes it did.

13 | Q.    Did Ms. Johnnie Pearl work when you knew her?

14 | A.    No.

15 | Q.    Did she ever sell anything out of her home?

16 | A.    Yes, she did.

17 | Q.    What did she sell out of her home?

18 | A.    Well, whiskey, beer.

19 | Q.    When was Quintez born?

20 | A.    1980.

21 | Q.    Were you and Ms. Johnnie Pearl planning on having a child

22 | at that time?

23 | A.    No.  I can speak for myself.  I didn't have no ideas.

24 | Because I was 40 years old, you know.

25 | Q.    Was her pregnancy a surprise to you?

DIRECT - BLAIR                Volume I, page  97

1   A.    It was.

2   Q.    How did you learn that Ms. Johnnie Pearl was pregnant with

3   Quintez?

4   A.    Well, you know, after so long, a woman starts showing; you

5   know it.

6   Q.    How old were you when Quintez was born?

7   A.    Forty.

8   Q.    Do you know how old Ms. Johnnie Pearl was at that time?

9   A.    I don't know exactly her age.  But she had me for a few

10  years.  But I don't exactly know her birthday.  I don't know

11  that.

12  Q.    Was she younger than you?

13  A.    No.  She was older.

14  Q.    Do you know by how many years?

15  A.    Maybe four.  I don't know.

16  Q.    Did Ms. Johnnie Pearl continue to smoke while she was

17  pregnant?

18  A.    Yes, she did.

19  Q.    Did she continue smoking after Quintez was born?

20  A.    Yes, she did.

21  Q.    Did she continue selling liquor out of the house after

22  Quintez was born?

23  A.    Yes, she did.

24  Q.    What did you think of Ms. Johnnie Pearl selling liquor out

25  of her house when Quintez was young?

1  A.    Well, I didn't like it, but -- I didn't like it.

2  Q.    Did Ms. Johnnie Pearl continue drinking after Quintez was

3  born?

4  A.    Well, when that time -- she get -- something get wrong

5  with her and she'd get that problem, yeah.

6  Q.    Did you ever deny that Quintez was your son?

7  A.    I never had.

8  Q.    Do you recall involving lawyers and setting up child

9  support?

10 A.    Say that again.

11 Q.    Do you recall lawyers being involved in setting up child

12 support?

13 A.    Well, I don't -- well, all I know, they brought me the

14 papers, you know.  I don't know the details of what happened,

15 now.  All I know is they just brought me the papers.

16 Q.    Did Ms. Johnnie Pearl try to get child support from you?

17 A.    She did.

18 Q.    Were you ultimately ordered to pay child support?

19 A.    Was I what, now?

20 Q.    Were you ordered to pay child support?

21 A.    Yes, I was.

22 Q.    How much did you have to pay in child support?

23 A.    At that time, $50 a month.

24 Q.    Did you sometimes have trouble paying that amount?

25 A.    Yes, I did.

1  Q.   Did Ms. Johnnie Pearl involve the lawyers when you got

2  behind on child support?

3           **MR. MCNAMARA:**  Objection to the leading, Your Honor.

4           **THE COURT:**  Sustained.

5  **BY MR. HEATHER:**

6  Q.   What happened when you got behind on child support?

7  A.   Well, at one time, I was -- I had a lot of bills; and I

8  was paying when I could.  I was paying $100 sometimes instead

9  of the 50.

10 Q.   Did you have lawyers involved in setting up visitation

11 rights with Quintez?

12 A.   Yeah.  We had a problem with that.

13 Q.   Tell me about those problems.

14 A.   Well, some -- well, they worked it out, worked it -- you

15 know, things worked out awhile.  Then maybe a month, then we'd

16 have to go -- next thing I know, had to go through it again.

17 Q.   Did you involve your lawyer in this process?

18 A.   Yes.

19 Q.   How involved was your lawyer in this process?

20 A.   Well, every time it got where I couldn't see him, I'd call

21 him.  He'd -- and tell him.  And I wouldn't know what he was

22 doing; but he'd write me, you know, and tell me what he was

23 doing.

24 Q.   I'll show you Exhibit 23.  If you'll look at Exhibit 23,

25 under paragraph B, it states --

1    A.    You say what, now?

2    Q.    Exhibit 23?

3    A.    Okay.

4    Q.    Next to paragraph B, it states, "Defendant began to pay

5    child support in accordance with the terms of this Court's

6    order, but the natural mother refused defendant the right to

7    visit his minor son on numerous occasions and, in fact, on one

8    occasion, called the police to prevent the defendant from

9    enjoying his right of visitation."  Do you see that, sir?

