1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF MISSISSIPPI
2

3   QUINTEZ WREN HODGES              .        Cause No. 1:07CV66
                                     .
4          Plaintiff                 .        Oxford, Mississippi
                                     .        March 31, 2010
5              v.                    .        9:00 a.m.
                                     .
6   CHRISTOPHER EPPS, ET AL.         .
                                     .
7          Defendants               .
    . . . . . . . . . . . . . . . .

8

9

                    DAILY COPY OF EVIDENTIARY HEARING
10            BEFORE THE HONORABLE MICHAEL P. MILLS
                UNITED STATES CHIEF DISTRICT JUDGE
11

12
    APPEARANCES:
13
    For the Petitioner:        FRANCES P. KAO, ESQ.
14                             JUSTIN LEE HEATHER, ESQ.
                               Frances P. Kao, Attorney
15                             155 North Wacker Drive
                               Suite 2700
16                             Chicago, Illinois 60606-1720

17                             ROBERT B. MCDUFF, ESQ.
                               Robert B. McDuff, Attorney
18                             767 North Congress Street
                               Jackson, Mississippi 39202
19
    For the Respondents:       PATRICK JOSEPH MCNAMARA, JR., ESQ.
20                             Mississippi Attorney General's Office
                               Post Office Box 220
21                             Jackson, Mississippi 39205-0220

22  Court Reporter:            Rita Davis Sisk, FCRR, RPR
                               911 Jackson Avenue, Room 369
23                             Oxford, Mississippi  38865
                               (662) 416-2038
24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

**DAILY COPY**

```
 1                        INDEX

 2                  Direct   Cross   Redirect

 3  WITNESSES FOR THE
        PETITIONER:
 4
      Antoinette Kavanaugh          4     53    74
 5    Carrie Jourdan               77     84    88

 6
     EXHIBITS:                                Marked    Received
 7
      Petitioner's Exhibit Nos. 35HH AND 35II.........17       17
 8    Petitioner's Exhibit Nos. 35T...................24       24
      Petitioner's Exhibit Nos. 35LL AND 35U..........53       53
 9

10
     CLOSING ARGUMENT:    Mr. McDuff..............................95
11                        Mr. McNamara...........................105

12
     THE COURT:          Adjourned.............................108
13
     (Court reporter has attempted to notate all exhibits entered
14   during the trial, but please refer to the exhibit list as
     produced by the courtroom clerk as the official exhibit list.)
15

16   CERTIFICATE OF COURT REPORTER...............................108

17

18

19

20

21

22

23

24

25
```

1      (CALL TO ORDER OF THE COURT)

2           **THE COURT:**  Are we ready to proceed?

3           **MS. KAO:**  Yes, Your Honor, the petitioner is ready.

4           **THE COURT:**  All right.

5           **MR. MCNAMARA:**  Yes, sir, we're ready, Your Honor.

6           **THE COURT:**  Who would you call as your next witness?

7           **MS. KAO:**  Petitioner calls Dr. Antoinette Kavanaugh.

8      (THE WITNESS IS SWORN)

9           **MR. MCNAMARA:**  If I may, before we start, Your Honor,

10  I did have a chance to look over, last night, some of the items

11  that I had said I would have an objection to; and I still do

12  have an objection to what they would have that would come out

13  of this witness's testimony.  That would be Exhibits 35T,

14  Exhibit 35HH through Exhibit 35LL.

15           **THE COURT:**  All right.

16           **MR. MCNAMARA:**  I would object to those on the grounds

17  of relevance and no -- perhaps they can lay a proper

18  foundation.

19           **THE COURT:**  Okay.  Well, let's see as each document

20  comes up if the foundation is laid; and we'll make a relevancy

21  determination at that time.

22           **MS. KAO:**  That's fine, Your Honor.  And I think, at

23  this point, we can resolve at least two of those by indicating

24  that the petitioners will withdraw Exhibits 35JJ and 35KK.  So

25  that's two problems taken care of.

1          **THE COURT:**  All right.  Thank you.  You may proceed.

2       **ANTOINETTE KAVANAUGH, PETITIONER'S WITNESS, SWORN**

3                        **DIRECT EXAMINATION**

4  **BY MS. KAO:**

5  Q.   Could you please state your name and spell your last name

6  for the record.

7  A.    Antoinette Elizabeth Kavanaugh, K-a-v, as in Victor,

8  -a-n-a-u-g-h.

9  Q.   Dr. Kavanaugh, I believe that your CV is already in

10 evidence.

11         **MS. KAO:**  And, Your Honor, the petitioner -- or the

12 State has agreed to stipulate that they will agree to

13 Dr. Kavanaugh being found an expert witness in -- as a clinical

14 psychologist with a speciality in adolescent psychological

15 development.

16         **THE COURT:**  You agree, Mr. McNamara?

17         **MR. MCNAMARA:**  Yes, Your Honor.

18         **THE COURT:**  All right.  She'll be so accepted.

19         **MS. KAO:**  Thank you, Your Honor.

20 **BY MS. KAO:**

21 Q.   Dr. Kavanaugh, can you please tell us what you were

22 engaged to do.

23 A.   I was engaged in this case to conduct an evaluation to

24 identify potential mitigating factors.

25 Q.   And can you explain the methodology that you used and the

1  sources of information that you relied on in your evaluation of

2  Mr. Hodges?

3  A.    I conducted clinical interviews of the defendant.  I

4  conducted three interviews over an eight-hour time span.  I

5  interviewed his family, and I reviewed records.

6  Q.    Can you please, just by category, tell me what records you

7  evaluated?

8  A.    I reviewed police documents, court documents, medical

9  records, mental health records, as well as letters that were

10  written from Ms. Cora Johnson to Mr. Quintez Hodges.  I also

11  reviewed academic and vocational records.

12  Q.    Did you -- I'm sorry.  I may have missed this.  Did you

13  also review any documents from the Department of Corrections?

14  A.    Yes, I did.

15  Q.    Dr. Kavanaugh, are these the types of documents that are

16  reasonably relied on by clinical psychologists in doing

17  assessments of individuals?

18  A.    They are.

19  Q.    Okay.  Did you prepare a written report?

20  A.    Yes, I did.

21  Q.    And I'm going to direct your attention, just very

22  generally, to Exhibit 35 and ask whether this is a true and

23  correct copy of your report.

24  A.    It is.

25  Q.    On the basis of the materials that you reviewed and the

1  interviews that you conducted, have you formed an opinion as to

2  whether there were facts and circumstances about Mr. Hodges'

3  life that should be considered mitigating factors and

4  mitigating circumstances?

5  A.    I have.

6  Q.    And what is your opinion?

7  A.    My opinion is that, in this case, there are mitigating

8  factors in the case at hand; and those factors include the

9  chronic level of poverty that he grew up in.  It includes the

10 chaotic home environment he grew up.  The factors related to

11 his mother that are relevant because they're mitigating.

12     Those factors are her depression, meaning that she dealt

13 with that depression by alcohol at one point in her life, by

14 abusing prescription medication.  It also -- another mitigating

15 factor has to do with her smoking and her lifestyle, including

16 running bootlegging activities out of the household.

17     Other mitigating factors in this case have to do with her

18 parenting style and her belittling way that she interacted with

19 him.  Other mitigating factors have to do with her as well as

20 how she and Mr. Wren Blair parented Mr. Hodges.

21     Other mitigating factors has to do with Mr. Hodges'

22 substance use, where he was developmentally at the time that

23 the offense occurred, where he was in his life developmentally

24 at the time the offense occurred; and finally, his relationship

25 with Ms. Cora Johnson and his desire to be a father and to have

1  a relationship with her.

2  Q.    Dr. Kavanaugh, let's discuss these items one at a time.

3  The first item that you referenced just now I believe was --

4  you mentioned the word *poverty*.  Can you please tell us why an

5  assessment of poverty is relevant to your assessment of

6  Mr. Hodges?

7  A.    Because one of the things that I've determined is whether

8  or not poverty is there.  When poverty exists in your

9  household, the parents or the caregiver's primary concern then

10  is reduced to taking care of simple needs, such as providing

11  shelter and food and more higher order, but equally important

12  needs, their emotional development, really goes to the wayside.

13  So I had to understand what kind of demands Ms. Hodges was

14  facing and whether or not those demands prevented her from

15  effectively parenting her son.

16  Q.    Okay.  And can you please tell us what you learned with

17  respect to the issue of poverty and its impact on Mr. Hodges?

18  A.    I learned that he grew up in extreme and chronic poverty.

19  Q.    Did you review documents in your assessment of the level

20  of poverty that Mr. Hodges experienced?

21  A.    I did.

22  Q.    I'm going to ask, if you could, to turn to Exhibit 35A, as

23  in apple.  Dr. Kavanaugh, is this one of the documents that you

24  reviewed and relied upon for your opinion?

25  A.    It is one of them, yes.

1   Q.   And can you tell me what was important about this document

2   in your assessment?

3   A.   This document was important to me -- first, the date.

4   When I review the document, I try to place it in his life; so

5   I'd understand what was going on at that point in his life.

6   The date here is 5/18/92, which indicates that he is not yet

7   12 years old.  He's 11.

8        And what's important to me in this note specifically is

9   that it says, quote, Grandmother wants to get client back on

10  Medicaid to eliminate part of the financial stress within their

11  lives."  It's clear to me in this note that grandmother is not

12  in fact his grandmother but his mother, because the note begins

13  with client and mother seen today in the office.

14       So it's simply a mistake.  The mistake being the reference

15  of grandmother.  What matters to me is that, contemporaneously,

16  someone was documenting the financial stress and the impact

17  that it had in his life.

18  Q.   Okay.  I'm going to now direct your attention to

19  Exhibit 35J.

20            **THE COURT:**  Is that -- I'm sorry.  A single J?

21            **MS. KAO:**  Yes, Your Honor.

22            **THE COURT:**  Okay.

23  **BY MS. KAO:**

24  Q.   Okay.  Dr. Kavanaugh, is Exhibit 35J a document that you

25  reviewed and relied upon -- one of the documents that you

1  reviewed and relied upon for your opinion?

2  A.    It is one of them.

3  Q.    And can you tell me, in this particular document, what was

4  important to you in your assessment?

5  A.    This document was important to me in my assessment of

6  poverty for many reasons.  Again, it's looking at the date.  So

7  here, I know that he's not yet three years old.  And it's a DHS

8  document.  And this document indicates that there are five

9  members in the household.

10      At the time, Ms. Johnnie Pearl Hodges was receiving public

11  assistance in two different fashions, the document indicates.

12  One, she was receiving $309 dollars' worth of food stamps.  The

13  other -- it also indicates that she was receiving $96 in ADC.

14  In addition to that, she was receiving $100 in child support.

15  So this document lets me know there are five people in the

16  household, and she has less than $500 a month to support her

17  and the people that are in her care.

18  Q.    I'm next going to ask you to turn to exhibits as a group,

19  35D through 35I.  And I'm going to ask you whether these are

20  documents that you reviewed and relied upon for your opinion.

21  A.    They are.

22  Q.    Dr. Kavanaugh, can you tell me what is significant about

23  these -- this set of documents to you and what they reflect to

24  you?

25  A.    One of the things that I considered is, living in chronic

1  poverty, what were the various demands that Mr. Hodges' mother

2  faced and that would keep her from effectively parenting him.

3  These documents indicate that one of the demands was his

4  medical condition.

5        Specifically, he had asthma.  And this was a chronic

6  condition.  And these documents, these series of documents, let

7  me know that this life-threatening chronic condition existed

8  since he was an infant.

9  Q.   And what is the basis on which you say that the condition

10 was life-threatening?

11 A.   Asthma is a life-threatening condition.

12 Q.   Was there anything in particular about the treatment that

13 would also lead you to believe that?

14 A.   They -- the documents indicate that, because of his

15 asthma, he was hospitalized at times; and they had to treat him

16 by putting him in a mist tent.  So it was so life-threatening

17 that it required hospitalization.

18 Q.   Dr. Kavanaugh, I'm going to ask you to then turn back to

19 Exhibit 35J, which we had seen just a few minutes ago.  Is

20 there anything in this particular document that assisted your

21 understanding of the medical needs and the poverty experienced

22 by Mr. Hodges?

23 A.   Yes.  This document indicates that the poverty was so

24 extreme that it was interfering with Ms. Hodges' ability to --

25 Ms. Johnnie Pearl Hodges' ability to take care of her son's

1  medical needs.

2      Specifically, she went to DHS because she was unable to

3  pay for the $3 shots, the shots which cost $3.  He needed these

4  allergy shots on a weekly basis, and her poverty was so extreme

5  that she could not afford the $3 required.

6  Q.   And is there anything else in this document that deals

7  with the issue of poverty and -- as it related to Mr. Hodges'

8  medical needs?

9  A.   Yes.  What I -- what was also relevant to me was the fact

10  that she was instructed by the DHS representative to stop

11  seeking medical care at his primary provider but instead use

12  the emergency room for his care.

13  Q.   Okay.  I'm going to ask you now to turn to Exhibit 35K.

14  A.   Okay.  One second.  Pardon me.

15  Q.   Of course.

16  A.   I apologize.  And you said K?

17  Q.   Yes, ma'am.  Are these documents among the ones that you

18  reviewed and relied upon for your opinion?

19  A.   They are.

20  Q.   And what are the significance of these documents?

21  A.   These documents -- again, as I said, one of the things

22  that's important to do is to place the documents in his life;

23  and so I can understand when they occurred in his life span.

24      These documents -- he was 9 to 13 years old over the

25  course of these documents.  They demonstrate, again, that he's

1  having an ongoing problem with asthma.  The documents are

2  emergency room documents, so they demonstrate they continue to

3  use the emergency room as his primary care and primary source

4  of medical treatment.

5       Another thing that I found interesting in the documents is

6  the extent to which they use the emergency room for his primary

7  care.  For example, in one instance, they went to the emergency

8  room to get his sugar tested because they were concerned.

9  That's something that typically one would go to a primary care

10 doctor.  But it's clear to me that they were using the

11 emergency room.  And they were doing this because of the

12 poverty in his life.

13      Another -- the final factor that's important to me in

14 these documents is the frequency, how frequently things went

15 unaddressed for days at a time before they finally sought

16 medical treatment.  The notes repeatedly indicate things like,

17 that the asthma attack was yesterday; but we're coming in

18 today.  Or he's had wheezing for multiple days, but we're

19 coming in.  So things were not addressed in a timely fashion as

20 well.

21 Q.   And finally, in this group of documents, I'm going to

22 direct your attention to Exhibit 35FF, like Frank.  Is this one

23 of the documents that you reviewed and relied upon for your

24 opinion?

25 A.   It is.

1  Q.    And tell me why this document is reflective or is

2  important in your assessment of the poverty level that

3  Mr. Hodges experienced.

4  A.    This document is important to me for a few reasons.

5  Again, the date, so I note that he's 13 years old.  From the

6  beginning of the document, it says "asthma attack Friday."  But

7  1/17/94 is a Saturday.  So again, there's a delay in seeking

8  treatment.

9        It's important to me also, if you see the on-call record,

10  it indicates that he is requesting his asthma meds and an

11  inhaler; but he doesn't know the name of his medication.  One

12  would expect, if you're taking your medication regularly, you

13  would know what you're taking.

14        So to me, it shows -- this document, in combination with

15  the documents we've just seen, suggests that his asthma

16  condition wasn't being treated in a timely fashion; and he

17  wasn't routinely taking his medication.

18  Q.    Okay.  Now, Dr. Kavanaugh, the second group of mitigating

19  circumstances that you talked about, you used the word *home*

20  *environment*.  Why is home environment relevant to an assessment

21  of Mr. Hodges?

22  A.    It's relevant -- it's relevant because by examining his

23  home environment I can obtain a better assessment of what

24  demands are being placed on Ms. Johnnie Pearl Hodges, who is

25  his primary caregiver, and whether or not those demands are so

1  great they're preventing her from adequately caring for him.

2  Q.    Okay.  And in the course of your work, did you determine,

3  when Mr. Hodges was growing up, how many people were living

4  with him in Ms. Johnnie Pearl Hodges' home?

5  A.    Yes, I did.

6  Q.    And what did you find?

7  A.    I determined that it changed over time, as we've already

8  seen in the DHS document.  There was one point where there were

9  five people living in the home, two of his sisters and one of

10 her children, as well as he and Ms. Johnnie Pearl Hodges.

11     At another point, there was another sister's child joined

12 them.  At another point, yet another sister's child, LaKasha

13 Hodges, joined them as well.  And then later on, his

14 grandmother, who had Alzheimer's, joined them.