10   A.    Yes.

11   Q.    Are those statements true?

12   A.    They're true.

13   Q.    Please describe the time that Ms. Johnnie Pearl called the

14   police to prevent you from visiting with Quintez.

15   A.    Well, I got up one morning.  I was suppose to be at work

16   at seven o'clock.  And I got up early enough where -- I hadn't

17   seen him -- well, I don't know how long it had been.  But it

18   had been a while since I had saw him.  So I decided I'd run by

19   and holler at him before I go to work.  She lived upstairs.

20       I went up, knocked on the door; and she let me in, just

21   like normal.  And me and her was -- we was talking.  And at

22   that time, he was a little boy.  I don't exactly know what his

23   age was, but he was old enough to talk.  And he must have heard

24   me talking, and he came -- he got up, and he came up in the

25   living room where I was.

1        And I picked him up, and I was playing with him like, you

2    know.  And in a few minutes, the phone rang.  I had no idea who

3    it was on no phone, you know.  I still don't know who it was.

4    But a few minutes, the cop knocked on the door.  And she never

5    did close the door.  She just left the screen.  You know, the

6    wooden door was open.

7        And I looked back, and the cop come on in.  And he started

8    talking.  And he told the other guy -- they was two of them.

9    He told the other guy, said, "Man, ain't nothing going on up

10   here."  He started, you know, talking to us.  And, so, they --

11   the other guy came in.  You know, we talked a few minutes.

12       And they got ready to leave.  And when they got ready

13   to -- when they got ready, that last guy got ready to go out

14   the door, she said, "I want him to go," that's me.  And they

15   said, "Mr. Blair," said, "you know you got to go."  I said, "I

16   know that."  And I come out.

17       And he was just -- I called him my "Baby."  He was just

18   crying.  And one of them told me, said, "I hate to see that,

19   but you got to go."  And he said, "Mr. Blair, don't come back."

20   I said, "I won't come back."

21   Q.    Did you leave then?

22   A.    Yes, I did.

23   Q.    Were you surprised when the police arrived?

24   A.    Yes, I was.

25   Q.    What were you doing when they arrived?

1  A.    What was I doing?

2  Q.    Yes, sir.

3  A.    When they came?

4  Q.    Yes.

5  A.    Oh, I wasn't doing anything but just talking to her.

6  Q.    In addition to the $50 in child support, did you provide

7  any other support to Quintez?

8  A.    Well, I bought him -- I bought clothes for him regular,

9  tennis, you know, whenever I could.

10  Q.    Do you believe Ms. Johnnie Pearl appreciated that support?

11  A.    I thought she did.

12  Q.    Did you -- do you know whether Quintez had life insurance

13  or health insurance?

14  A.    Life insurance?

15  Q.    Yes, sir.

16  A.    I don't know about life, but he had sick and accident

17  because I had him on my policy at work.

18  Q.    Do you know that Quintez had health insurance, then?

19  A.    Pardon?

20  Q.    He had health insurance, then?

21  A.    Yes.  He had health insurance because I knew that for a

22  fact, ever since he had been born.

23  Q.    Do you believe Ms. Johnnie Pearl appreciated that you

24  carried him on your health insurance?

25          THE COURT:  That's irrelevant.  Let's move on.

1   Irrelevant.  Move along.

2   **BY MR. HEATHER:**

3   Q.   What was your general visitation arrangement with Quintez?

4   A.   Well, it's several times it was different ways.  But at

5   one time -- one time -- it happened so many times.  I can't

6   remember all of it.  But I just remember what happened.  Okay?

7        Just say when it first started, I'd pick him up on a

8   Saturday.  I think it was -- I'm thinking -- it's been so

9   long -- 10, 11; and I was suppose to have him back at five.

10  Q.   What type of activities did you and Quintez do during your

11  visitation?

12  A.   Okay.  I'd go get him.  I'd go get him and I -- well, you

13  know, being a single man at that particular time, I had to do

14  my laundry.  So we'd go to the washer, wash.  After I washed,

15  then we'd go McDonald's.  And we spent several hours there when

16  we went.