15     So his mother then had to care for not only his niece, who

16 she was the guardian of, but also a grandmother who had

17 Alzheimer's.  And then, at one point, his mother's companion,

18 Mr. Griffin, lived in the house.

19 Q.    Okay.  Dr. Kavanaugh, you mentioned the fact that Ms.

20 Johnnie Pearl Hodges' mother lived in the house.  Why is that

21 significant to assessing Mr. Hodges' home environment?

22 A.    Again, based upon my interview and the records that I

23 reviewed, it's apparent that Ms. Johnnie Pearl Hodges was under

24 a lot of stress in caring for her ailing mother who had

25 Alzheimer's.  This is a very difficult condition when someone

1  has to care for them because of the nature of the condition.

2  Q.    Okay.  Dr. Kavanaugh, can I direct your attention, please

3  to Exhibit 35V, as in Victor?  Is this -- is this one of the

4  documents that you reviewed and relied upon for your opinion?

5  A.    It is.

6  Q.    And tell me what was important to you about this

7  particular document.

8  A.    The document, again, it's important to me when it was

9  written in his life span.  He's 11 years old at the time.  The

10  document's important because it's a contemporaneous document

11  that indicates the stress in the household and the conditions.

12      Specifically, the author notes -- sorry about this -- Mom

13  is very stressed as she's always caring for her own mother as

14  well as her grandchildren.  Have referred client's grandmother

15  to case management services for the elderly."

16  Q.    And in your review of the documents and the records, did

17  you find out whatever happened with that particular

18  recommendation?

19  A.    There's no evidence that the referral was ever made or

20  that she -- that Ms. Johnnie Pearl Hodges received any

21  assistance in helping her care for her mother who had

22  Alzheimer's and the demands of that.

23  Q.    Okay.  Dr. Kavanaugh, you also just mentioned the presence

24  of Ms. LaKasha Hodges in Johnnie Pearl Hodges' household.  Can

25  you tell me why anything relating to Ms. LaKasha Hodges is

1  relevant to an assessment of Quintez Hodges?

2  A.    It's relevant for multiple reasons.  One, they were living

3  in the same household.  And, so, therefore, anything that

4  describes the household in which LaKasha Hodges was in and the

5  benefits or shortcomings of that household also apply to

6  Mr. Hodges, because they're living in the same household;

7  they're close in age -- and they're close in age.

8      It's also relevant because, to the degree to which

9  Ms. LaKasha Hodges is presenting difficulties in the household,

10 that impacts Mr. Hodges, his behavior.  That also impacts the

11 ability that Ms. Johnnie Pearl Hodges has to care for her son.

12 If she's taking time and attention caring for LaKasha, that

13 gives her less time and attention to give to her own son.

14     **MS. KAO:**  Your Honor, I will now be approaching the

15 two documents HH and II that the State had an objection to.

16 And I've just asked Dr. Kavanaugh the question on how those

17 factors are relevant.

18     **THE COURT:**  Mr. McNamara?

19     **MR. MCNAMARA:**  Well, Your Honor, in this case, that

20 was an assessment of another individual that was in that

21 household.  It does not tell anything about the effect on

22 Mr. Hodges who sits here today.

23     **THE COURT:**  Overruled.  I think it is relevant to the

24 proceedings; it's the same home.  You may proceed.

25     **MS. KAO:**  Thank you, Your Honor.

1      (EXHIBIT NOS. 35HH AND 35II WERE RECEIVED INTO EVIDENCE)

2  **BY MS. KAO:**

3  Q.   Dr. Kavanaugh, may I direct your attention, please, to

4  Exhibit 35HH?  Is this one of the documents that you reviewed

5  and relied upon for your opinion?

6  A.   It is.

7  Q.   And can you tell me what document this is?

8  A.   This is a document from the Community Counseling Services.

9  And it's a progress note for Ms. LaKasha Hodges.

10 Q.   Can you tell me what is important in this document to your

11 assessment?

12 A.   For my assessment, the progress note from April of '91 is

13 important.  It describes that she's setting fires.  It also

14 indicates that she's taking medication.  And these medications,

15 specifically, are an antidepressant and a seizure medication.

16      So they let me know that she's got psychological issues,

17 behavior problems, setting fire is a behavioral problem; and

18 that she also has a medical disorder, specifically, a seizure

19 disorder.

20 Q.   Okay.  Can you also, then, turn to the next document in

21 line, which is Exhibit 35II?  Was this one of the documents

22 that you reviewed and relied upon for your opinion?

23 A.   It was one of them, correct.

24 Q.   Can you tell me, Dr. Kavanaugh, what was important about

25 this document in your assessment?

1  A.   Again, as I mentioned, one of the things that I assessed

2  was the impact of having to care for so many children.  I think

3  I should also step back and say that by this time Ms. Hodges

4  had raised seven kids to adulthood.  She's an older parent.

5  She was 45 years when she gave birth to Mr. Hodges.  So not

6  only is she dealing with Mr. Hodges, her ailing grandmother,

7  but also LaKasha Hodges.

8       And I have to understand what impact that has on her

9  ability to parent.  And this contemporaneous note provides very

10  important information.  It says, quote, Grandmother seems tired

11  of raising children."  Her being tired of parenting is a thing

12  that comes up repeatedly, also, in Mr. Hodges' records.

13  Q.   Now, in your review of the records, did you determine if

14  having Ms. LaKasha Hodges in the household in fact had an

15  impact on Mr. Hodges?

16  A.   Yes, it did.

17  Q.   Okay.  And can you tell me what that impact is?

18  A.   That impacts his behavior.  The record speaks repeatedly

19  about how he likes to not be at home because of the problem

20  that his niece, Ms. LaKasha Hodges, was causing in the

21  household.  So he would try to avoid being home.  And that's an

22  impact -- direct impact on his behavior.

23  Q.   I'm going to direct your attention again to Exhibit 35A,

24  like apple, which we have seen earlier.  Did this document

25  inform your judgment regarding the impact that Ms. LaKasha

1 Hodges was having on Mr. Hodges?

2 A. Yes.

3 Q. And can you tell me what that is?

4 A. This is a progress note from the Community Counseling

5 Services.  And it's Mr. Quintez Hodges' progress note.

6 Q. And what was important in this document to your

7 assessment?

8 A. Something that's important in this document is the note

9 from May 18th, '92; so he's 11 years old at the time.  And the

10 author writes, quote, Client enjoys spending time with his dad

11 and enjoys the escape from the problems at the home."  It's

12 clear, based upon the two notes written on 5/18/92, that the

13 reference to problems in the home is the niece and her defiant

14 behaviors, disruptive and defiant behaviors in the home.

15 Q. I'm going to ask you also, then, to turn to Exhibit double

16 L.

17 A. I'm sorry.  Double L?

18 Q. Yes, ma'am.  I'm sorry.

19 A. Thank you.

20 Q. Dr. Kavanaugh, was this one of the documents that you

21 reviewed and relied upon for your report?

22 A. It's one of the documents that I reviewed and relied upon

23 for my opinion, yes.

24 Q. And what was significant about this particular document to

25 you?

1  A.    This document was significant because of the date of the

2  document, in that it's 1995.  So we've seen documents now

3  spanning many years that describe a chaotic home environment

4  and one that left Mr. Hodges' mother tired and unable to parent

5  effectively.  So this document describes that home environment.

6      And as such, the author writes, "LaKasha is in need of a

7  more stable environment, including that with more limits,

8  responsibility and consistency."  So that lets me know the

9  deficits in the home environment are limits, and there's a lack

10 of consistency.

11     And the document goes on to indicate if these things were

12 addressed how they would benefit her, that she would then have

13 more meaningful relationships and would have a more positive

14 self-image.

15 Q.    Okay.  Dr. Kavanaugh, I'm going to ask you now to turn to

16 the final document in this group, Exhibit 35U, as in umbrella,

17 and ask whether this is a document that you reviewed and relied

18 upon in your opinion?

19 A.    Yes.

20 Q.    And can you tell me what was significant about this

21 document?

22 A.    For me, this document was significant because it's a

23 document from Mr. Hodges' records.  It's written in 1992, so

24 before he's 12 years old.  And the author notes, quote, The

25 house has been full of children and grandchildren each time

1  I've called to remind the mom of appointments.  Today was no

2  exception.  Plan to allow mother a chance to vent some of these

3  frustrations to me."

4      So it's, for me, evidence of the chaotic nature of the

5  household and, again, the impact that they were having on

6  Ms. Johnnie Pearl Hodges and, subsequently, her ability to

7  effectively parent her son.

8  Q.   Other than that notation, was there anything else in this

9  document that you took note of as part of your opinion?

10 A.   Yes.  The other thing that was relevant to me in this

11 document was, again, we see that -- sorry.  Pardon me.  About

12 how many -- there's another note that indicates how many people

13 there are in the home, and Mr. Quintez Hodges' response to

14 that.

15     There's a note from 3/11 that says, "Client seems to enjoy

16 the attention and being able to be away from home and the many

17 people in -- the many people there."  Now, attention here is an

18 important thing.  What this note describes is a one-to-one

19 outing that they simply had to the mall.

20     But he was so deprived of the attention, this was a

21 meaningful interaction; and that's what they're noting here.

22 So I see two things.  I see here evidence of what his unmet

23 needs are, attention, that he's seeking attention; and that he

24 needs attention.  And I see an indication of the negative

25 impact of having so many people in the home on Mr. Hodges.

1  Q.    Thank you, Dr. Kavanaugh.  The next item that you had

2  discussed as a mitigating circumstance are events relating to

3  Mr. Quintez Hodges' mother.  And along those lines, you discuss

4  her depression.  As a preliminary matter, why is an assessment

5  or anything to do with Ms. Johnnie Pearl Hodges relevant when

6  we're talking about Mr. Hodges?

7  A.    An assessment of a parent is relative because -- in

8  Ms. Johnnie Pearl Hodges because their mental state and their

9  own needs and unmet needs impact their ability to provide for

10 their child and take care of their child's developmental needs

11 over the course of the child's life.  I mean, put simply, if

12 I've got needs that aren't being met, it would be difficult for

13 me to take care of my kids' needs.

14 Q.    Okay.  And in particular, you mentioned the issue of

15 depression.  Can you tell us what you learned about that?

16 A.    I learned from the interviews, as well as the records that

17 I reviewed, that she was chronically depressed.

18 Q.    Okay.  Dr. Kavanaugh, I'm going to ask you now to turn to

19 Exhibit 35S, like Sam.  This is one of the documents that you

20 reviewed and relied upon for your opinion?

21 A.    It is.

22 Q.    And can you tell me what in this document was important to

23 your assessment?

24 A.    This is a medical document, and it lists her medical

25 problems; but also, it indicates that she's suffering from

1   depression.

2   Q.    Okay.  Now, you had earlier mentioned Ms. LaKasha Hodges

3   being in the home.  As part of your assessment, did you

4   determine whether there was any indication that -- of mental

5   health issues as relating to Ms. LaKasha Hodges?

6   A.    Yes, I did.

7   Q.    And can I ask you to turn to Exhibit 35 -- first of all,

8   can you tell me what that issue was?

9   A.    I learned that she had dysthymia.  And dysthymia is a

10  chronic form of depression.  When it is diagnosed in children

11  and adolescents, it's often accompanied by irritability and

12  disruptive behavior.  So I learned that she had depression.

13  She was being treated for that depression through therapy, as

14  well as medication; and she also had a seizure disorder.

15  Q.    Okay.  And I'm going to ask you now to turn to

16  Exhibit 35T, like Tom.  Is this a document that you reviewed

17  and relied upon for your opinion?

18  A.    Yes, it is.

19  Q.    And can you tell me what is important about this

20  particular document?

21  A.    What's important about this particular document --

22          **THE COURT:**  Yes.  Excuse me.  Has that been admitted?

23  Has this document been admitted?

24          **MS. KAO:**  Oh, yes.  I apologize, Your Honor.  This

25  document, again, is one of the ones that the State has objected

 1  to.  And I've already asked Dr. Kavanaugh the relevance.

 2         **THE COURT:**  Okay.  I'm going to -- who does it deal

 3  with?

 4         **MS. KAO:**  This deals with Ms. LaKasha Hodges, Your

 5  Honor.

 6         **THE COURT:**  I'm going to overrule your -- I assume

 7  it's the same objection, Mr. McNamara?

 8         **MR. MCNAMARA:**  Yes, Your Honor.

 9         **THE COURT:**  Overruled.  It's admitted.

10         **MS. KAO:**  Thank you, Your Honor.

11     (EXHIBIT NO. 35T WAS RECEIVED INTO EVIDENCE)

12         **THE WITNESS:**  I'm sorry.  You're going to have to

13  give me that again.

14  **BY MS. KAO:**

15  Q.   What -- I'm just going to -- the question was, What was

16  important about this particular document to you?

17  A.   This document is important because it demonstrates that

18  she has -- she was diagnosed with dysthymia.  And, so, that's

19  the importance of it.  And I've already explained that

20  dysthymia is a chronic form of depression; and when diagnosed

21  in children or adolescents, it's accompanied by irritability

22  and disruptive behavior.

23      The other thing that's important I should note about this

24  document is that although it says that she's 11 years old; in

25  fact, she's not 11 at the time.  If you look at her birthday

1  and the date of the intake, it's clear that she's just eight

2  years old.

3  Q.    With respect to Ms. Johnnie Pearl Hodges, another element

4  that you mentioned was her alcohol use as a mitigating factor.

5  Now, what sources did you use to develop this portion of your

6  opinion?

7  A.    This portion of my opinion was developed based upon the

8  interview data, as well as the records that I reviewed and,

9  specifically, her own medical records.

10  Q.    Dr. Kavanaugh, I'm going to direct your attention now to

11  Exhibit 35L.  And before we address that document, I'm going to

12  ask you the general question, What did you learn about

13  Ms. Johnnie Pearl Hodges' alcohol use in your assessment?

14  A.    I learned that Ms. Johnnie Pearl Hodges suffered from

15  alcoholism.  I learned that -- it's my clinical opinion that

16  she was drinking, in large part, to manage the symptoms of her

17  depression.

18      I also learned that as a result of her drinking and

19  depression she was unable to care for -- completely care for

20  Mr. Hodges' needs.  Although she was able to feed him, she

21  wasn't able to care for his emotional needs and how these needs

22  changed over the course of his life.

23  Q.    Okay.  Dr. Kavanaugh, Exhibit 35L, is that one of the

24  documents that you reviewed and relied upon for your opinion?

25  A.    It is.

1  Q.    And can you tell me what that document is?

2  A.    This is an emergency room -- what's called a "face sheet";

3  and that's where they document chief complaints, the history,

4  and what was done in the ER when someone comes in the ER.  So

5  this is a face sheet from December 7th, 1979, just ten months

6  before Mr. Hodges was born.

7       The chief complaint is wrote as, quote, "In a state of

8  mind where she did not know the family.  Yelling like something

9  was hurting, but she did not say what."  So it's clear that

10 she's acting in an unusual fashion, so unusual they have to

11 take her to the emergency room.  The diagnosis was alcohol

12 intoxication, which would explain her unusual behavior.

13 Q.    Can I ask you to turn to the next exhibit, which is 35M,

14 like Mary?  Dr. Kavanaugh, is this document one that you

15 reviewed and relied upon for your opinion?

16 A.    It is.

17 Q.    And can you tell me what that document is?

18 A.    Again, it's an emergency room face sheet.  And this

19 document was important to me because, as I've said, it's

20 important to place the documents where they are in his life and

21 when they occurred.  At this time, he's just 4 months old, 4

22 months and six days old; so he's a very young infant.  It's ten

23 o'clock in the morning.

24      She -- she being Ms. Johnnie Pearl Hodges -- is --

25 presents in the ER with the chief complaint of, quote, being

1  run down."  The assessment by the medical provider was that

2  they smelled alcohol on her breath, and that she had slurred

3  speech.  She admits to drinking alcohol the last evening or

4  night, p.m., quote, but not much."  So she's minimizing her

5  alcohol use.

6      And I've evidence that she's minimizing her alcohol use

7  because her blood alcohol level was 278, but yet anything over

8  150 is intoxicated.  So she was significantly intoxicated.  And

9  in fact, she was diagnosed with acute alcohol intoxication.

10     And this document was important to me because Mr. Hodges

11 is four months old at the time; and clearly, she can't take

12 care of his needs if she's acutely intoxicated.  And it's 10:30

13 in the morning.