17  Q.   Other than Quintez, do you have any other children?

18  A.   Nope.

19  Q.   Does your wife have any children?

20  A.   Yes.

21  Q.   How many children does she have?

22  A.   She's got four.

23  Q.   Did your wife's children live with you and Quintez -- or

24  live with you when Quintez came to visit?

25  A.   Did they what, now?

1  Q.    Did your wife's children live with you when Quintez came

2  to visit?

3  A.    Oh, yes.

4  Q.    Were you involved in Quintez's schooling?

5          **MR. MCNAMARA:**  Objection to the leading, Your Honor.

6          **THE COURT:**  Sustained.

7  **BY MR. HEATHER:**

8  Q.    What do you know about Quintez's schooling?

9  A.    I don't know anything about that.

10  Q.    Did Quintez ever live with you?

11  A.    Yeah, he lived with me about three months.

12  Q.    How old was he when he lived with you?

13  A.    What?

14  Q.    How old was he when he lived with you?

15  A.    I think -- I'm thinking 15, now.  I'm thinking 15.  It's

16  hard for me to just pinpoint exactly when because that's been a

17  long time.  I'm no young man, you know; I can't remember all of

18  that.

19  Q.    How would you describe your relationship with your own

20  father?

21          **MR. MCNAMARA:**  Objection, relevance, Your Honor.

22          **THE COURT:**  Sustained.

23  **BY MR. HEATHER:**

24  Q.    Were you ever contacted by Quintez's lawyers before trial?

25  A.    Well, let's see.  I don't -- you know, see, what was

1  happening, John Crump was my lawyer; and when something was

2  happening, you know, it come from him, you know.  He -- you

3  know, that's the way he did it.

4  Q.    Did you ever speak with a man named Mike Miller?

5  A.    I don't know him.

6  Q.    Did you ever speak with a man named Guy Rogers?

7  A.    I don't know him.

8  Q.    Did you ever speak with a woman named Carrie Jourdan?

9  A.    I don't know her.

10  Q.    Prior to today, when was the last time you saw Quintez?

11  A.    Today?

12  Q.    Prior to today.

13  A.    Just before he went -- before he went to Parchman.

14  Q.    Why haven't you visited him since he went to Parchman?

15  A.    Please don't ask me that.

16          **THE COURT:**  All right.  Any cross?

17          **MR. MCNAMARA:**  May it please the Court?

18                    **CROSS-EXAMINATION**

19  **BY MR. MCNAMARA:**

20  Q.    Mr. Blair, I've just got a few questions.  Your

21  relationship with Johnnie Pearl Hodges had its ups and downs?

22  A.    Right.

23  Q.    Okay.  And you had your own place where you could go when

24  things weren't going right?

25  A.    My own place?  Yes, I did.

1  Q.    And sometimes you said she threw your clothes out?

2  A.    She did.

3  Q.    And other times she just put you out?

4  A.    Well, I knew -- you know, you be around somebody long

5  enough you learn their ways.  You know when they're not acting

6  right; you just get ready to leave.  Sometimes I just left.

7  Sometimes I'd wait until she'd go to sleep because I knew she

8  wasn't acting right, you know; and I'd just go, to try to save

9  myself.

10  Q.    All right, sir.  But you testified earlier sometimes she'd

11  just put you out?

12  A.    Yeah.

13  Q.    Okay.  And you lived with her during the time she was

14  pregnant with Quintez?

15  A.    Yes.

16  Q.    And for a period of time -- how long did it take before

17  you moved out after Quintez was born?

18  A.    Man, I'm telling you, I -- it was in and out.

19  Q.    In and out?

20  A.    I mean, you know, whenever she'd get that problem, I'd

21  just -- I had to go.

22  Q.    You're right around 40 years old?

23  A.    Forty?  No.  Man, I'm 70.

24  Q.    Back then you were about 40 years old?

25  A.    Oh, yes.

1  Q.    You were a younger man?

2  A.    Yes.  Then.

3  Q.    And you testified a little while ago you weren't ready to

4  settle down, right?

5  A.    No.

6  Q.    So occasionally, whenever Johnnie Pearl Hodges would put

7  you out, you probably deserved it, didn't you.

8  A.    No, it wasn't nothing I was doing.

9  Q.    Nothing you --

10 A.    No.  No.  She didn't deserve to put me out.

11 Q.    Okay.  You say that you -- as I was reading some of the

12 court filings, it says that y'all went back and forth in court

13 a few times, right?