14 Q.   Dr. Kavanaugh, I'm going to ask you now to turn your

15 attention to Exhibit 35N, as in Nancy, and 35O, as in Oscar.

16 And let's take 35N first.  Is this a document that you reviewed

17 and relied upon for your opinion?

18 A.   It is.

19 Q.   And can you tell me what this document is?

20 A.   This is a history and physical examination from Golden

21 Triangle Regional Medical Center.

22 Q.   And why was this significant to your assessment of

23 Mr. Hodges?

24 A.   It was significant for the following reasons:  A, he's two

25 years old at the time.  In my clinical opinion, where past

1   medical history is noted as nervousness, this is equivalent to

2   depression.  It's sometimes how people characterize depression.

3   It's also significant because it shows that she's had a 2- to

4   3-week history of generalized weakness and cramping.

5        Frequently, when people are depressed and their depression

6   isn't being addressed, they will complain of physical ailments

7   as a way to express their symptoms.  Also, the document was

8   important because, quote, She states that she has been drinking

9   alcohol pretty heavy over the past 3 to 4 days in an effort to

10  try and improve her general feeling and sense of well-being,"

11  unsuccessfully however.

12       So this is yet another indication of her depression and

13  her, like, malaise that she's experiencing during this point in

14  her life.  And again, he's two years old at the time.  So to

15  have these problems will impact her ability to take care of his

16  emotional needs.  Finally, the document is important to me

17  because she was diagnosed with alcohol abuse.

18  Q.   And I'm going to ask you now to turn to the next one in

19  line, which is Exhibit O, 350.  And is this a document that you

20  reviewed and relied upon for your opinion?

21  A.   It is.

22  Q.   And can you tell me what is important about this document?

23  A.   This document is important for me because, A, it

24  demonstrates that she was admitted to the hospital as a result

25  of her alcohol abuse or, rather, alcohol dependence and her

1  being intoxicated.  She was admitted for four days, so it

2  wasn't a brief admission, especially when one considers the

3  alcoholism.

4      It was also important to me because in the final paragraph

5  it notes, quote, She stated that she felt most of her problems

6  were related to her home situation; and that she was drinking

7  too much."  She is to be discharged in fair condition to be

8  followed as an outpatient, at which time she will be instructed

9  to seek psychiatric care.

10     So this is a contemporaneous document that indicates the

11  stress she was under because of her home.  And in my opinion,

12  that stress was so great it prevented her from effectively

13  parenting Mr. Hodges.

14  Q.   Now, the note indicates an -- a referral, instructed to

15  seek psychiatric help.  In your review of the records, did you

16  determine what happened with that referral?

17  A.   There's no indication that she sought psychiatric help or

18  received, rather, psychiatric help.

19  Q.   Another issue that you raise with respect to Ms. Johnnie

20  Pearl Hodges is her use of Valium.  Can you tell us what

21  sources you use to develop this portion of your opinion?

22  A.   This portion of my opinion was developed based upon

23  records that I reviewed and interviews with the family members.

24  Q.   And what did you discover?

25  A.   What I discovered is that she chronically abused Valium

1  throughout the course of his life.

2  Q.    Dr. Kavanaugh, I'm going to ask you to turn to Exhibit

3  35P, as in Paul.  And is this a document that you reviewed and

4  relied upon in your opinion?

5  A.    It is.

6  Q.    And what is important about this document?

7  A.    Again, it's an emergency room document written when

8  Mr. Hodges was 12 years old.  The document, under chief

9  complaint, notes an arrow, which means increased nerves.  The

10 arrow horizontally means leading to insomnia, even taking

11 Valium.  "Taking care of a sick, older family member."

12      This document, to me, is important because it shows the

13 increased level of depression, symptoms of depression, what

14 she's doing to address those; she's taking Valium.  And that

15 even in taking Valium, these things are happening.  These

16 things being the increased insomnia and depression.

17      And it also indicates one of the factors that's

18 contributing to this, which is the responsibility of taking

19 care of her mother who had Alzheimer's.  In doing that, she had

20 less energy and was less able to care for her son.

21 Q.    Okay.  Now, as a result of your training and through your

22 practice, are you familiar with drugs used to treat psychiatric

23 illnesses?

24 A.    I am.

25 Q.    And based on your training and experience, what is Valium

1  used to treat?

2  A.    Valium is a medication that's used to treat symptoms of

3  alcohol withdrawal and/or symptoms of anxiety and stress.

4  Q.    Now, this particular document, I believe, is from 1992.

5  What basis do you have for believing that Ms. Johnnie Pearl

6  Hodges' Valium use predated or postdated this time?

7  A.    Based upon my interviews with the family, it became clear

8  that she was using -- Ms. Johnnie Pearl Hodges was using and

9  abusing Valium before '92 and after '92.  This is a problem

10  because Valium, taken over a long period of time, is addictive

11  and increases symptoms of depression.

12  Q.    In addition to the drinking and the Valium, did you learn

13  anything else about Ms. Johnnie Pearl Hodges' personal habits?

14  A.    I also learned that Ms. Johnnie Pearl Hodges was a chronic

15  smoker who died of lung cancer; and that she smoked before

16  Mr. Hodges was born, while pregnant with Mr. Hodges, and

17  throughout his entire life.

18       Now, this is particularly problematic in this instance

19  because Mr. Hodges suffered from a life-threatening illness,

20  specifically, asthma.  And it required him to be hospitalized,

21  over the course of his life, multiple times and seek emergent

22  care.  Secondhand smoke is a trigger for asthma.

23       So she could have addressed his medical needs.  One way

24  that she could have addressed his medical needs is by not

25  smoking, yet she failed to do this despite knowing the

1  detrimental effect it had on her son.

2  Q.    Another element you talked about, you raised, with respect

3  to Ms. Johnnie Pearl Hodges, was the issue of her parenting

4  skills.  What did you learn about that?

5  A.    I learned that she was an inconsistent parent, that she

6  parented him inconsistently.  I learned that she provided poor

7  supervision, and that she was belittling to him.

8  Q.    And when you say "belittling to him," what do you mean by

9  that?

10  A.    I mean that she said nasty things to him -- and it wasn't

11  only when she was drunk -- over the course of his life.  For

12  example, I learned that when he would come home from visits

13  with his parents she would say -- visits with his father,

14  pardon me, you're going to end up a faggot like your father.

15       I learned that at other points in his life, when she

16  didn't like his friends, she would say, "Why are you spending

17  so much time with him?  What's he doing, trying to punk you

18  out?"  And "punk you out" is a colloquial term referring to

19  forcing a person to engage in homosexual activities.

20       So these are statements that ebb away at a person's

21  self-esteem.  They're not the kind of statements that you

22  expect a parent to say when they're taking care of their

23  child's developmental needs.

24  Q.    You mentioned the word *inconsistency* just now when you

25  were talking about her parenting skills.  What does

1  inconsistency have to do with an analysis of a person's

2  parenting skills?

3  A.    One of the reasons that we urge parents to be consistent

4  is that it provides a safe environment for the child.  It lets

5  them know what to expect, what to expect from the world.  It

6  also helps them to learn skills of how to think things through.

7  Because they know, "If I do this, then this will happen."

8  That's what you want to be an effective parent.  That's what

9  you want to do to be an effective parent.  When those things

10 aren't there, that's when you see behavior problems arising

11 later on.

12 Q.    Okay.  A fourth category of mitigating circumstance that

13 you mentioned when you started is the general category of

14 parental relationship between Mr. Hodges' parents.  Why is this

15 factor relevant to your assessment of Mr. Hodges?

16 A.    It's relevant for a couple of reasons.  When parents

17 basically aren't on the same page, that's difficult for the

18 child to know what to expect.  Knowing what one part of a

19 parent's role is to -- both parents is to provide a level of

20 consistency and to have a good relationship, especially in

21 front of their child; so the child feels loved by this family

22 unit, be they living in the same household or not.  What I

23 learned is that he didn't have that in his life.

24 Q.    Okay.  And what did you learn -- what facts did you learn

25 about the relationship between Mr. Hodges' parents?

1  A.    I learned that it was a very contentious relationship

2  between the two of them.  I also learned that Ms. Johnnie Pearl

3  Hodges was frequently angry at Mr. Wren Blair and was -- spoke

4  about her anger and dislike for him in front of Mr. Hodges

5  repeatedly.

6  Q.    Okay.  I'm going to ask that you turn to Exhibit 35Y, as

7  in yellow.  And I'm going to ask whether these are documents

8  that you reviewed and relied upon for your opinion.

9  A.    You said Y?

10  Q.    Yes, ma'am.

11  A.    Okay.  Good.  Yes, they are.

12  Q.    And can you tell me what is important -- first of all, can

13  you please tell me what documents these are?

14  A.    Community Counseling Services' progress notes of

15  Mr. Quintez Hodges.

16  Q.    And can you tell me what is the significance of these

17  documents to your opinion?

18  A.    These documents are significant because they're

19  contemporaneous documents covering the time from 1992 to '96.

20  They give an indication of how Ms. Hodges was feeling about

21  Mr. Wren Blair, and they demonstrate that she was expressing

22  these feelings in front of her son.

23      And, so, for example, the progress note, the intake

24  assessment, from January of '92, indicates, "Client's mother --

25  client's mother very angry with client's dad.  They do not --

1  underlined -- talk."  And, so, this demonstrates, to me, her

2  feelings toward him and the communication difficulties they're

3  having.

4      Other notes also describe their inability to communicate,

5  how that impacted Mr. Hodges, and how Ms. Johnnie Pearl Hodges

6  was encouraged to communicate with him directly.  But I have no

7  indication that she did so.

8      The notes are also important because -- for example, the

9  note from October 4th, 1993, the top note indicates, "Mom

10  thinks client's father is a bad influence."  So that indicates

11  her perception of the impact that Mr. Wren Blair had on

12  Mr. Hodges.

13  Q.  Okay.  Another overarching category of mitigating

14  factor -- mitigating factor that you discussed or you talked

15  about earlier was the issue of substance abuse on the part of

16  Mr. Quintez Hodges.  Do you remember that?

17  A.  Yes.

18  Q.  And can you tell me what you -- why that issue was

19  significant to you, in your opinion?

20  A.  That issue is significant because what we, as a science,

21  know is that the frontal lobe is developing through adolescence

22  up until early adulthood.  And that's the part of the brain

23  that helps you think things through, understand the sequence of

24  events that could happen and to weigh the pros and cons of the

25  various choices.  And that's also the part of the brain that

1  helps you sort of slow down your emotions.

2      What we also know is that using substances during --

3  chronically using substances, drugs or alcohol, during

4  adolescence will impede the growth of that part of your brain.

5  So it's important to understand whether or not normal

6  developmental process was being impaired.

7  Q.    Okay.  I'm going to direct your attention to Exhibit 35Q,

8  as in queen.  Is this one of the documents that you reviewed

9  and relied upon for your opinion?

10 A.    It was.

11 Q.    And can you tell me what is important about this document

12 in your assessment?

13 A.    What's important about this document, in my assessment,

14 relative to the issue of substance use is the note -- the top

15 note, 3/21/96.  It indicates that Ms. Johnnie Pearl Hodges

16 wanted to get Mr. Hodges drug tested because she thought that

17 he might be using drugs.

18     And she was willing to pay for that, even.  Subsequent

19 notes just indicate that she was -- that her suggestion of

20 getting him drug tested was denied.

21 Q.    Okay.  And I'm going to ask you now to turn to

22 Exhibit 35R, as in Ray.  Is this one of the documents that you

23 reviewed and relied upon for your opinion?

24 A.    It is.

25 Q.    And can you tell me what document this is?

1  A.    It's the Mississippi Department of Mental Health Substance

2  Abuse Client Admission Form.

3  Q.    And can you tell me what is important about this document

4  to you?

5  A.    To me, what's important about this document are lines 44

6  and 45.   Those codes correspond to a diagnosis of alcohol

7  dependence and cannabis dependence.

8  Q.    And what are those codes from?

9  A.    The codes are from the *Diagnostic Statistics Manual*, which

10 is the book that mental health professionals use to determine

11 if someone suffers from a mental illness and what the diagnosis

12 is, if they meet the criteria for a diagnosis.

13 Q.    Okay.  Did you undertake an evaluation into the level of

14 Mr. Hodges' education?

15 A.    Yes, I did.

16 Q.    And was that relevant to your opinion in this matter?

17 A.    Yes, it was.

18 Q.    Okay.  And can you tell us what you learned about that?

19 A.    What I learned is that Mr. Hodges failed the 8th grade,

20 and he didn't complete school beyond the 9th grade.  I learned

21 this was yet another source of decreased self-esteem for him

22 and a sense of overall failure.

23 Q.    Okay.  I'm going to ask you to turn to Exhibit 35Z, as in

24 zebra.  Is this a document that you reviewed and relied upon

25 for your opinion?

1   A.   Yes, it is.

2   Q.   And can you tell me what's important about this document

3   to you?

4   A.   What's important about this document to me is that it

5   demonstrates -- if you look at the lower portion of the

6   document where it says 8th grade, it demonstrates that he was

7   not promoted in 8th grade, that he failed the 8th grade, which

8   is consistent with what he and his family reported.

9        It's also interesting to me that during the year that he's

10  failing, he's doing well in band.  And as I talked to him and

11  his family, this was a source of pride for him, his musical

12  ability, and clearly an area where he got praise and positive

13  reinforcement.

14       That's important to me, clinically, because one of the

15  things that's repeated themes in the Community Counseling

16  Center records is that they were trying to get Ms. Johnnie

17  Pearl Hodges to understand the importance of praise to her son,

18  to any child; that that's an important part of parenting them

19  and making the child feel confident.

20       In these notes, their repeated attempts to get her to do

21  that span the course of his life.  So she failed to appreciate

22  a fundamental part of parenting.  And I think that what was

23  happening here in band, as I see how well he did and how he and

24  his family talked about it, it's clear to me the benefits of

25  giving him praise and how she failed to do that.  And that

1 failure results in significantly decreased self-esteem and

2 sense of self worth.

3 Q.    Okay.  And based on your review of the record, what was

4 the highest level of Mr. Hodges' education?

5 A.    Ninth grade.

6 Q.    And did the fact that he dropped out -- or left school

7 after the 9th grade hold any significance for you?

8 A.    It did hold significance for me.

9 Q.    And can you tell me what that is?

10 A.    What that meant -- the significance -- based upon the

11 record and my interviews, it's clear to me that by dropping out

12 of school he had more time to spend with his peers, peers that

13 the records indicate were negative.  And also, I learned that

14 he spent that time using drugs and alcohol.

15      The reason that he had more time is not only because he

16 dropped out of school, but because Ms. Johnnie Pearl Hodges

17 wasn't applying structure consistently.  She was letting him

18 do -- letting him not be home, not giving him things to do and

19 expecting him to do it, and following through with those

20 expectations.  She wasn't providing these basic things you

21 expect of a parent.

22 Q.    Okay.  In your overall discussion about mitigating

23 factors, you also mentioned one regarding Mr. Hodges'

24 individual development.  Can you tell us what the -- what you

25 learned with respect to Mr. Hodges' individual development?

1  A.    Based upon the information that I obtained in the record

2  and my clinical interviews, it's my opinion that not only did

3  he suffer from low self-esteem, he was also impulsive.  And his

4  impulsivity -- there's a level of impulsivity that's normal for

5  the adolescent because the frontal lobe is still developing.

6        I've already described the important role the frontal lobe

7  played.  But in his case, he was even more impulsive and

8  immature, in large part due to his substance abuse, and in

9  large part due to his mother's parenting style and to the fact

10 that his parents left him in a place where he really didn't

11 feel love.

12       We heard yesterday LaKasha Hodges talked about how she

13 never heard Ms. Johnnie Pearl Hodges tell Mr. Hodges that he

14 was loved.  So this lack of feeling of sense of love and being

15 cared for contributed to -- later contributed to low

16 self-esteem and impulsivity on his part.

17 Q.    Okay.  You used the word *adolescent* in your response.

18 What does the word *adolescent* mean to a clinical psychologist?

19 A.    Adolescence is a period that extends from about the time

20 that a person is 11 years old until their early 20s.  And we've

21 had this sort of extension of the period of adolescence since,

22 roughly, 1985 or so.

23       And we, the science, got information that the frontal

24 lobe -- the part of the brain that I've already described how

25 important that is -- is still developing and continues to

1  develop until your early 20s.  And, so, now that's considered

2  adolescence during that period.