14 A.    Yes.  Right.

15 Q.    Is it your feeling -- in the end, between yourself and

16 Johnnie Pearl, y'all kind of worked things out, got it all

17 straight?

18 A.    Well, if you call it straight, yeah.

19 Q.    I'm not calling it.  Whatever you call it.

20 A.    What do you mean?  I don't understand what you're saying.

21 Q.    I was noticing in some of the orders from the judge said

22 y'all had come to a mutual agreement, and the Court would take

23 that into consideration in its order.  Do you remember working

24 out things with her?

25 A.    Well, yes.

1  Q.    And you're saying you're not really aware of what

2  Quintez's school record was like?

3  A.    No.

4  Q.    But you did carry him on your insurance?

5  A.    Yes, I did.

6  Q.    How long did you keep him on your insurance?  Was he on

7  there all the way up till --

8  A.    Ever since he'd been born up until -- up until that thing

9  happened.

10  Q.    Up until he went to Parchman, he was still on your

11  insurance?

12  A.    Yes.

13  Q.    Are you saying -- and I apologize because I just didn't

14  hear a minute ago.  But who did you say that you got your

15  information about -- I'm sorry.  After he was arrested?

16  A.    Uh-huh (yes).

17  Q.    You were aware he was under arrest, correct?

18  A.    Yeah, I knew that.

19  Q.    You knew he was in jail?

20  A.    Right.

21  Q.    Did you know the charges he was facing?

22  A.    Yes, I did.

23  Q.    Did you know he was facing the death penalty, possibly?

24  A.    Yes, I did.

25  Q.    Okay.  And you said you never met any of his lawyers?

1  A.    I never met any of them.  I didn't even know the trial was

2  going on.

3  Q.    How did you get your information about the status of what

4  was going on with Quintez?

5  A.    Well, my wife -- I don't know why I should say it, but

6  it's true.  Because I wouldn't get up here and lie about

7  anything, you know.  But my wife, she worked for -- I don't

8  know the guy's name.  The guy's dead; I know that.  But he was

9  in court every day.  He was -- from the start, he was in court.

10 And every day, he'd call her and tell her what was happening

11 with him; and she'd tell me.  That's the way I knew.  Because I

12 didn't even know when it started.

13 Q.    But you became -- you were aware that the trial was going

14 on?

15 A.    That's what I'm saying, yeah.

16 Q.    Okay.  Did you ever have occasion -- I'm sorry.  Where

17 were you living at the time that Quintez was arrested and

18 sitting in jail waiting for trial?

19 A.    I was living in Brooksville, Mississippi.

20 Q.    Did you go to the jail and visit him?

21 A.    Yes, I did.

22 Q.    And he never told you when his trial was going to be?

23 A.    He never mentioned it.

24 Q.    Okay.  And you say that you never met his attorneys; is

25 that correct?

1  A.   No, I never met them.

2  Q.   Did you ever attempt to meet his attorneys?

3  A.   No.

4  Q.   Did you have any information that you thought should be

5  conveyed to his attorneys?

6  A.   No, I didn't.

7           **MR. MCNAMARA:**  Thank you, sir.  That's all I have.

8           **THE COURT:**  All right.  Any redirect?

9           **MR. HEATHER:**  None, Your Honor.

10          **THE COURT:**  All right.  You may step down.

11          **THE WITNESS:**  Thank you.

12          **THE COURT:**  You may remain in the courtroom if you

13  wish.  Who would you call next?

14          **MR. HEATHER:**  Renise Hodges, Your Honor.

15     (THE WITNESS IS SWORN)

16          **RENISE HODGES, PETITIONER'S WITNESS, SWORN**

17                   **DIRECT EXAMINATION**

18  **BY MR. HEATHER:**

19  Q.   Ms. Hodges, please tell us your name.

20  A.   Renise Lashon Hodges.

21  Q.   When were you born?

22  A.   July 27, 1980.

23  Q.   Where do you currently live?

24  A.   Tuscaloosa, Alabama.

25  Q.   Are you married?

1   A.   No.

2   Q.   Do you know Quintez Hodges?

3   A.   Yes, I do.

4   Q.   How do you know him?

5   A.   He's my little uncle.

6   Q.   Who is your mother?

7   A.   Martha Hodges.

8   Q.   What is the age difference between you and Quintez?

9   A.   We're about 3½ months apart.

10  Q.   How would you describe your relationship with Quintez?

11  A.   We're close.

12  Q.   How much time did you spend with him growing up?

13  A.   We was together all the time.

14  Q.   What types of activities did you do when you spent time

15  together?