3      What we know, too, is that during this period of a lot of

4  growth, a person is -- needs their parent to help guide them

5  through this process.  So it's a time where there's a lot going

6  on for the person, and the person's also needing guidance from

7  their family system as well to navigate this.

8  Q.    Okay.  Did you -- in your evaluation, did you learn

9  anything about Mr. Hodges' emotional development?

10  A.    I -- yes.

11  Q.    And can you tell me what you learned?

12  A.    I learned that he was very immature, and he -- rarely was

13  he as mature as his chronological age would lead you to

14  believe.

15  Q.    Okay.  And when you say *immature*, can you give us some

16  facts that would demonstrate his immaturity, in your opinion?

17  A.    For me, the most salient fact of his immaturity was his

18  relationship with Ms. Johnson.  Ms. Johnson was significantly

19  younger, but yet he found that this is a relationship that met

20  his developmental needs because his needs were in fact so

21  basic.

22  Q.    And the reason the relationship with Ms. Johnson -- that

23  was, in fact, one of your overarching mitigating circumstances.

24  Can you -- why is the relationship with Ms. Cora Johnson

25  relevant to an assessment of Mr. Hodges?

1  A.    Because it was an essential part in his life for two

2  years, and the two years prior to this offense.  Because it

3  really satisfied some of his emotional needs.  Again, yet

4  another indication of how immature he was.

5       He described a relationship where they talked multiple

6  times a day; they were romantically involved.  They talked and

7  discussed, through conversation and letters, having a life

8  together, getting married.  He loved her.  As he describes it

9  and as the family describes it, he -- she was his world and his

10  focus.  And, so, that was an important part of understanding

11  the mitigating factors in the case at hand.

12  Q.    Okay.  What can you tell me about the relative age between

13  the two, that is Ms. Johnson and Mr. Hodges?

14  A.    She was significantly younger than he was.

15  Q.    Okay.  And again, can you tell us what that is -- how that

16  is relevant?

17  A.    That's relevant because if he was as mature as you would

18  expect of a person who -- the relationship basically spanned

19  the time from '97 to '98.  No, that's wrong.  Sorry.  '97 to

20  '99.  And if he was as mature as you would expect, based upon

21  his birthday at the time, he would not be in a relationship

22  with someone who was so much younger than him and also who was,

23  at times, belittling and inconsistent.  The fact that he would

24  tolerate the way that she treated him just shows how -- what he

25  longed for emotionally.

1  Q.    Okay.  Now, Dr. Kavanaugh, did you learn anything about

2  how Ms. Johnnie Pearl Hodges behaved towards Ms. Johnson and

3  Mr. Hodges relative to their romantic relationship?

4  A.    What I learned is that it was another area where she was

5  inconsistent and gave him inconsistent messages.

6  Q.    And on what facts do you rely for that statement?

7  A.    Well, I should say not giving him inconsistent messages;

8  what she said was not consistent with what she did.  I learned

9  that she would tell him, "I don't like her.  You shouldn't be

10 in a relationship with her."

11     But yet at the same time, whenever Ms. Johnson came over,

12 she let Ms. Johnson into the house, thereby, sanctioning their

13 relationship, although she's telling him that she doesn't like

14 the relationship.

15     And this level of inconsistency that she gave is important

16 because it makes it difficult for him to know what to expect of

17 the world, to know what consequences there'll be for behavior.

18 Q.    Now, did you solely rely on the reports of the family to

19 develop your opinion with respect to this relationship?

20 A.    I did not.

21 Q.    What else did you rely upon?

22 A.    I relied on letters that Ms. Cora Johnson wrote to

23 Mr. Quintez Hodges over the course of their relationship.

24 Q.    Okay.  I'm going to ask you to turn to Exhibit David

25 David, double D.  And it's a very big stack, Dr. Kavanaugh, so

1    take your time.  And I'm going to ask you whether these are the

2    letters that you reviewed and relied upon for your opinion?

3    A.    Yes, they are.

4    Q.    Okay.  And did you excerpt portions of these letters in

5    your expert report?

6    A.    Yes, I did.

7    Q.    Okay.  Now, Dr. Kavanaugh, was Mr. Hodges always at home

8    when Ms. Johnson was corresponding with him by letter?

9    A.    No, he was not.

10   Q.    And where else was he besides his home when he received

11   these letters?

12   A.    He was also in the Mississippi Department of Corrections

13   and, specifically, the RID program.

14   Q.    And why was that fact important to you?

15   A.    It was important -- well, I should back up.  What was

16   important to me was why he got there.  And he got there for an

17   offense that involved Ms. Cora Johnson.  So despite being

18   arrested because of something that involved her, he continued

19   to maintain contact with her and she with him.

20   Q.    Okay.  So based on your review, what effect did his being

21   in the RID program have on their relationship?

22   A.    If anything, it strengthened their relationship because

23   they continued to communicate frequently vis-a-vis letters.

24   Q.    Okay.  I'm going to ask you to turn your attention to

25   Exhibit 35 double B, like boy, BB.  Is this a document that you

1   reviewed and relied upon for your opinion?

2   A.    It was.

3   Q.    And can you tell me what this document is?

4   A.    This document is a document in which the inmate indicates

5   who's allowed to visit him or who he wishes to visit.  And this

6   document was important to me because the people that Mr. Hodges

7   indicated could visit were his family and Ms. Cora Johnson,

8   thereby elevating her to the position of a family member.

9        And I think that that's reflective of how he saw her at

10  that point in his life, despite the fact that she was involved

11  in the conditions that got him incarcerated.

12  Q.    Okay.  Dr. Kavanaugh, going back to the letters that

13  Ms. Johnson wrote to Mr. Hodges, can you tell me, based on your

14  review of the letters, a little bit about what you learned

15  about their relationship?

16  A.    Yes, I can.  The letters describe her love for him, how

17  he -- she makes references to letters that he has written to

18  her where he's also describing how much they love each other.

19  The letters repeatedly give her promise that they'll marry,

20  that -- the letters also talk about her child and how she hopes

21  that he's the father.

22       At times, she tells him that he's the father; but then at

23  the same hand, she's also very inconsistent in these letters.

24  She says things like, "I don't love you anymore."  She's

25  belittling to him.  She says that the baby is in fact not his.

1   But then she'll say, "I want the baby to be yours; I know the

2   baby's yours."

3       The month -- the week that he's getting -- or the month

4   that he's going to be released, she also reinforces their

5   desire to marry; and she outlines what he needs to do to marry

6   her and to be -- have a family.

7       The letters also give an indication that he has told her

8   that he believes this baby to be his, wants the baby to be his,

9   and his plans for fathering a child.  And by that, I mean how

10  he wants to be in the role of father.  And it's clear in doing

11  so, he's speaking about, also, what he felt he didn't have; and

12  how he was going to give that to the child.

13  Q.   Okay.  Now, you indicated that she had made certain

14  demands or conditions about, you know, their marrying.  Based

15  on your review of the letters, can you tell me what those

16  demands were?

17  A.   She was very clear and repeatedly stated this in letters.

18  She wanted him to get a job, get a car and get a house.  And

19  once he's obtained these three things, they will marry and live

20  together with their child.

21  Q.   Okay.  Did Mr. Hodges address those demands when he left

22  the RID program?

23  A.   He was -- he had employment.  And I learned that his goal

24  was to save his money so that he could then get a house and get

25  a car.  He felt that she was placing demands on him that he set

1  a little high, but he was intent on doing it because that's

2  what he wanted.  And that being he wanted to marry her so they

3  could live together as a family.  They being she and their

4  child.

5  Q.   Now, you had mentioned that Mr. Hodges was in this RID

6  program.  Did you learn anything about how Mr. Hodges adjusted

7  to life or otherwise behaved once he was released from RID?

8  A.   I learned that the adjustment for him was difficult.  And

9  by difficult, what I learned was that he was having difficulty

10 sleeping.  He was sleeping with the blinds open, which -- he

11 was also having difficulty eating.  And he wasn't communicating

12 effectively.

13      I also learned there was a level of paranoia.  He was

14 hypervigilant, as it's normative to be in prison; you need to

15 have a level of hypervigilance.  This extended to his life when

16 he got out, and he was still very hypervigilant and somewhat

17 paranoid.

18 Q.   Okay.  And let me ask you to turn your attention to

19 Exhibit 35EE.  Is this a document that you reviewed and relied

20 upon for your opinion?

21 A.   Yes.  It's one of the documents that I relied upon in

22 forming my opinion.

23 Q.   And can you tell me what was important in your assessment

24 in this document?

25 A.   This document was one of -- this document was important

1  because it gave me an indication of how he was responding to

2  life after the RID program.  If you look at what's

3  Bates-stamped 8382 and page-stamped page 13 of the document,

4  specifically, this -- the physician interviewed his -- his

5  being Mr. Quintez Hodges' -- mother; and she reported that,

6  quote, He would sleep with the blinds open, and that he wasn't

7  sleeping very well."  Quote, He would be up late and wake up

8  early."  She also -- close quote.

9      She also went on to indicate that he wasn't eating very

10  well and he was quiet.  He didn't talk much.  You could ask him

11  things, and he would act like he didn't hear you.  All

12  suggesting that he wasn't adjusting well to life outside of

13  RID.

14  Q.   Okay.  Now, Dr. Kavanaugh, in your review of these case

15  notes and the report from the Mississippi State Hospital, did

16  you determine whether you reviewed documents that were

17  different or additional to things that Whitfield reviewed?

18  A.   I reviewed additional documents than those that are listed

19  here as having been reviewed.

20  Q.   Okay.  And can you tell me what categories of documents

21  you had at your disposal that they did not?

22  A.   I reviewed mental health records.  I reviewed medical

23  records that were his records as well as his mother's.  And I

24  reviewed educational and vocational records that they don't

25  note of having reviewed.

1  Q.    Okay.  And did you interview people for your opinion that

2  was in addition to things that were done at Whitfield?

3  A.    Yes.

4  Q.    And can you tell me what that was?

5  A.    I also -- this report is based upon only a 70-minute

6  interview with him.  I spent eight hours interviewing him.  And

7  this report is also based on an interview with his mother.  I

8  wasn't able to interview his mother, obviously, because she's

9  deceased.  But instead, I interviewed ten family members; and

10 they were not interviewed as part of this report.

11 Q.    Okay.  A couple of answers ago, you indicated that

12 Mr. Hodges found employment after he left RID.  Can you tell me

13 what you learned about that employment?

14 A.    Yes.  I learned that he was working at Trim Joist; and

15 that there he was working 12-hour shifts, which required him to

16 get up early for those shifts.  So that, combined with this

17 document we heard that he wasn't sleeping much, then not only

18 was he not sleeping much; he was also working at a pretty

19 demanding -- physically demanding job.

20 Q.    Okay.  Now, very briefly, can you summarize for us the

21 mitigating facts and circumstances that, in your opinion,

22 affected Mr. Hodges?

23 A.    Briefly, the mitigating facts and circumstances are the

24 chronic poverty that he grew up in.  His mother, with regard to

25 her depression and its impact on his development and her

1   ability to take care of his needs, her drinking.

2       Another mitigating factor that I listed was that she ran a

3   bootlegging activity or a speakeasy in her home, which thereby

4   exposed him, chronically -- because she probably ran it until

5   he was about eight years old, from what I can gather.  So that

6   exposed him to illegal activity and further decreased the level

7   of supervision that he received.

8       I -- other mitigating factors in this case are her

9   substance -- her misuse of Valium, which thereby increased her

10  depression and made her unable to effectively parent.  Her

11  parenting style was a mitigating factor in that she was not

12  consistent.  She did not consistently parent him in a manner

13  that gave him what he needed, despite other professionals

14  telling her what to do and advising her to do that; she ignored

15  them.

16      Another mitigating factor is his own medical needs and her

17  ability to effectively address them.  Another mitigating factor

18  is the chronic household that he grew up in.  And that's

19  mitigating because it took away from her ability to parent him

20  effectively.

21      Other mitigating factors are his substance use and the

22  impact that they had on his normative frontal lobe development.

23  Another mitigating factor is the relationship that his parents

24  had.  And these factors culminate to make him feeling unloved,

25  having low self-esteem, and seeking a relationship that

1  provides him a sense of self-worth and self-value.  And that's

2  the relationship he had with Ms. Cora Johnson.

3      And that's another mitigating factor because it really

4  fuels what he -- how he thinks about the world, and what he's

5  desiring at the time.  And that's a relationship with her and

6  the child that he believes to be his.

7      I think it's important to look a these mitigating factors

8  as a complete package and not sort of tease them out.  Because

9  what we have is many of these factors are chronic and going on

10  at the same time.

11  Q.    Okay.  And with that summary, can you tell us, in your

12  opinion, how these circumstances affected Mr. Hodges on the

13  night of the crime?

14  A.    On the night, as I've indicated, that in his relationship

15  with Ms. Johnson, he was trying to fulfill his need to feel

16  loved and valued, also, his desire to have a family and have

17  fathered this child to increase his sense of value, self-value,

18  and value to others.  So you have that factor going on.

19      You have the level of impulsivity and poor judgment;

20  that's normative.  But in this case, it's further impeded by

21  his paranoia, because he's adjusting to life after the RID

22  program; and his sleep deprivation.  So you have some

23  developmentally normal things happening that are made worse

24  because of the particulars of his life and of his life after

25  RID.

1  Q.    Thank you, Dr. Kavanaugh.

2          **MS. KAO:**  Your Honor, I have no other questions for

3  Dr. Kavanaugh at this time.

4          **THE COURT:**  All right.  Mr. McNamara, would this be a

5  good time for a short recess or would you like to proceed with

6  your cross at this time?

7          **MR. MCNAMARA:**  It would be a good time for a recess.

8          **THE COURT:**  Let's take about a five-minute break.

9  You can step down.

10         **THE WITNESS:**  Thank you, Your Honor.

11         **THE COURT:**  Court will be in recess.

12     (AFTER A SHORT BREAK, THE PROCEEDING CONTINUED)

13     (CALL TO ORDER OF THE COURT).

14         **THE COURT:**  You may proceed.  Oh, excuse me.  Did

15  you --

16         **MS. KAO:**  Your Honor, I think that Exhibit LL for

17  Ms. LaKasha Hodges was not formally admitted and that was

18  talked about and authenticated in Dr. Kavanaugh's testimony.

19         **THE COURT:**  All right.  And I had overruled the

20  objection, so it is admitted.

21         **MS. KAO:**  And in addition to that, it would be 35U,

22  as an umbrella.

23         **THE COURT:**  All right.  Any objection?

24     **MR. MCNAMARA:**  No.

25         **THE COURT:**  Let it be entered.

1      (EXHIBIT NOS. 35LL AND 35U WERE RECEIVED INTO EVIDENCE)

2          **THE COURT:**  And we'll go over all of the exhibits at

3  the end of the proof to make sure that we've ruled on all of

4  them, and I'll ask both sides to look at them.  So don't be

5  overly concerned right now.

6          Mr. McNamara.

7                      **CROSS-EXAMINATION**

8  **BY MR. MCNAMARA:**

9  Q.    Dr. Kavanaugh, is this your first trip to Mississippi?

10 A.    It is not.

11 Q.    What has brought you here before?

12 A.    This case in evaluating Mr. Hodges and his family.

13 Q.    Okay.  Other than dealing with this case, have you had an

14 occasion to come to Mississippi for any business?

15 A.    I have not.

16 Q.    Okay.  On -- you're saying you conducted this evaluation

17 using a multifaceted approach; is that correct?

18 A.    That's correct.

19 Q.    Okay.  When you're doing your evaluation, as you gather

20 the information to reach your conclusion, do you give more or

21 less weight to certain types of information that you come in

22 contact with?

23 A.    I don't know what you mean.

24 Q.    Let's say, Do you give more weight to a family member that

25 has reason to not want their loved one to be facing execution;

1   or do you give that less weight as opposed to an official

2   document from the hospital?

3   A.    I don't look at it that way.  Instead, I look at the

4   information that I obtain from the family members and the

5   degree that that is corroborated with other documents; that's

6   how I look at it.

7   Q.    So it has to be corroborated?

8   A.    Not that it has to be, but whether or not it is.  Not

9   everything is written in a document.  It doesn't mean that it

10  didn't occur.  So I look to see whether or not there's also

11  information.  But the absence of that doesn't minimize,

12  necessarily, the information I obtain from a family member.

13  Q.    Okay.  When you -- all the information that you get, I

14  believe you said that you look for corroboration, but it's not

15  absolutely necessary.  So you take everything that you get as

16  true?