16  A.   We played T-ball, football with him, basketball.  We use

17  to make, like, little drums.  Like, my grandmother use to buy,

18  like, chitterlings; and we made drums and played drums and

19  played games.

20  Q.   Can you tell us about your T-ball; did you play on the

21  same team?

22  A.   No.  Me and my sister played on the same team.  He played

23  on the opposite team.

24  Q.   Did your family attend your T-ball games?

25  A.   Yes.

1  Q.    Who is Quintez's mother?

2  A.    Johnnie Pearl Hodges.

3  Q.    How would you describe Quintez's relationship with his

4  mother?

5          **MR. MCNAMARA:**  Objection, Your Honor.  That calls for

6  speculation on the part of the witness.

7          **THE COURT:**  Lay your foundation.  The objection is

8  sustained.

9  **BY MR. HEATHER:**

10  Q.    Ms. Hodges, did you see Quintez interact with his mother?

11  A.    Yes.

12  Q.    Did you spend time with Quintez when he was with his

13  mother?

14  A.    Yes.

15  Q.    How would you describe their interaction?

16  A.    They was close.  He was a mama's baby.

17  Q.    Do you know Quintez's father?

18  A.    Yes.

19  Q.    Who is he?

20  A.    Wren Blair.

21  Q.    Was Quintez close to his father?

22  A.    Yes.

23  Q.    Did you ever spend any time with Wren Blair?

24  A.    Yes.

25  Q.    Can you describe those times?

1  A.    We use to go, like, when Quintez would go over on

2  weekends --

3            **MR. MCNAMARA:**  Objection, relevance as to her

4  relationship with the father.

5            **THE COURT:**  Sustained.

6  **BY MR. HEATHER:**

7  Q.    Did you ever live with Quintez?

8  A.    He lived with us, yes.

9  Q.    How old was he when he stopped living with you?

10  A.    I know he was in -- he was out of the 8th grade, so it had

11  to been -- he was like 14, 15.

12  Q.    Do you know why he stopped living with you?

13  A.    He moved to Highway 12 with his mother.

14  Q.    And where did you live at the time?

15  A.    On 14th Avenue.

16  Q.    Did you and Quintez stay in touch after he moved?

17  A.    Yes.

18  Q.    Did you participate in Quintez's trial?

19  A.    Yes.

20  Q.    How did you participate?

21  A.    I testified.

22  Q.    Did you prepare for that testimony?

23  A.    No, I didn't.

24  Q.    Do you know who Mike Miller is?

25  A.    Yes.

1  Q.    Who is Mike Miller?

2  A.    It was his lawyer.

3  Q.    Did you speak with Mike Miller prior to your testimony?

4  A.    We probably talked, like, two -- I mean, probably not even

5  five minutes before I even testified.

6  Q.    Did Mr. Miller tell you what questions he would ask you

7  during those five minutes?

8  A.    No, he didn't.

9  Q.    Did you discuss with him the topics of your testimony?

10          **MR. MCNAMARA:**  Objection to leading, Your Honor.

11          **THE COURT:**  Sustained.

12  **BY MR. HEATHER:**

13  Q.    Had you previously spoken to Mr. Miller about your

14  testimony?

15          **MR. MCNAMARA:**  Objection, leading.

16          **THE COURT:**  Well, he can say -- where are you going,

17  Mr. Heather?

18          **MR. HEATHER:**  Your Honor, I'm simply trying to ask

19  her what sort of preparation she's done for her testimony and

20  whether Mike Miller had done that.

21          **THE COURT:**  Ask her what sort of preparation.

22          **MR. HEATHER:**  Yes, Your Honor.

23  **BY MR. HEATHER:**

24  Q.    What sort of preparation had you done with Mr. Miller in

25  preparation for your testimony?

1  A.    None.

2  Q.    Do you know why Mike Miller asked you to testify?

3  A.    No, I don't.  I believe -- I mean, I don't even say I

4  believe --

5           **MR. MCNAMARA:**  Objection.  She said she didn't know,

6  Your Honor.

7           **THE COURT:**  Sustained.

8  **BY MR. HEATHER:**

9  Q.    What is your understanding of why you were asked to

10  testify?