17  A.    Truth isn't what -- no.  The answer is no.  I have more

18  confidence with information when it's also documented in

19  records.  But the lack of documentation doesn't mean that I

20  don't have confidence in it.

21  Q.    Okay.  From the information that you gave on your direct

22  examination, I believe it's pretty clear that Johnnie Pearl

23  Hodges would never be up for the mother-of-the-year award;

24  that'd be correct?

25  A.    What do you mean by "mother-of-the-year award?"

1  Q.    She was not a good mother, in your opinion; is that clear?

2  Is that what you were saying?

3  A.    She didn't meet his developmental needs; that's what I'm

4  saying.  (Inaudible).

5  Q.    So in fact she was a good mother?

6  A.    Excuse me?

7  Q.    She was a good mother?

8  A.    I think that you're simplifying it.  I'm not looking at it

9  as a yes or no thing.  What I'm looking at, instead, is whether

10 or not she was able to meet his developmental needs over the

11 course of his life and what things prevented her from doing

12 that.  And there was a series of things that prevented her from

13 doing that.

14 Q.    So you're saying she did not meet his needs?

15 A.    Yes.

16 Q.    Did she meet any of his needs?

17 A.    Certainly.  As I said previously, she was able to provide

18 him with some very, very basic needs, such as shelter and food.

19 But we know -- for example, for kids who are in orphanages, we

20 know that's not enough.  There are these other levels of needs

21 that kids need over the course of their life, and she wasn't

22 able to consistently give him that.

23 Q.    You say that we know this about orphanages; I don't

24 believe there has been any evidence brought out about that, has

25 there?

1  A.    I was using that as an example.

2  Q.    Okay.  You were saying -- one of the reasons you said

3  that -- one of the mitigating factors is he lived in chronic

4  poverty.  Is that correct?

5  A.    That's correct.

6  Q.    What -- how do you assess poverty?  What is chronic

7  poverty?

8  A.    I know that his poverty was to such an extent that he was

9  able to receive public assistance; and that's an indication of

10 chronic poverty -- of poverty, sorry.  I know that it was

11 chronic because I can look at the records and see how she --

12 when she went to the ER, she was unemployed.  In his medical

13 records, they indicate that she was unemployed.

14      I know that it was chronic based upon the information that

15 I obtained from interviews as well.  So I know -- those are the

16 factors that let me know it was chronic.  I know that it was

17 poverty because you get public assistance by virtue of being

18 poor.

19 Q.    Okay.  Is it -- so poverty but to -- you're aware that

20 Mississippi is the poorest state in the union, right; is that

21 correct?

22 A.    Uh-huh (yes).

23 Q.    So that poverty is encountered in Mississippi, that

24 wouldn't be a unique situation, would it?

25 A.    I think that it's important to understand that I've

1  identified a series of mitigating factors, all of which are

2  important; and that it's important to look at them as they

3  relate to each other. *Them* being the factors. So the fact

4  that he's not the only poor person in the state doesn't

5  minimize the importance of the poverty.

6      Instead, what's important to understand is that he grew up

7  in chronic poverty and how that poverty impacted his mother's

8  ability to parent him, and then how that impacted his

9  development.

10 Q.   Could you answer my question, please? It wouldn't be

11 unusual for someone living in Mississippi to be living in

12 poverty; so he is not unique in that, is he?

13 A.   He is not unique in that. What makes him a unique person

14 is the totality of the mitigating circumstances that I've

15 identified.

16 Q.   Mitigating circumstances. Okay. His mother didn't meet

17 his developmental needs so that gives him the excuse to commit

18 capital murder; is that what you're saying?

19 A.   I've not offered an excuse for the offense. I've instead

20 identified mitigating circumstances to the offense. There's a

21 difference.

22 Q.   What is your understanding of what a mitigating

23 circumstance is?

24 A.   It helps to put the defendant's life in context, and the

25 offense in context. Putting something in context doesn't

1  excuse it; it just helps to explain how it came to be.

2  Q.    Okay.  So chronic poverty that he shared with others is a

3  mitigating circumstances -- one of the mitigating

4  circumstances?

5  A.    Yes, it is one of the mitigating circumstances in this

6  case.

7  Q.    Okay.  And the letters that were written by Cora

8  Johnson -- and you stated that she was quite a bit younger than

9  Quintez Hodges; is that correct?

10  A.    That's correct.

11  Q.    And do you recall when they first started dating she was

12  13 years old?

13  A.    I'm -- I -- she was approximately 13.

14  Q.    And she was approximately 15 when he committed the murder?

15  A.    Yes.

16  Q.    And, so, then, she was approximately 15 when those letters

17  were generated that you reviewed; is that correct?

18  A.    No.  The letters were -- she wrote the letters over the

19  course of their relationship.

20  Q.    Okay.  She was a young --

21  A.    It wasn't -- I want to be clear; I'm sorry.

22  Q.    I'm sorry.

23  A.    It wasn't just that she wrote them at the end of their

24  relationship.  She wrote them over the course of their

25  relationship.  And the letters were important to me because it

1  described the course of their relationship and also how

2  important the relationship was to his life and then how then

3  the relationship was a mitigating factor.

4  Q.    Okay.  Getting back to your -- when you evaluated Quintez

5  Hodges at the state penitentiary, you said you went up there;

6  you met with him.  Can you tell me what happened the first time

7  you met Quintez Hodges?

8  A.    What do you mean what happened the first time?  What are

9  you referring to?

10  Q.    Did you go up and evaluate him?

11  A.    Yes.  I evaluated him three times for a total of

12  approximately eight hours, each time at the penitentiary.

13  Q.    Did you conduct any tests?

14  A.    I did not.

15  Q.    Why not?

16  A.    Because it's important that clinicians don't test for the

17  sake of testing.  It's important that you use the testing data

18  to identify -- so that it's relevant to the question that was

19  asked.  I was asked to identify mitigating factors.

20      We know that a potential mitigating factor could be a

21  person's IQ.  That's already been tested.  I have no reason to

22  think that the results of those tests are not accurate.  I was

23  asked to -- so therefore, I didn't need to reinvent the wheel

24  in this case.  I was asked to identify potential mitigating

25  factors that contributed to the offense.

1       If I were to give testing now, years after the offense, I

2  would be identifying things that are relevant to him now and

3  that may have resulted from being incarcerated for years.   I

4  wasn't asked to do that.   So, therefore, testing wasn't

5  necessary in this case.

6  Q.    Okay.   In the course of preparing your evaluation, you did

7  review the reports from the Mississippi State Hospital at

8  Whitfield; is that correct?

9  A.    That's correct.

10  Q.    Did you find any problem with that evaluation?

11  A.    I found -- there were things in that evaluation that were

12  certainly lacking.   For example, the failure to also interview

13  other family members is one thing that was lacking.   And also,

14  I was surprised by the limited amount of time that was spent

15  with Mr. Hodges in forming a clinical opinion.

16  Q.    How much time did they spend with him?

17  A.    Seventy minutes.

18  Q.    And did you -- well, did you take note that was a forensic

19  evaluation?

20  A.    Yes.

21  Q.    Okay.   Are you able to give a forensic evaluation?

22  A.    I am.

23  Q.    In this case, you gave a clinical evaluation.

24  A.    I think I should explain how the terms *forensic* and

25  *clinical* are used.   I am a forensic psychologist.   Forensic

1  psychologists are clinical psychologists.  Forensic

2  psychiatrists are clinical psychiatrists.  The term *forensic*

3  means conducting an evaluation that's going to be used in a

4  legal setting, so this could also be characterized as a

5  forensic evaluation.

6  Q.    Could also.  But as I recall today, you were tendered and

7  accepted as a witness as a clinical psychologist.

8  A.    You -- in order to be a forensic psychologist, you're also

9  a clinical psychologist, correct.

10  Q.    So forensic elements are in here, in your evaluation?

11  A.    Yes.  As I've just said, a forensic evaluation is a

12  clinical evaluation done in the context of a legal proceeding,

13  frequently to help the fact finder in answering the question

14  before them.

15  Q.    Is it -- and I don't mean this to be belittling.  It's a

16  question I wrote down that I wanted to ask you.  As far as

17  chronic poverty goes, do people that have health insurance --

18  are they usually classified as chronically in poverty?

19  A.    Depends upon the nature of the insurance.  For example,

20  you can have public-funded insurance; and you don't get that

21  unless you're poor.  So it depends upon the nature of the

22  insurance.

23  Q.    Well, the type of insurance that Mr. Hodges had, which

24  would be a policy through his father's work.

25  A.    I know that that's what his father reports.  However, we

1  also have documents that indicated that he was in fact on

2  Medicaid, which is insurance that you get when you're young

3  because you're poor.  And, so, it was clear to me that, because

4  of his poverty, he was receiving publicly-funded insurance.

5  Q.    So he never had a problem getting medical attention.  Is

6  that correct?

7  A.    No.  I think there's a difference between having

8  insurance, be it publicly or privately funded, and getting

9  medical attention.

10  Q.    Okay.  But, so, to say that -- you're saying that

11  Mr. Blair lied?

12  A.    I'm not making a statement about whether or not he lied.

13  No.  Instead I'm making a statement of what I saw in the

14  documents that I reviewed.  And the documents that I reviewed

15  clearly indicated that he was, at times in his life, on --

16  receiving public insurance, public health insurance.

17  Q.    Okay.  Just going to say, so his mother didn't meet his

18  needs; but at the same time, it appears that his family, his

19  mother, his family as a whole, did meet his medical needs when

20  he was a young child.  Is that correct?

21  A.    No, that's not correct.

22  Q.    But where did they miss out?  They took him to the

23  hospital when he was sick.

24  A.    He had a chronic medical condition.  They frequently

25  waited days to do that, thereby putting him at risk.  Another

1   way that they missed -- as you said, "missed out" was that they

2   also repeatedly exposed him to things that would exacerbate

3   that medical condition.

4        Specifically, she smoked.  She could have stopped smoking.

5   We know that secondhand smoke is a trigger for asthma.  We know

6   that asthma is a life-threatening illness.  So I'm not in any

7   way saying that they didn't take care of his medical needs.

8   Instead, I'm saying they were neglectful by waiting to take

9   care of his medical needs; and that there was neglect in that

10  they also contributed to the exacerbation of his medical

11  problem.

12  Q.   Would you agree it's not unique that his mother smoked

13  throughout his pregnancy and smoked after she found out that he

14  had asthma?

15  A.   I would agree that he's not unique in that respect.

16  Instead, what makes him unique --

17  Q.   You've already answered the question.

18  A.   -- is the totality of the mitigating factors.  So I think

19  it's important not to parcel them apart but to realize that

20  it's a complete package, and that they were frequently chronic

21  factors that he was experiencing at the same time.

22  Q.   Okay.  Well, I have to wonder.  You say his mother didn't

23  met his needs, but -- and you've been in here, and you've heard

24  all the testimony of his family.  They came in.  They said it

25  was -- their mother had problems; they knew it.

1       Whenever she would go down, she would have an episode,

2   when she got drunk, several times a year, that might require

3   hospitalization, the family came together and helped.  Is that

4   not nurturing?  Is that not meeting his needs?

5   A.    That's not.  Because there are different levels of needs

6   that we have.  And one's ability to have your needs met on

7   those different levels is -- will contribute significantly to

8   your having optimal mental health.  Simply feeding a person and

9   clothing a person is not enough.  That's how they stepped in.

10       It's important to keep in mind that when they stepped in,

11   they had their own demands.  They had their own children as

12   well.  So you have -- granted she's in the hospital, being

13   separated at a young age from your primary caregiver causes

14   subsequent problems.  But you're right; they did step in.  But

15   they stepped in only to care for basic needs, and they had

16   their own demands as well.

17   Q.    And is that in your report?

18   A.    Is what in my report?

19   Q.    What you just said.

20   A.    That he had -- his mother's alcoholism is in my report,

21   and you mentioned the testimony yesterday.  And that's what I

22   was explaining, the impact of yesterday's testimony.  That's

23   what you mentioned.  But his mother's alcohol -- his mother's

24   alcoholism and its impact on his life was mentioned in my

25   report as being a mitigating factor, yes.

1   Q.    What you just said a moment ago, you're saying they just

2   came in, met his basic needs; they fed him; they clothed him.

3   The testimony that was given on the stand while you were in

4   this courtroom was that they loved him; they nurtured him; they

5   were a family.  You're saying they just fed him, give him a

6   little food, and send him on.  That's not what was said, was

7   it?

8   A.    I was asked to use my clinical opinion about the

9   information.  So that if a family identifies something as love

10  and nurturing, my job is to use my clinical judgment to

11  determine if that's sufficient.  When you live in extreme

12  poverty, love is equivalent to feeding, nurturing is equivalent

13  to feeding; you're taking care of basic needs.

14       It's my clinical opinion that those needs, though -- that

15  taking care of those is not sufficient.  There are other needs.

16  This is also demonstrated in the records that I reviewed.  The

17  records from Community Counseling Services shows that they were

18  trying to teach Ms. Johnnie Pearl Hodges how to take care of

19  his other needs, just give him positive reinforcement, give him

20  more one-to-one attention, things that she was unable to do.

21  Those are in the Community Counseling Services' records, the

22  records that I also reviewed.

23  Q.    What you're saying is poor families are not capable of

24  love and caring for each other?

25  A.    I'm not making a statement about all poor families.  I was

1  not asked to do that.  I'm making a statement about Mr. Hodges.

2  Q.   That's the question I'm asking you now, in response to

3  what you just said.

4  A.   And again, what I said is that's beyond the scope of what

5  I was asked to do.  I am not making -- and each family, in and

6  of itself, is different.  I'm clearly making a statement about

7  Mr. Hodges, his family, and what mitigating factors are

8  present.

9  Q.   Okay.  When you prepared your report, was it just based on

10  the facts that you derived from your investigation, from all

11  the information you went over; or is there any bias or sympathy

12  on your part toward that family?

13  A.   I have no bias or sympathy toward the family.  It's based

14  upon the information I obtained in conducting my report, based

15  upon the interviews and the records that I reviewed.

16  Q.   Okay.  If you would, if you -- on page 5 of your report,

17  if you'd look at that last paragraph, please.

18  A.   Yes.

19  Q.   Okay.  "Like his mother, Ms. Hodges, eventually,

20  himself -- Mr. Hodges eventually, himself, eventually abused

21  substances; but what is unfortunate in this case is that

22  Ms. Johnnie Pearl Hodges suspected Mr. Hodges' drug use and

23  sought help to no avail."  And that's not a bias statement?

24  A.   I'm not sure what you're referring to there as bias.  Can

25  you point that out to me?

1  Q.    Never mind.

2  A.    Okay.

3  Q.    What's your view on the death penalty?

4  A.    What do you mean by what's my view?  I believe --

5  Q.    Are you for the death penalty?

6  A.    I believe that sometimes I'm for it, and sometimes I'm

7  against it.

8  Q.    When are you for it?

9  A.    When it's an appropriate response to the crime at hand,

10 and when there aren't mitigating circumstances at play.

11 Q.    Have you ever encountered a case like that?

12 A.    Where there aren't mitigating circumstances?

13 Q.    Correct.

14 A.    Yes.

15 Q.    In one that you testified in?

16 A.    It was a case that I wasn't asked to testify because I was

17 retained by the defense.  And that frequently happens in my

18 practice, that I'm retained by the defense; and they don't like

19 the opinion that I offer, so they ask me not to testify.

20 Q.    How many times have you testified for the prosecution?

21 A.    I've never testified for the prosecution.  Instead, what

22 I've done is either testified for the defense; or I've

23 conducted court-ordered evaluations.  And those typically don't

24 require testimony because every party is given, meaning the

25 judge, the state's attorney, and the defense, a copy of the

1   report at the same time.

2   Q.    Okay.  You say you did look through the -- did read the

3   Mississippi State Hospital report.  You also reviewed the

4   report by Dr. Zimmerman; is that correct?

5   A.    That is correct.

6   Q.    Were there any other mental evaluations that you reviewed?

7   A.    Any other what?

8   Q.    Mental evaluations.  Any other mental information,

9   evaluations that were done?

10  A.    There were other mental health evaluations or evaluations

11  conducted by mental health practitioners in the Community

12  Counseling Services records.  There was also another mental

13  health evaluation that I reviewed in addition to that.

14  Q.    And which one was that?

15  A.    Oh, the name escapes me.

16  Q.    Could it be Wiviott?

17  A.    Yes.  Thank you.

18  Q.    You did review that?

19  A.    I did review that.

20  Q.    But you -- as far as I can tell, you have eliminated that

21  from your materials in what you evaluated?