11  A.    Because I was there.

12  Q.    Thank you.

13           **MR. HEATHER:**  Your Honor, no further questions.

14           **THE COURT:**  All right.  Any cross?

15           **MR. MCNAMARA:**  No questions, Your Honor.

16           **THE COURT:**  All right.  You may step down.

17     Let me ask the attorneys to approach the bench, please.

18  (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE AUDIENCE)

19           **THE COURT:**  How many of these do you have,

20  Mr. McDuff?

21           **MR. MCDUFF:**  We've got two more today.  We've got one

22  more family member tomorrow.

23           **THE COURT:**  For what purpose?

24           **MR. MCDUFF:**  For the same purpose of mitigation.

25           **THE COURT:**  I think a cloud of witnesses might not be

1 helpful to you. I don't even know if these have helped you. I

2 think they may have helped the State. So I mean, is there a

3 purpose that I'm missing here? Is there some fact that's going

4 to be brought out that hasn't been brought out yet? Or are we

5 just taking turns with putting people on the stand?

6   **MR. MCDUFF:** Well, let us confer about that.

7   **THE COURT:** I don't want you to.

8   **MR. MCDUFF:** Okay.

9   **THE COURT:** There's nothing been brought out here

10 that has been helpful. But I don't want to hinder you if

11 everybody needs their say. But there are some critical points

12 that need to be developed and some important law. There needs

13 to be some judgment as to what those points of law are. Does

14 that make sense?

15   **MR. MCDUFF:** Yes, sir.

16   **MR. HEATHER:** Yes, sir.

17   **THE COURT:** Do you agree, Mr. McNamara?

18   **MR. MCNAMARA:** Yes, Your Honor.

19   **THE COURT:** Well, let's take a short recess. And I

20 don't want to inhibit you from putting on anybody that you want

21 to. But I don't want, just because every family member's here,

22 to hear from them.

23   **MR. MCDUFF:** We are -- most of our mitigation is

24 going to be through our expert tomorrow.

25   **THE COURT:** Okay. You don't have your expert here

1  today?

2          MR. MCDUFF:  She is here.  She's been listening to

3  the testimony.

4          THE COURT:  Okay.  Just tighten it up, then.  And if

5  you want to put them on the stand, get up there and let them

6  tell what they saw.  Get them up and get them down.

7          MR. MCDUFF:  Let me say this:  We're moving a lot

8  more quickly than we thought we would be, and we'll be moving

9  even more quickly if we remove the witnesses we had for today.

10  Tomorrow we've got -- we will have, at most, four witnesses

11  tomorrow.  We've got two more we were planning to put on today.

12  Because of scheduling, we told them to be here -- be available

13  tomorrow.  And we were going to wait and put the expert on

14  tomorrow.

15          THE COURT:  All right.  Let's finish with all the

16  witnesses that you want to call.  But let's try to get to the

17  issues at hand if we could.  You think we could do that?

18          MR. MCDUFF:  Yes, sir.

19          MR. HEATHER:  Yes, sir.

20          THE COURT:  All right.  Let's take a short recess.

21          MR. MCDUFF:  Final question.  Do you mind if we break

22  early today, given we'll only have four witnesses tomorrow?

23          THE COURT:  That'll be fine.  I hope you're not just

24  trying to kill time so you --

25          MR. MCDUFF:  No, no.  We're not doing that.  I was

1   about to tell you that we would only have, at most, two

2   witnesses today.  So it would be okay to break early today.

3            **THE COURT:**  All right.  You want to go ahead and take

4   those witnesses?

5            **MR. MCDUFF:**  Do you want to chat about it briefly?

6            **THE COURT:**  Really, I want you to call the witnesses

7   if that's what you plan to do.  Unless there's a new fact or

8   something to be presented, we don't need all the witnesses

9   talking about the same thing.  Okay?

10           **MR. MCDUFF:**  Yes, sir.

11           **THE COURT:**  And they need to be knowledgeable about

12  what they talk, too.  I don't need to try to tell either of you

13  how to try your cases.  I apologize for that.  But let's get to

14  the point, okay?  All right, let's take a short recess.

15  (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE AUDIENCE)

16           **THE COURT:**  I'm going to take about a five-minute

17  break, Charlie.  Court will be in recess.

18      (AFTER A SHORT BREAK, THE PROCEEDING CONTINUED).