22  A.    I didn't rely upon that in forming my opinion because one

23  of the things that wasn't done in that evaluation was to

24  interview other people that were important in his life, to

25  gather that information.  And also, there were a lot of records

1 that were not included in that evaluation that I found to be

2 very important.

3 Q.   So you gave it no weight whatsoever?

4 A.   That's not what I said.  I said that I didn't rely upon it

5 in forming my opinion because I did more than what they did in

6 that evaluation.

7 Q.   I'll just ask you, if you recall, from when you reviewed

8 that, would you agree that -- I see the conclusions are

9 different.  But the content of Dr. Wiviott's evaluation falls

10 very much in line with your contents and what you relied on as

11 far as going to the same passages that were taken from the

12 letters that Cora Johnson wrote --

13 A.   I --

14 Q.   I'm sorry.  Go ahead.

15 A.   No, I'm sorry.  I did not mean to interrupt you.

16 Q.   Do you recall that?

17 A.   I need to know what you're referring to.  There was a lot

18 of vague things in that question.

19 Q.   Do you recall her report?

20 A.   I do -- I recall having read her report, yes.

21 Q.   Do you recall that in her report there were references to

22 the letters that Cora Johnson wrote to Quintez Hodges?

23 A.   Yes, there were.

24 Q.   Do you recall that most of the letters that you referred

25 to are identical to the ones that she did?

1  A.    That -- I don't know what you mean by "most of them."  And

2  I think that what's also important is the fact that --

3  Q.    Many of them?

4  A.    Excuse me?

5  Q.    Many of them.

6  A.    Well, I still don't know exactly which ones you're

7  referring to.

8  Q.    Yes, ma'am.

9  A.    What's important, though, is not only are references to

10 them but his perception of them.  And what's clear to me is

11 that she only reviewed -- interviewed him in one instance and

12 did not discuss that important factor with him.  And that

13 important factor is the perception of those letters and also

14 the depth of their relationship.

15 Q.    And what did you perceive the depth of their relationship

16 to be?

17 A.    It's -- basically, this relationship was his world.  It

18 was important to him.  It gave him value and a sense of

19 self-worth.

20 Q.    Okay.  And you say -- and that was one of the factors on

21 the night that the murder occurred?

22 A.    That was one of the mitigating factors that I identified

23 in this case.

24 Q.    And then you also talked about the fact that he was -- are

25 you saying he had sleep deprivation?  Is that correct?

1   A.    That is correct.

2   Q.    Okay.  He's 18 years old, just got out of the RID program.

3   Is it unusual for an 18-year-old to stay up late at night,

4   watch TV, just kind of hang around, want to be out at night?

5   A.    That in and of itself isn't unusual.  What is --

6   Q.    I -- I'm sorry.  Go ahead.

7   A.    What makes him unique in this case is the fact of how that

8   sleep deprivation impacts his thinking; and the impact here is

9   great because it impacts his frontal lobe, makes him more

10  impulsive, inability to follow things through.  And this is a

11  problem for him in part, also, because of his chronic substance

12  use.  So it's not just that he was sleeping or his lack of

13  sleep in and of itself; but it's, again, the total picture.

14  Q.    Okay.  This information that you had about the frontal

15  lobe not being fully developed until -- those under 20, are

16  developmentally immature; is that correct?

17  A.    Yes.

18  Q.    And that's every 20-year-old on the face of the planet?

19  A.    The research hasn't looked at every 20-year-old.  But what

20  we know from looking at a large number of 20-year-olds is that

21  we can see that the frontal lobe is still developing.  And

22  because of that, that aspect of their development is immature.

23  He has, also, other aspects of his development -- of his

24  personality that are immature.

25  Q.    So he was immature?

1  A.    Yes.  On many fronts, he was immature.

2  Q.    And you're not saying everybody in the world but most of

3  them, immature, because the frontal lobe hasn't developed?

4  A.    That's one aspect that adolescence and through your early

5  20s share.  But he had other things that also made him

6  immature, other factors that made him immature.

7  Q.    That his mother didn't help him develop?  Would that be

8  one?

9  A.    That would be one.  Parents -- an important task that they

10  have is to help their children develop.  Their inability to do

11  that will negatively impact their kids throughout their life.

12  And this is something the State recognizes in other venues.

13       If a parent isn't helping their child develop and taking

14  care of their needs, frequently children are taken away from

15  their parents for that reason.  That's because we've recognized

16  how important that is.

17  Q.    But that's not the case in this case; no one took him

18  away, did they?

19  A.    No.  But the circumstances existed where -- for example,

20  she was exposing him, chronically, to illegal activity and

21  wasn't, in a timely fashion, taking care of his medical needs.

22  It is -- was quite astounding to me that the Department of

23  Human Services -- or I don't know what you call it here -- but

24  child welfare agency wasn't actually called on this family.

25  There were certainly reasons for them to be called and

1  investigate the family.

2  Q.    Okay.  I'll wrap it up real quick.  But you're saying --

3  all right.  I'm looking at the last page of your -- and it

4  spells out your opinion, and you went through it with Ms. Kao.

5  All those factors are mitigating, in your estimation?

6  A.    Yes.

7  Q.    And all of those factors -- I'm sorry, you're saying --

8  and I don't mean this to be flippant, but could you tell me

9  what the meaning of mitigation is again?

10 A.    Mitigating are factors that put the person's life and the

11 circumstances of the offense in context.

12 Q.    Okay.  And the next to the last sentence where you have

13 "These impairments created difficulties for Mr. Hodges that

14 most people never have to experience," you're saying those

15 mitigation factors that you listed up there, that is rare; he

16 is so unique that he is a person that has these mitigating

17 factors and the circumstances of his life have led him to

18 kidnap the girl he loves and kill her brother in the process?

19 A.    I'm saying that what is unique about Mr. Hodges is the

20 package of mitigating factors that he presents with and how he

21 experienced them chronically over the course of his life.  Yes,

22 that does make him unique.

23 Q.    I think that might be my last question, but let me check.

24 If you'll --

25 A.    Certainly.

1    Q.    -- give me a second.  With all that said, are you saying

2    he -- these circumstances and the things have worked against

3    him -- at what point in time does he -- or has it yet to

4    occur -- when is he responsible for his own actions?

5    A.    He's always responsible for his actions.

6    Q.    That's all I have.  Thank you.

7              **THE COURT:**  Any redirect?

8              **MS. KAO:**  Very briefly, Your Honor.

9                        **REDIRECT EXAMINATION**

10   **BY MS. KAO:**

11   Q.    Dr. Kavanaugh, Mr. McNamara asked you about your testimony

12   for the defense.  And I'm going to follow up and ask you, What

13   percentage of retention by the defense, just a broad estimate,

14   results in your actually getting up on the stand to give

15   testimony?

16   A.    I would say -- I only testify in about 25 of the --

17   25 percent of the cases that I'm retained in.

18   Q.    And what happens in the other 75 percent of those cases

19   that you're retained in?

20   A.    I conduct an evaluation, the retaining attorney doesn't

21   like my opinion, so I don't testify.  I don't do anything else

22   in the case.

23   Q.    And when you say, "They don't like your opinion," what do

24   you mean by that?

25   A.    It's not favorable to the defense.

1  Q.    Mr. McNamara also asked about your qualifications as a

2  forensic psychologist.  Do you recall that?

3  A.    I do.

4  Q.    On your curriculum vitae, you list a clinical director of

5  the juvenile division of the Cook County Juvenile Court Clinic.

6  Can you tell me what the Cook County Juvenile Court Clinic is?

7  A.    It's the forensic clinic in Cook County, one of the oldest

8  juvenile court clinics in the country.  It's a forensic clinic

9  in which we only conduct forensic evaluations.  And by

10 forensic, I mean they are mental evaluations conducted by a

11 mental health professional to be tendered to court to help

12 answer a legal question.

13      The Cook County Juvenile Court Clinic serves both sides of

14 the court in juvenile court, abuse and neglect and delinquency.

15 And we respond to court -- I say *we* because I was there for 10

16 years and helped to develop the model for the court clinic.

17 And we were asked by the chief judge to do so.  So all we did

18 is respond to court-ordered evaluations.  It is a forensic

19 clinic.

20 Q.    And, Dr. Kavanaugh, what was your role at the Cook County

21 Juvenile Court Clinic?

22 A.    I conduct -- I established all the protocols for how to

23 conduct evaluations based upon the best forensic standards.  I

24 conducted evaluations.  I supervised those that conducted

25 evaluations.  And as part of my supervision, I sat in on their

1  evaluations and read all their reports for the first six months

2  before they were tendered.  *They*, the report, was tendered to

3  the Court.

4  Q.   Okay.  And, Dr. Kavanaugh, so is it fair to say that the

5  Cook County Juvenile Court -- that in your capacity as the

6  clinical director of the juvenile division of the Cook County

7  Juvenile Court Clinic, that the juvenile court system of Cook

8  County considered you an expert forensic psychologist?

9  A.   Yes.

10  Q.   And just to be clear, where is Cook County, Illinois?

11  A.   Chicago.

12  Q.   Thank you very much.

13         **MS. KAO:**  No further questions, Your Honor.

14         **THE COURT:**  All right.  You may step down.

15         **THE WITNESS:**  Thank you.

16         **THE COURT:**  Is she free to leave?

17         **MS. KAO:**  Your Honor, we will have 1 or 2 fact

18  witnesses.  We would like to not excuse Dr. Kavanaugh in case

19  we may need to recall her.

20         **THE COURT:**  All right.  She may remain in the

21  courtroom.

22     Who will you call next?

23         **MR. MCDUFF:**  Carrie Jourdan.

24     (THE WITNESS IS SWORN)

25         **CARRIE JOURDAN, PETITIONER'S WITNESS, SWORN**

1                          __DIRECT EXAMINATION__

2   __BY MR. MCDUFF:__

3   Q.    Good morning, Ms. Jourdan.

4   A.    Good morning.

5   Q.    For the record, please state your name.

6   A.    Carrie Ann Jourdan.

7   Q.    Okay.  And spell it, please.

8   A.    C-a-r-r-i-e, A-n-n -- Ann is my middle name; it's not one

9   word -- Jourdan, J-o-u-r-d-a-n.

10  Q.    And what's your occupation?

11  A.    I'm an attorney.

12  Q.    Okay.  Where do you live?

13  A.    I live in Columbus, Mississippi.

14  Q.    Okay.  Did you at one point represent Quintez Hodges in

15  his capital murder case?

16  A.    That is correct.

17  Q.    And how did you -- how were you hired to represent him?

18  A.    I am a public defender for the 16th judicial district,

19  which includes Lowndes County, which of course encompasses

20  Columbus, Mississippi.  I was appointed, I believe, in either

21  '98 or '99, as memory serves me correctly, to represent Quintez

22  Hodges.

23  Q.    Okay.  And when you say you're a public defender in

24  Lowndes County, is that a part-time position?

25  A.    Yes, that is correct.  I have a private practice.  And in

1  addition to that, I have a part-time position as a public

2  defender.

3  Q.    Okay.  Was there a point when you were contacted by a

4  lawyer named Mike Miller about this case?

5  A.    Yes, there was.

6  Q.    Okay.  When was that; do you recall?

7  A.    I was actually, I believe, contacted in -- and I don't

8  remember the specific date -- but June of 2001.

9  Q.    Okay.  And what did Mr. Miller tell you?

10 A.    If I could, Quintez Hodges had been appointed to me for

11 almost two years, I believe is the time frame.  We had very --

12 I had very early on made a motion for a mental exam.  He had

13 received subsequent charges because he'd attempted to escape

14 and some other issues, and I had to make motions in those cases

15 as well.

16     His mental exam had taken a year and a half for lots of

17 different reasons.  Primarily, at that particular time, the

18 state hospital had only one psych forensic examiner, if my

19 memory is serving me correctly.

20     So he had been examined and returned in late December of

21 2000, and I think we actually got the report in early January.

22 I didn't actually see the report -- I'm not really sure why --

23 until the February term.  The --

24 Q.    This is 2001?

25 A.    Yes.  2001.

1  Q.    Okay.

2  A.    In June of 2000 -- not a lot had been done to the case is

3  what I'm trying to say gracefully.  And in June of 2000 -- he'd

4  been returned in the early part of 2001.  In 2001, in June, I

5  was contacted by Mr. Miller indicating that Mr. Hodges' family

6  was -- had retained him.

7  Q.    Okay.  And what was the next contact you had, next

8  involvement you had with respect to the case?

9  A.    Mr. Miller indicated to me in that conversation that he

10 would -- which is customary when someone is retained or takes

11 over a case, that he would prepare the order substituting him

12 as counsel.  And we had a conversation regarding the status of

13 the case and all the things that I needed -- that he would need

14 to do.

15      And then subsequent to that, I was called into judges's

16 chambers during the August term of Court.  There was actually a

17 motion day scheduled in Quintez Hodges, which would have been

18 the appropriate day to hear all the motions on Quintez Hodges.

19 I had not filed anything because I'd been contacted in June and

20 led to believe that Mr. Miller was going to take over the case.

21      When I indicated that to the judge, I immediately made a

22 motion to move back all the deadlines; and I believe the court

23 administrator for Judge Montgomery contacted Mr. Miller's

24 office and confirmed that he had taken over the case.  And, so,

25 they extended all the deadlines to allow him to enter a motion

1  of appearance and to make the appropriate motions.

2  Q.    Okay.  So when you -- when you were called into the

3  judge's office during the August term, at that point, had

4  Mr. Miller entered his appearance?

5  A.    No, he had not.  But either the court administrator or

6  myself -- I believe it was the court administrator -- called

7  and confirmed that he had taken over the case.  I don't know if

8  I actually did the order or he had actually sent it over, but

9  we got the order done.

10       But on each occasion, in June and then in August, I told

11 Mr. Miller, you got to file for a continuance because there's a

12 bunch of stuff you need to do, not the least of which was

13 mitigation.  And I told him on each occasion to file the

14 continuance and file that continuance along with his motions.

15 Because, obviously, the weight of those motions would all but

16 require Judge Montgomery to continue the case.

17 Q.    At that point, had a mitigation investigation been done?

18 A.    Nothing had been done.  As I indicated, it took almost a

19 year and a half to get the mental exam done because it was just

20 a chain of circumstances.  They were short on -- they only had

21 one forensic mental examiner.

22       They had -- he committed some other crimes.  He kept

23 having to be brought back to receive the indictment.  I had to

24 make motions in all those other issues.  By the time he got

25 brought back, I was also in the middle of another death penalty

1   case.  Well, actually, a death penalty -- the case you're

2   familiar with is *Kennedy Brewer* (phonetic).  We'd just gotten

3   back the DNA on that case, and I was in the middle of that.

4        And, so, I hadn't even requested co-counsel.  And, so, it

5   had been my plan, after we got him out of the mental exam, to

6   get the co-counsel, make all our motions.  And we had, in fact,

7   set the motion day for August 7th back in the May term of Court

8   to allow me time to do all that; I believe is when we set them,

9   to allow me time to get all that done.

10  Q.    Okay.  And just to make sure this is clear, did you tell

11  Mr. Miller that the mitigation investigation had not been done?

12  A.    I told Mr. Miller everything.  I emphasized the need -- I

13  wasn't familiar with Mr. Miller, but that in and of itself

14  didn't necessarily mean anything.  He was new to the area.  I

15  knew he was not very long out of law school.

16       But I told him, you know, your most important thing is to

17  get it continued, but also to file a variety of motions.  And I

18  think I even named them.  I think I talked about it in my

19  affidavit.  You need a mitigation expert.  You need to file all

20  those motions that relate to voir dire, all those motions that

21  relate to getting an investigator.

22       Well, he wouldn't have been able to get -- once he's

23  retained, unless he can show the inability -- it would be a lot

24  harder for him to get an investigator as retained counsel.  But

25  there was a bunch of things that needed to be done, and I

1  talked about that with him at length.  And we had a very candid

2  and, I thought, illuminating discussion about what needed to be

3  done.  And he assured me he would do those things.

4       Unfortunately for the situation, I should have followed up

5  on him getting the order entered; and I didn't, because that

6  would have clued me that the order wasn't done and neither were

7  any of the motions.  But the most important thing being the

8  motion to continue.

9  Q.    Okay.  And just so I can be clear on this, did you tell

10  him the mitigation investigation had not been done?

11  A.    Absolutely.

12  Q.    Okay.

13  A.    I told him almost exactly what I've told you.  "Mike,

14  we've been messing around with a mental exam for over a year

15  and a half.  I was in the middle of this other case.  I was

16  just now starting to really focus on Quintez Hodges.  You need

17  to do a bunch of stuff, including the mitigation."