19      (CALL TO ORDER OF THE COURT).

20           **THE COURT:**  All right.  Are we ready to proceed?

21           **MS. KAO:**  Yes.  We did speak with Mr. McNamara, and

22  we've reached a stipulation and eliminated one witness.  And we

23  will put on a second witness; and then we would like to, if the

24  Court agrees, then recess for the day and commence again

25  tomorrow morning.

```
 1                 THE COURT:  All right.  You want to announce your

 2   stipulation?

 3                 MS. KAO:  Yes, Your Honor.  Exhibit 32 has been

 4   stipulated between the petitioners and the State as a letter

 5   from Quintez Hodges to Mr. Christian Hodges.  And that is,

 6   again, in the record as Exhibit 32.

 7                 THE COURT:  Let it be entered.

 8        (EXHIBIT NO. 32 WAS RECEIVED INTO EVIDENCE).

 9                 THE COURT:  Anything further?

10             MS. KAO:  No, Your Honor.

11             THE COURT:  Who would you call next?

12             MS. KAO:  Ms. LaKasha Hodges Porter.

13        (THE WITNESS IS SWORN)

14          LAKASHA HODGES PORTER, PETITIONER'S WITNESS, SWORN

15                        DIRECT EXAMINATION

16   BY MS. KAO:

17   Q.   Good afternoon, Ms. Porter.  Could you please state your

18   full name, and then spell your fist name for the record?

19   A.   LaKasha JoAnn Hodges Porter, L-a-k-a-s-h-a.

20   Q.   Ma'am, how old are you?

21   A.   Twenty-eight.

22   Q.   And where do you reside currently?

23   A.   Columbus.

24   Q.   Do you know Quintez Hodges?

25   A.   Yes.
```

1  Q.    And what is your relationship to Mr. Hodges?

2  A.    He's my uncle.

3  Q.    And is he older or younger than you?

4  A.    Older.

5  Q.    Are you familiar with a Ms. Johnnie Pearl Hodges?

6  A.    Yes.

7  Q.    And who is Ms. Johnnie Pearl Hodges?

8  A.    My grandmother.

9  Q.    Did there come a time when you went to live with

10  Ms. Johnnie Pearl Hodges?

11  A.    Yes.

12  Q.    And how old were you when you went to live with

13  Ms. Hodges?

14  A.    I was around eight.

15  Q.    And at the time, was Mr. Quintez Hodges also living there?

16  A.    Yes.

17  Q.    As a child, did you spend time with Quintez Hodges?

18  A.    Yes.

19  Q.    When you were living with Ms. Johnnie Pearl Hodges, can

20  you describe to us what her general demeanor was?

21  A.    She was good.  But she was like -- sometimes she'd get

22  depressed.

23  Q.    Pardon me?

24  A.    I said she was good.  But, you know, she was like normal,

25  sometimes she would get depressed.

1   Q.    She would get depressed?

2   A.    Uh-huh (yes).

3   Q.    And what was your observation of how she would act when

4   she'd get depressed?

5   A.    She'd be sad.  She'd probably cry.

6   Q.    And how frequently would she be depressed?

7   A.    A couple of times a month.

8   Q.    And was she -- would she be depressed and cry and do this

9   also in front of Mr. Quintez Hodges?

10  A.    Yes.

11  Q.    Can you tell me how much attention Ms. Johnnie Pearl

12  Hodges paid to you and to Quintez --

13          **MR. MCNAMARA:**  Objection.  No foundation for that

14  question, Your Honor.

15          **THE COURT:**  Sustained.

16  **BY MS. KAO:**

17  Q.    When you were growing up and living with Ms. Johnnie Pearl

18  Hodges, were there rules that you would have to abide by as

19  children?

20  A.    Yes.

21  Q.    And what would happen to you if you broke those rules?

22  A.    Well, we probably would, like, get in trouble, like, you

23  know, punishment.

24  Q.    Okay.  And were there any -- was there any curfew that was

25  imposed when you were living with Ms. Johnnie Pearl Hodges

1  about what time at night you had to come in?

2  A.    Well, when we moved to Stings (phonetic), we really didn't

3  have a curfew.

4  Q.    You didn't have a curfew.  And would you and Mr. Hodges

5  take advantage of that?

6  A.    Yes.

7  Q.    And what would you do?

8  A.    We would probably stay out, like, a little longer.  I

9  mean, you know, like, stay out -- come in when we get ready.