18       In the Hodges case, there was a -- the guilt phase was --

19  also needed some significant investigation, obviously.  But the

20  most important thing to me, in my mind, based on everything

21  with the Hodges case was also the mitigation phase.

22  Q.    Okay.  Now, you mentioned earlier that you did not -- you

23  had not yet secured a second counsel to assist you on the case.

24  Is this something -- was that something -- would that be

25  something you would normally do to prepare for trial in a

1  capital case?

2  A.   Yeah.  I mean, absolutely.  Well, first of all, we're

3  entitled to -- it's mandatory now to have a second chair,

4  someone who's also death penalty qualified.  And I'm just, you

5  know, again, sounding like a broken record; but it's true.  It

6  took so long to get the mental exam.

7       And then when we finally got him back in December of 2000,

8  it took me a couple of months to be in a position to crank up

9  and start doing all the things you need to do.  I am death

10  penalty qualified.  I think at this point -- I don't know how

11  many I've done; but 7 or 8, I think.

12       And there's a bunch of stuff that you obviously -- you and

13  I both know, and anybody that's worked in a death penalty case,

14  that have to be done, and for any case, to be adequately

15  prepared.  And I just hadn't had an opportunity.  And at the

16  point of time when I was getting ready to do all of that is

17  when I was contacted, and Mr. Miller substituted himself in.

18  Q.   After he told you -- after he first contacted you and told

19  you he was going to be taking the case, did you do any more

20  work on the case?

21  A.   No, I didn't do anything.

22  Q.   Okay.  Did you give him your file at some point?

23  A.   Yes.  In fact, I believe that he already had my file.  I

24  think he came by the office and picked it up.  And that was the

25  other reason -- again, we let things get outside normal

1   channels.  Normally, when we give the file, we make the

2   attorney give us an order of substitution.

3        But again, normally, that's not a problem.  The criminal

4   defense bar is fairly small.  We all interact together.  It's

5   usually not a problem.  "Hey, you didn't get the order; let me

6   have it."  And it just didn't get entered.

7   Q.    Okay.  So everything you had was given to him?

8   A.    Yes, sir.

9             **MR. MCDUFF:**  One moment, Your Honor.  That's all.

10            **THE COURT:**  All right.  Any cross?

11                         **CROSS-EXAMINATION**

12  **BY MR. MCNAMARA:**

13  Q.    Ms. Jourdan, how long did you say you were Quintez Hodges'

14  attorney?

15  A.    I think I was his attorney for almost two years.

16  Q.    And your testimony is, over that two-year period, you

17  didn't do much of any work on his case?

18  A.    I filed for a motion for discovery.  I arraigned him on, I

19  think, three separate felonies.  I attended arraignment

20  sessions on three separate felonies.  I met with him on

21  numerous occasions.  I met with his mother and his aunt.  I

22  filed for mental exams, I think three separate mental exams

23  because of three separate felonies.  In terms of procedurally,

24  I did not do a lot.  But again, I was waiting for the return of

25  the mental exam.

CROSS  -  JOURDAN          Volume II, page 85

1  Q.    The return of the mental exam -- without having that, you

2  were not able to do any mitigation investigation whatsoever?

3  A.    No, I don't think that would be accurate.  I think that

4  the -- and I think I stated this in my affidavit.  But I

5  believed -- and I'm not an expert, but I've been doing this a

6  long time.  I believed that Mr. Hodges was significantly

7  impaired and had my own doubts about his ability to distinguish

8  right or wrong at the time the act was committed and about his

9  ability to assist counsel.  So quite frankly, sir, I had --

10  even with the state of the Mississippi Hospital, I had some

11  belief that he might be returned as incompetent.

12  Q.    And this was based on -- I believe you said over that

13  two-year period you met him for a total of eight hours when

14  you -- just during terms of court, and you would talk to him

15  then; and that's when you based that opinion?

16  A.    Yes, sir.  Also, my familiarity with the history, what had

17  occurred in the discovery file.  If you read the history of

18  Mr. Hodges and the young lady that he kidnapped, clearly, we

19  were dealing with someone who had significant problems.

20  Q.    I believe you testified a minute ago that the -- the

21  main -- I may have gotten -- I may have heard this wrong.

22  A.    That's fine.

23  Q.    But I think you were saying, in Mr. Hodges' case, what you

24  needed more than anything -- I guess I'm paraphrasing -- what

25  you needed more than anything was mitigation evidence rather

1  than anything to put on at the guilt phase?

2  A.    Well, no.    I think I said substantial investigation needed

3  to be done on the guilt phase, but we're all aware that a

4  mitigation expert could take anywhere from 6 to 8 months.

5       You've got to remember, too, I'm -- not to sound

6  defensive, but I believe, in '99, I had a case load of

7  approximately 100 cases that were PD cases.  At that time, we

8  made a request; and at some point during the course of the next

9  several years, they appointed other public defenders, and our

10  case loads were significantly reduced.  So that case was in

11  desperate need of attention that I had been unable to give it,

12  period.

13  Q.    I think you answered it.  How many other DP cases did you

14  have at that particular time?

15  A.    I only had one death penalty case and a death penalty PCR

16  that I was appointed on.

17  Q.    But this was the only one that was scheduled to go to

18  trial?

19  A.    That is correct.

20  Q.    And it was not your priority?

21  A.    Let me just say that in my capacity as a public defender

22  for now, I think, 11 years, I have never been forced to trial

23  on a death penalty case when I was not ready to go.  I did not

24  have any belief that judge -- I felt confident about my ability

25  to get the case continued once I got all my motions filed.

1  Q.    So you just assumed that, correct?

2  A.    Yes.  And based on my interaction -- my nearly a decade's

3  worth of interaction with the district attorney's office and

4  Judge Montgomery; and the fact that he hadn't yet given me

5  co-counsel, which I had requested.

6  Q.    So --

7  A.    But I will agree with you that the case had not been

8  properly worked to go to trial in September, no question about

9  that.

10 Q.    Okay.  So if -- you said Mr. Miller just told you; you

11 know, you just took his word for it without any paperwork, the

12 required paperwork.  You just assumed that you didn't have to

13 work on that case anymore?

14 A.    Well, he came and picked up the file.  And quite frankly,

15 that's how I deal with most lawyers.  I operate on them giving

16 me -- talking to me as officers of the court.  I've never had a

17 lawyer call me and say, "I've been hired on this case, and now

18 I'm not doing it."  That's never happened.

19 Q.    Let's say that it was set for -- you knew that it was set

20 for a September trial date, correct?

21 A.    That is correct.

22 Q.    And without a continuance, you wouldn't have been ready

23 for this case either, would you?

24 A.    That is correct.

25              MR. MCNAMARA:   I have nothing further.

1          **THE COURT:** All right. Any redirect?

2          **MR. MCDUFF:** Just one question on redirect, Your

3  Honor.

4                    **REDIRECT EXAMINATION**

5  **BY MR. MCDUFF:**

6  Q.   You said that you had a case load of 100 cases in 1999?

7  A.   I remember that one time we did a -- we put together a

8  bunch of statistics for Lowndes County in order to get --

9  actually, I think it was closer to 2,000 -- in order to get

10 some more help. And we put together a thing of our average

11 case load. And at one time, the average case load -- and I

12 believe it was around that time -- was around that.

13     Now our case load runs around 40. But they hired two

14 others -- they started out to be 3 or 4 of us; now there's six

15 of us. So it substantially improved our ability to do things

16 in a timely -- I believe that we were still a very good public

17 defenders staff in Lowndes County, but it was much slower.

18 It's increased our ability to be timely.

19 Q.   And these were 100 appointed cases in your position as a

20 part-time public defender?

21 A.   Correct.

22 Q.   Okay. And then you had your private practice in addition

23 to that?

24 A.   Correct.

25          **MR. MCDUFF:** No further questions.

1          **THE COURT:**  All right.  You may step down.

2          **THE WITNESS:**  Thank you, sir.

3          **MR. MCDUFF:**  Your Honor, we have, at most, one other

4    witness.  I need to check with my co-counsel if I may.  Be

5    right back.

6          **THE COURT:**  All right.

7       (AFTER OFF-THE-RECORD COMMENTS, THE PROCEEDING CONTINUED)

8          **MR. MCDUFF:**  May we confer with opposing counsel?

9       (AFTER OFF-THE-RECORD COMMENTS, THE PROCEEDING CONTINUED)

10          **MR. MCDUFF:**  May we approach, Your Honor?

11          **THE COURT:**  Yes.

12          (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING

13          OF THE AUDIENCE AND THE DEFENDANT 11:25 a.m.)

14          **MR. MCNAMARA:**  Your Honor, I was just told by --

15          **THE COURT:**  Let me ask y'all to speak towards this

16    microphone so the court reporter can hear you.

17          **MR. MCNAMARA:**  What Mr. McDuff just tells me -- I'm

18    sorry.  What's her name?

19          **MS. KAO:**  Latasha Martin.

20          **MR. MCNAMARA:**  Latasha Martin.  She was the subject

21    of -- when Mr. Allgood was on the stand, she was the attempted

22    sexual assault victim that was one of the charges that was

23    dropped as a result of the plea and the break-in of Bessie

24    Tatum's house.

25          I haven't -- I was just notified Monday night about ten

1  o'clock that she would be called as a witness. I'm now told

2  that she's out there. I was wanting to talk to her before she

3  testified. But I'm now told by the petitioner's counsel that

4  she's going to get on the stand and refute the fact that that

5  crime ever occurred. And I'm just now trying to take that in

6  and form my objections to it.

7           **THE COURT:** What is the purpose of her testimony? I

8  mean, up until now, at least, she had made charges, hadn't she?

9           **MR. MCNAMARA:** There was an indictment.

10          **THE COURT:** Okay.

11          **MR. MCDUFF:** Well, she -- she actually didn't make

12 charges. Someone else made them. And they did indict him.

13 The arrest was brought into the penalty phase. It shouldn't

14 have been; but as we said, the defense improperly opened the

15 door, so it did come in. Because, otherwise, it would have

16 been inadmissible.

17    It came into the penalty phase of his testimony that he

18 had been indicted on it. And we went and talked to her, and

19 she said it never happened. And to the extent that was harmful

20 to him in the penalty phase --

21          **MR. MCNAMARA:** That was dropped. At the same time, I

22 don't have access to that file. I haven't looked at that

23 entire file. It's very likely she could face perjury charges

24 if she gets up here, which I would fully prosecute.

25          **MR. MCDUFF:** Well, you wouldn't be able to prosecute

1   it.  I mean, it's in federal court.

2          **MR. MCNAMARA:**  I'll do what I can.

3          **THE COURT:**  Well, I think you probably should be

4   allowed to interview her, don't you?

5          **MR. MCDUFF:**  We don't have any problem with that.

6   And I'll say this:  I mean, you know, our position is it never

7   should have been -- the arrest never should have been admitted

8   in the first place, and that's part of the prejudice.  But we

9   went and talked to her, and she said it didn't happen.  So in

10   terms of -- you know, we're going to put her on to say, Hey,

11   even if it was properly admitted, it could have been refuted at

12   the time.

13     Now, I think that's secondary to the key point, which is

14   it never should have been admitted in the first place.  And --

15   let me finish.  And if we're right about that, then, of course,

16   her testimony is not terribly relevant; but we're trying to

17   cover all our bases here.

18          **MR. MCNAMARA:**  I just have to say that I'm still

19   trying to soak it in at this moment.  But if she's going to

20   testify to that -- and what was testified to at that hearing

21   was the fact that that -- no one ever spoke to the veracity of

22   the charges.

23     There was an indictment.  In fact, that indictment was

24   dropped as a result.  There was -- so it was still -- if it

25   happened or not, a valid indictment on the information that

1  come through -- it had gone through the process.  In agreement,

2  they dropped that.  I think it's pretty much a nonissue for the

3  most part until she gets up there and testifies, and we'll see

4  where she may --

5          **THE COURT:**  I'm inclined to not hear that evidence

6  because it doesn't shine any light on the facts that were

7  available at the time of his trial.  If she was -- if he was

8  under indictment at that time, I don't see how it would change

9  one's view of the fairness of that proceeding then, which is

10 what I'm concerned about.

11         **MR. MCDUFF:**  Well, what we would like to do, then, is

12 make a proffer that if Mr. Hodges had adequate counsel at the

13 sentencing phase and if, in fact, that evidence -- the fact of

14 that indictment and that arrest for the attempted sexual

15 battery of Latasha Martin had come into evidence or been

16 mentioned into evidence, his counsel could have secured

17 Ms. Martin's appearance at trial; and she would have testified

18 that it didn't happen.  And that's our proffer.

19         **THE COURT:**  Do you want to do it -- and that's

20 sufficient.

21         **MR. MCDUFF:**  Okay.

22         **THE COURT:**  Mr. McNamara?

23         **MR. MCNAMARA:**  That'd be fine, Your Honor.

24         **THE COURT:**  Okay.

25         **MR. MCDUFF:**  All right.  Then in light of the Court's

1   ruling and with that proffer, we won't call her to the stand.

2          **THE COURT:**  All right.  I'll let you make your

3   announcement.  Is this your last witness?

4          **MR. MCDUFF:**  Yes.

5          **MS. KAO:**  Yes, Your Honor.

6          **THE COURT:**  All right.

7          (END OF DISCUSSION AT SIDEBAR OUT OF HEARING

8      OF THE AUDIENCE AND THE DEFENDANT AT 11:30 a.m.).

9          **THE COURT:**  All right.  Mr. McDuff?

10         **MR. MCDUFF:**  Your Honor, is the proffer I made at the

11  bench sufficient to protect our record at this point?

12         **THE COURT:**  It is.

13         **MR. MCDUFF:**  With that, the petitioner rests.

14         **THE COURT:**  Anything from the State?

15         **MR. MCNAMARA:**  No, Your Honor.

16         **THE COURT:**  Do you wish to make closing statements?

17         **MR. MCDUFF:**  Your Honor, we would like to do whatever

18  the Court prefers.  We do want to discuss, at least briefly in

19  a closing statement, the error with respect to the sentencing

20  instructions and the form of the verdict.

21      We are happy to discuss the evidence that's been produced

22  at trial today, or we could give you a short post-trial

23  memorandum.  And very short because I know you have had

24  significant briefing on the law.  But discuss the evidence that

25  came out at the hearing.

1          **THE COURT:**  What would you prefer, Mr. McNamara?

2          **MR. MCNAMARA:**  The third option works best for me,

3    Your Honor.

4          **THE COURT:**  All right.  And we still have a

5    deposition that needs to be submitted for the record.

6          **MR. MCDUFF:**  Yes, sir.  We do have his affidavit.

7    It's in evidence.  But if Mr. McNamara does want to examine

8    him, we will arrange his deposition.  He remains under

9    subpoena.

10          **MR. MCNAMARA:**  I absolutely wish for that to happen,

11    Your Honor.

12          **THE COURT:**  Okay.  How soon can y'all get that done?

13          **MR. MCNAMARA:**  I have the week of the 12th open and

14    possibly even next week.

15          **MR. MCDUFF:**  We'll do it.

16          **THE COURT:**  All right.  And let me know if you can't

17    or if you have a problem.  Well, I tell you what, let's have

18    about ten minutes each for a brief summary of what you think

19    you've proved.

20          And I would like to hear on the matter of the

21    instructions, if you have something to add.  And then if you

22    wish to do a post briefing after that deposition is submitted,

23    just let me know what you think would be appropriate.

24          **MR. MCDUFF:**  Okay.

25          **THE COURT:**  Are you ready to summarize your position?

1          **MR. MCDUFF:**  Yes, sir.

2          **THE COURT:**  All right.

3          **MR. MCDUFF:**  Thank you, Your Honor.  First, with

4   respect to the jury instruction, as the Court knows, the jury

5   was instructed they had three options, death, life without

6   parole, life with parole.  The Mississippi Supreme Court held

7   on appeal that this was error.

8       And it was further error that the jury was instructed --

9   and this is the really important part -- that if they couldn't

10  agree and if they weren't unanimous, he would be sentenced to

11  life with parole.  And the Mississippi Supreme Court held

12  that's completely wrong.  Life with parole is not available as

13  an option; and as we know, it hasn't been available as an

14  option in capital cases since 1994.

15      But the Mississippi Supreme Court held it was harmless.

16  And with all respect, they completely missed the point.  The

17  point is, that when you have a deadlocked jury, some for death,

18  some for life without parole, those who voted for life without

19  parole have an enormous pressure to agree with those who voted

20  for death in order to reach unanimity so that he won't be

21  sentenced to life with parole.