10 Q.    And what time would that be?

11 A.    It just depends.  I mean, it wasn't, like, a really set

12 time.

13 Q.    When you were living with Ms. Johnnie Pearl Hodges, would

14 she take time to supervise you and Quintez?

15 A.    Well, she had -- she had, like, a lot going on; so I mean,

16 the supervision was limited.  But she provided for us.

17 Q.    All right.  And when you say, "She had a lot going on,"

18 can you give me an example of what that might be?

19 A.    Well, she took care of me, Quintez, my great grandmother,

20 Ms. Rosebud Pratt; and my cousin Christian.

21 Q.    While you were living with Ms. Johnnie Pearl Hodges and

22 Quintez, did you ever hear or see Quintez talk to Ms. Johnnie

23 Pearl about things that were important to him?

24 A.    No.

25 Q.    Did you ever hear Ms. Johnnie Pearl Hodges tell Quintez

1  that she loved him?

2  A.    No.

3  Q.    Did you ever see Ms. Johnnie Pearl --

4          __MR. MCNAMARA:__  Objection to the leading.

5          __THE COURT:__  Leading question.  Sustained.

6  __BY MS. KAO:__

7  Q.    Would there be times you would -- would you have occasion

8  to observe Ms. Johnnie Pearl Hodges with Quintez?

9  A.    Yes.

10  Q.    And can you tell us how she was with him?

11  A.    She was good.

12  Q.    Okay.  And did you have any -- did you also observe how

13  Quintez felt about his mother?

14  A.    Yes.

15          __MR. MCNAMARA:__  Objection to the speculation about how

16  he felt.

17          __THE COURT:__  I'm going to allow her to answer.

18  Overruled.

19          __THE WITNESS:__  He loved her.

20  __BY MS. KAO:__

21  Q.    And how did you know that?

22  A.    Because he was always with her; he always wanted to go

23  with her.

24  Q.    Did you -- are you familiar with a gentleman named

25  Mr. Wren Blair?

1    A.    Yes.

2    Q.    And to your understanding, what is Mr. Blair?

3    A.    His father.

4    Q.    Did you ever see Quintez talking to Mr. Blair about things

5    that were important to him?

6    A.    No.

7    Q.    Are you familiar with a gentleman named Mr. Joseph

8    Griffin?

9    A.    Yes.

10   Q.    And who is Mr. Griffin?

11   A.    My grandmother's boyfriend.

12   Q.    Did you ever see Quintez talking to Mr. Griffin about

13   things that were important to him?

14   A.    No.

15   Q.    How would you characterize your relationship with Quintez

16   when you were growing up?

17   A.    We was close.

18   Q.    How much time would you spend with him?

19   A.    Every day.

20   Q.    And during the time that you were growing up with him, did

21   Mr. Hodges ever talk to you about things that were important to

22   him?

23   A.    No.

24          **MS. KAO:**  That's all I have, Your Honor.

25          **THE COURT:**  All right.  Any cross?

1          **MR. McNAMARA:**  No questions, Your Honor.

2          **THE COURT:**  You may step down.  Who would you call

3    next?

4          **MS. KAO:**  Your Honor, Ms. Hodges is our last witness

5    for the day; and we will commence tomorrow morning with

6    Ms. JoAnn Hodges.

7          **THE COURT:**  Okay.  Is there anything further for me

8    to take up at this time?

9          **MS. KAO:**  Not at this time, Your Honor.

10         **THE COURT:**  Mr. McNamara, do you have anything?

11         **MR. McNAMARA:**  No, Your Honor.

12         **THE COURT:**  Mrs. Beard, do you have anything?

13         **MRS. BEARD:**  I do not, Judge.

14         **THE COURT:**  All right.  The Court will be in recess

15    until nine o'clock in the morning.  Is that convenient?

16         **MS. KAO:**  Yes, thank you, Your Honor.

17         **THE COURT:**  Okay.  Court will be in recess.

18              (THE TRIAL RECESSED AT 2:43 p.m.)

19

20              C E R T I F I C A T I O N

21    "I certify that the foregoing is a correct DAILY COPY
      transcript from the record of proceedings in the above-entitled
      matter, March 30th, 2010."

22                        /s/ Rita Davis Sisk_____
                          RITA DAVIS SISK, RPR, BCR, CSR #1626

23                        Official Court Reporter

24

25