22      And it's fundamental.  And the U.S. Supreme Court has held

23  that as a matter of the 8th amendment, matter of the 14TH

24  amendment, due process clause, that capital defendants have a

25  right for the jury to be instructed properly as to what the law

DAILY COPY

1    is and what the options are.  And clearly, the jury wasn't

2    instructed properly here.

3        And the Mississippi Supreme Court was completely wrong to

4    say that this was a harmless error.  So this violates, first,

5    the requirement of accuracy in the jury instructions.  The

6    Mississippi Supreme Court agreed with that.

7        Second, they're completely wrong about the harmless error.

8    Third, the U.S. Supreme Court, in a case called *Simmons v.*

9    *South Carolina* -- we discussed this in our brief -- 534 U.S.

10   154, 1994 decision, said that when the issue of future

11   dangerousness is raised by the prosecution, and where state law

12   prohibits the defendant's release on parole, due process

13   requires that the sentencing jury be informed that the

14   defendant is parole ineligible.

15       Now, the jury wasn't informed of that in this case.  They

16   were informed he was eligible for parole.  And more

17   importantly, they were informed that if they couldn't agree on

18   a verdict he would be eligible for parole.

19       Now, the prosecution in this case, during the closing

20   argument, asked the jury to protect society.  They emphasized

21   the prior acts of Mr. Hodges, the one for which he was

22   convicted and the arrest that had been improperly admitted; and

23   that were admitted because of ineffective assistance of

24   counsel.

25       And they said, quote, He stands before you and asks for a

1   second chance.  A second chance to do what to who and when and

2   where?"  That was the closing argument of the prosecution.  So

3   they clearly injected future dangerousness.  The rule of

4   *Simmons v. South Carolina* clearly applies.  So it's a federal

5   constitutional error for the jury to be instructed as it was.

6   And it was clearly harmful error.

7         Now, when the case was first appealed to the Mississippi

8   Supreme Court, and when that Court held that it was error --

9   and I'm quoting now, "It was error for the verdict form to

10  state that if the jury did not agree on a verdict that the

11  Court must sentence the defendant to a term of life

12  imprisonment with the possibility of parole.  It was also error

13  for the State to comment on this during its closing argument,

14  end quote.

15        They also said, in passing, that defense counsel had

16  failed to object to that part of the jury instruction.  They

17  nevertheless addressed the merits in the alternative.  The

18  claim was raised again on postconviction review in state court;

19  and at that point, the Mississippi Supreme Court addressed only

20  the merits of the claim.  They didn't invoke the procedural

21  bar.

22        And they referred to their earlier discussion on the

23  merits.  And they said, on post conviction review, it was

24  harmless error.  But they didn't say, We are invoking a

25  procedural bar at this stage of the case.  So what we have is

1  the latest opinion of the Mississippi Supreme Court to review

2  this federal constitutional error does not invoke a procedural

3  bar.

4       Accordingly, this Court not only can but, we believe, is

5  required to address the merits of the claim and cannot impose a

6  procedural bar that the state court failed to impose when it

7  last addressed this issue, because it addressed the issue on

8  the merits.

9       Now, if it had invoked the procedural bar, the last time

10 it looked at it, which it didn't, but if it had, this Court

11 still would be required to review the merits, we believe,

12 because the reason for the procedural bar was the absence of a

13 contemporaneous objection by defense counsel, who were

14 completely ineffective.

15      They were ineffective for not objecting to that

16 instruction because it's basic law.  Everybody, every -- it's a

17 fundamental understanding for people who have practiced

18 criminal law in Mississippi, do capital cases, that life with

19 parole is not an option if the crime occurred after 1994.  It's

20 fundamental.

21      Nevertheless, defense counsel didn't object to it.  Now,

22 we know that defense counsel was ineffective in a myriad of

23 other ways.  So this is not one isolated mistake; this is part

24 of the whole panoply of ineffectiveness.  But their failure to

25 object to this was fundamental; and it certainly calls to reach

1  the issue, even if the Mississippi Supreme Court had invoked a

2  procedural bar.

3       So for all of those reasons, this Court has to address the

4  merits; and we believe it's clear there was error.  It is not

5  harmless error.  It is fundamental.  It is a fundamental

6  skewing of the jury's own role.  The jury had a right to be

7  told what the law is, not to be mislead about the meaning of a

8  nonunanimous verdict.

9       And this error, by itself, requires that the death

10 sentence be set aside.  It goes to the basics of proper

11 sentencing instructions.  And there's a distinct possibility --

12 and it happens so often -- that jurors are disagreed on

13 punishment between death and life without parole.  It very

14 likely happened here.

15      And given that possibility, this fundamentally flawed jury

16 instruction was error, and it was harmful error; and it

17 requires that the death sentence be vacated.

18      Now, with respect to -- I just want to touch briefly on

19 some of the proof that came out regarding the other issues.

20 There are really sort of five areas of prejudice here.  First,

21 the jury instruction.  Second, the fact that defense counsel

22 opened the door for aggravating evidence to come in that was

23 clearly inadmissible.  That's the prior unadjudicated arrest.

24      Third is defense counsel did not secure the sort of

25 mitigating evidence that we heard today from Dr. Kavanaugh.

DAILY COPY

1  Fourth is the fact that the prosecution, through its testimony

2  and through its argument to the jury, presented the jury with a

3  misleading scenario in which they claim that Quintez Hodges

4  would not acknowledge the benevolence of Bessie Tatum with

5  respect to his prior burglary offense.

6      And then fifth, and this is crucial, defense counsel

7  didn't call Bessie Tatum as a mitigation witness to testify as

8  she had stated in her victim impact statement, regarding the

9  murder, that she didn't believe Quintez Hodges should get the

10  death sentence.

11      Now, that was not the subject of testimony because it's in

12  the file.  It's in documents that have been admitted into

13  evidence.  But I want to point this out -- I don't have the

14  exhibit number right in front of me, but it's her second victim

15  impact statement.  I believe it was in 1999.

16      There's a file stamp on it that shows it was in the

17  court's file.  And anyone who had read the court file would see

18  that Bessie Tatum had said she didn't want him to get the death

19  sentence.  And she had testified as a prosecution witness --

20  that's also part of the record -- during the guilt phase.  All

21  they had to do was give her a subpoena.

22      During the hearing on the motion for continuance that was

23  held on September 4th, Mike Miller told Judge Montgomery, six

24  days before trial, that he had not read the court file.  And

25  it's clear he didn't.  And it's clear he wasn't functioning as

1  a competent advocate because anyone who had read that would

2  have seen that and would have subpoenaed her to be present to

3  testify at the penalty phase.

4       Now, with respect to the prosecution's presentation of

5  untrue testimony, when Judge Kitchens, then Assistant District

6  Attorney Kitchens, testified at the sentencing hearing of

7  Mr. Hodges for capital murder, he testified under oath that all

8  of these things had been said in open court; that it had been

9  said in open court with Mr. Hodges present that Ms. Tatum

10 didn't want him to go to the penitentiary. And it had been

11 said in open court that the state was seeking a 15-year

12 sentence.

13      So when Mr. Hodges had previously denied hearing that

14 during the cross-examination of Mr. Allgood, Assistant District

15 Attorney Kitchens' testimony made him look like a liar. Made

16 him look like an ungrateful liar.

17      Well, so we finally discover, though, once someone bothers

18 to look at the transcript -- and by the way, that was not the

19 defense's fault. Nobody knew that Mr. Allgood was going to

20 suddenly spring this on everyone and start asking about what

21 Mr. Hodges had heard during that earlier sentencing proceeding

22 for the burglary. So once this was over and his appellant

23 counsel got the transcript, we see it's completely wrong. That

24 didn't occur in open court.

25      Judge Kitchens said various things in his examination. He

DAILY COPY

1  said at one point, he said, the court reporter uses a pen;

2  maybe she missed something.  One point he said something about

3  going into chambers.  Finally, he said, "Well, I think we

4  discussed it when we went to the bench, me and Mr. Rogillio,

5  the other prosecutor; and the defense attorney; and the judge.

6  We discussed it at the bench.

7       Now, that doesn't jive with the record of that hearing;

8  but even if it's true, the point is Mr. Hodges wouldn't have

9  heard it.  He wasn't at the bench.  So their presentation of

10  testimony at the capital sentencing trial, presented to make

11  Mr. Hodges look like a liar, to make him look like an

12  ungrateful beneficiary of Bessie Tatum's benevolence, was

13  completely false, completely false.  And it was very harmful,

14  particularly in the absence of mitigating evidence.

15       So that's the key point here, and that's why that is part

16  of the sort of significant conglomeration of prejudice that has

17  resulted to him from all of these -- from all of these errors.

18       The arrests, I think, were fundamentally inadmissible.

19  Mr. Miller opened the door to that by not preparing these

20  witnesses and by letting them get into territory that opened

21  the door for inadmissible evidence.  And then the prejudice

22  extends -- and I think we've clearly established incompetence.

23       I think, in fact, the incompetence reaches the realm of

24  what the Supreme Court, in the *United States v. Cronic* case

25  called presumptive prejudice.  I think it was so bad, his

1  functioning was so deficient -- and he had Mr. Rogers there

2  with him, but Mr. Rogers basically deferred to Miller.  This is

3  clear from his affidavits; it'll be clear from his deposition.

4      Mr. Rogers did some of the work, but he basically deferred

5  to Mr. Miller, who'd never tried a case in circuit court on

6  fundamental issues, like whether to call family members in a

7  penalty phase without having prepared them, without having met

8  them.

9      So I do think it reaches the level of presumptive

10  prejudice; but even if it doesn't, I think Dr. Kavanaugh's

11  testimony makes it clear what could have been presented to the

12  jury.  And as we all know, once she sort of explained things to

13  a jury, explained about a defendant's background, how they may

14  have had a tougher road than some of us have had, that they

15  might realize that death is not the appropriate punishment, or

16  at least one might.  And that's the test.

17      In Mississippi, one juror properly instructed, if he or

18  she doesn't vote for death, can call -- will lead to a life

19  without parole verdict, not a death verdict.  And I think that

20  would have happened here had the jury heard the evidence that

21  Dr. Kavanaugh -- had the jury heard the evidence that

22  Dr. Kavanaugh presented here.

23      One other thing, there was -- there's been a mention of

24  the Whitfield examination.  The Whitfield examination was

25  focused primarily on competence to stand trial and sanity at

DAILY COPY

1    the time of the offense.  There was not a thorough discussion

2    in there of mitigation.

3        And in fact, if you look in one of the exhibits in

4    Dr. Kavanaugh's reports, she includes some of the Whitfield

5    notes; and it describes the materials they had.  And they had a

6    lot of police reports, and they had a lot of stuff from the

7    DA's office.  The only thing they had at Whitfield by way of

8    records was just a listing for some medical records from one

9    source.  And I can't remember where it was, one health center.

10       If you look at all the records Dr. Kavanaugh looked at,

11   DHS records, medical records from multiple sources, school

12   records, records not only involving Quintez Hodges but

13   involving his mother, his niece, the whole family, that gives

14   the entire picture of his life and what -- and what growing up

15   in that house was.  And the problems that resulted from that.

16       None of that was available to Whitfield.  So Carrie

17   Jourdan was right when she said mitigation investigation had

18   not been done.  And that was the problem.  Had it been done,

19   there would have been a significantly different amount of

20   proof.  There would have been a much more compelling case

21   against the death penalty.

22       And I think, had all these things been done properly, had

23   the mitigation evidence been presented, had the aggravating

24   evidence not been let in, had the -- and by that, I mean the

25   prior arrest -- had the prosecution not presented untrue

**DAILY COPY**

1 testimony to the jury, had Bessie Tatum been called to say that

2 she, the mother of the man who got shot, didn't believe Quintez

3 Hodges should receive the death penalty, and had the jury been

4 properly instructed, there is a significant possibility that

5 one -- at least one, and perhaps more jurors, would have not

6 voted for death.

7 And under that, I think it is just a very clear case; and

8 the writ has to be granted. The death sentence has to be

9 vacated, and the matter sent back so that, if the State

10 chooses, it can conduct a new trial on penalty alone where the

11 jury can hear all of the evidence and be properly instructed.

12 Now, we also have claims relating to the guilt phase; I

13 won't go into those. I know the Court has ordered a hearing

14 only with respect to these particular issues. Thank you.

15 **THE COURT:** Thank you.

16 Mr. McNamara?

17 **MR. MCNAMARA:** Your Honor, briefly, with the -- as

18 far as the form of the verdict goes, I pretty much have to

19 defer to what was contained in the memorandum brief. But just

20 like I would have to disagree, there was no objection to the

21 form of the verdict by the defense at trial. I don't believe

22 it was brought up as a matter of ineffective assistance of

23 counsel but Court error instead.

24 But at the same time, I'd say the Mississippi Supreme

25 Court decision that was rendered both in the *Drought Deck*

1  (phonetic) appeal and the PCR, it was not an unreasonable

2  application of any law.  That Court had handled just the same

3  issue in the case of *Puckett v. State of Mississippi,* state

4  case, found that harmful error would only exist if, after

5  giving the three choices, the jury would have chosen life with

6  parole.

7      As they concluded, even though the language is improper,

8  the error was harmless, since the jury, knowing it had life

9  without parole -- life with parole as an option and life

10  without parole as an option, it chose death instead.

11      As far as the ineffective assistance of counsel, those

12  issues related to Mr. Miller and the other two counsels, I

13  don't believe, can fully be discussed until Mr. Rogers gets

14  deposed.  And I believe it will shed new light on what will be

15  put before the Court.

16      But as far as by way of mitigation, what has been

17  presented here, I believe, just like -- and what was presented

18  to the Mississippi Supreme Court on direct appeal, and on PCR,

19  were -- like I said at trial, nothing was presented.  But there

20  was a record made, by the defense attorneys, specifically to

21  inform the trial Court why we are not calling our expert from

22  Whitfield.

23      Then on appeal and in the postconviction relief filing,

24  there were -- there was the -- introducing of that were the

25  state hospital evaluation, the evaluation by Dr. Zimmerman and

1  the evaluation by Dr. Wiviott.  And the Mississippi Supreme

2  Court took all of those into consideration and found that, yes,

3  those could have been presented.  The only thing that was not

4  cumulative was the mention of the marijuana use.

5       And I would submit that the evidence that has been

6  presented by Dr. Kavanaugh here today is, again, nothing more

7  than cumulative of what has already been presented to the

8  courts below for consideration.  And none of it would rise to

9  the level of prejudice it would call for in a taking back of

10 that death sentence that the jury came to, that concluded on.

11      As far as the allegation of the misconduct by the district

12 attorney's office, I believe it's completely without merit; and

13 the witnesses' testified.  And I believe it wasn't hemming and

14 hawing and trying -- I'm trying to remember.  There were

15 some that were saying, It's been so long ago there were some

16 details that just weren't clear.  But there was no

17 equivocation.

18      They remembered the salient facts that came in, that

19 15 years was the offer.  The 15 years and the fact that

20 Ms. Tatum wanted the RID program were both relayed to the

21 Court.  That they were not in that transcript is of no moment

22 in that it was a hearing before the judge.  There wasn't a jury

23 to impress.  There wasn't anyone else.

24      They went into chambers.  They fully informed the Court of

25 the 15-year offer and of Ms. Tatum's wish that the RID program

1  be given.  And that is also confirmed in Ms. Tatum's

2  deposition, which was taken in -- prior to this hearing.  And

3  that she confirmed that she couldn't remember 15 years or not,

4  but she remembered that they -- the district attorney wanted a

5  number of years, and she wanted the RID program; and that they

6  passed that along to the judge at her request.

7       That's all I have, Your Honor.

8            **THE COURT:**  All right.  Anything further?

9            **MR. MCDUFF:**  Nothing from the petitioner, Your Honor.

10           **THE COURT:**  I'll ask the attorneys to review the

11 documents with Ms. Pennebaker and make sure of what's in the

12 record.  And if there's nothing further, the Court will be in

13 recess.

14           **MR. MCDUFF:**  Thank you, Your Honor.

15                (THE TRIAL RECESSED AT 11:56 a.m.)

16

17                    C E R T I F I C A T I O N

18     "I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter, March
   31st, 2010."

19                         /s/ Rita Davis Sisk_____
                           RITA DAVIS SISK, RPR, BCR, CSR #1626

20                         Official Court Reporter

21

22

23

24

25