## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF MISSISSIPPI, EASTERN DIVISION

QUINTEZ WREN HODGES,                    )
                                        )
                    Petitioner,         )
                                        )
        v.                              )        C.A. No. 1:07-CV-66-MPM
                                        )
CHRISTOPHER B. EPPS, Commissioner,      )        Hon. Michael P. Mills
Mississippi Department of Corrections,  )
JIM HOOD, Attorney General of the       )
State of Mississippi,                   )
                                        )
                    Respondents.        )

## PETITIONER'S POST-HEARING MEMORANDUM

This memorandum highlights certain important evidence produced in connection with the hearing in this case, and discusses some of the related legal principles. This supplements the prior briefing in this case and, for the most part, will not repeat what is already in the earlier briefs. This memorandum addresses: (1) the deficient performance of trial counsel at the sentencing phase, (2) the false evidence presented by the prosecution about what happened in open court in a prior case involving Mr. Hodges, (3) the erroneous instructions and verdict form regarding the jury's sentencing options, and (4) the prejudice that resulted from all of these errors.[1]

---

[1] Because the evidentiary hearing related only to certain penalty-phase issues, this memorandum will address only those claims. In short, with respect to all claims, the Mississippi Supreme Court's decisions were contrary to and an unreasonable application of clearly established federal law and an unreasonable determination of the fact in light of the record before the state court. The other claims in the case, whether related to the guilt or the penalty phase, are addressed in the prior briefing.

I.    The Constitutionally Deficient Performance of Trial Counsel

Carrie Jourdan originally was appointed to represent Quintez Hodges on September 29, 1999. (Petitioner's ("Petr.") Ex. 12.) She testified that, as of the summer of 2001, nearly two years later, no mitigation investigation or preparation had been conducted. (Tr. Vol. II at 80:10-21.) With little having been done, Mr. Hodges' mother, Johnnie Pearl Hodges, hired Michael Miller to replace Ms. Jourdan. Both Mr. Miller and his paralegal, Brandy Wagoner,[2] testified that Ms. Hodges was concerned that Ms. Jourdan had not done much to prepare her son's case. (Petr. Ex. 9 at 7:9-19; Petr. Ex. 8 at 13:4-18.)[3] Ms. Jourdan confirmed that she was not, in fact, prepared to try the case, in part because the mitigation work had not been done. (Tr. Vol. II at 83:18-21.) Ms. Hodges' decision to hire a new lawyer was not the action of a sophisticated person trying to game the system by hiring a new lawyer at the last minute to obtain a continuance.[4] Instead, this was a mother who was concerned that her son's appointed lawyer was not prepared and had good reason to think he might need a new lawyer. Indeed, Ms. Jourdan testified that she herself would have sought a continuance if Mr. Miller had not entered the case, and she believed she would have obtained it. (Tr. Vol. II at 81:16-21.)

Like many people without wealth or an education, Ms. Hodges was not a sophisticated

---

[2]    Ms. Wagoner was known as Brandy Crisler at the time of the Hodges trial. Subsequently, her name was changed to Brandy Hall, and her affidavit is under that name. She is now Brandy Wagoner, which is the name on her deposition.

[3]    The statements of Johnnie Pearl Hodges are offered not for the truth of the matter asserted (that Ms. Jourdan had not done much), but to show Ms. Hodges' motivation for hiring another lawyer. Therefore, they are not hearsay. Fed. R. Evid. 801(c). (Ms. Jourdan herself testified that she had not done much (Tr. Vol. II at 79:2-6; 80:10-21; 81:10-21; 82:9-21; 87:7-9), so Ms. Hodges' statements are not necessary to prove that point).

[4]    In fact, in October 2000, Mr. Hodges wrote to Ms. Jourdan to express his dissatisfaction with her representation and noted that he had not received copies of various papers. (Petr. Ex. 18.) Mr. Hodges

consumer of legal services. She hired Mr. Miller because he was one of the few lawyers who would handle a capital case for a fee she could afford. The reason he was so inexpensive is that he was only one year out of law school, had never tried a circuit court case, and had no office, working, instead, out of his trailer. (Petr. Ex. 8A at ¶¶ 1, 4; Petr. Ex. 10 at 27:13-16.) As with many lay people, Ms. Hodges likely did not know that capital litigation is highly specialized and requires a level of experience and knowledge that Mr. Miller did not have. Unfortunately, Mr. Miller took the case despite the fact that, as he testified, he was not qualified to do so. (Pet. Ex. 8 at 44:14-18.)[5] He also took the case despite being told by Ms. Jourdan that the case was not ready for trial and that no mitigation investigation or preparation had been done. (Tr. Vol. II at 81:12-21; 82:13-21.)

Mr. Miller secured the assistance of more experienced co-counsel, Guy Rogers, Jr., shortly before trial. Mr. Rogers had been involved in two prior capital cases, one at which he sat second chair and one of which resulted in a plea agreement prior to trial. (Petr. Ex. 10 at 6:18-25; 7:2-11.) He testified that although he agreed to join Mr. Miller in the case, he was very busy at that point and did not have time to investigate or prepare the mitigation case. He told Mr. Miller that this would be Mr. Miller's responsibility, as would the investigation and preparation of the guilt phase. Mr. Rogers testified that he would not have agreed to join the case absent the agreement by Mr. Miller that Mr. Miller would handle the investigation and preparation of the

made a complaint to the Consumer Assistance Program of the Mississippi Bar about what he viewed as Ms. Jourdan's ineffective assistance. (Petr. Exs. 20-21.)

5       Indeed, in denying Mr. Miller's motion for a continuance or withdraw, the trial court noted that "[t]he Court expressed to Mr. Miller reservations about his qualifications to handle a death penalty case." (Dkt. No. 160-22 at 3.) The trial court proceeded to explain Mr. Miller's repeated failure to file motions in a timely fashion, his failure to appear at scheduled hearings, failure to observe court procedures, failure to subpoena witness, his purported illness, and failure to follow "statutory requirements" regarding the presentation and submission of evidence in support of his motion to continue or withdraw. (Id. at 3-6.)

penalty-phase defense. (*Id.* at 10:19-12:5.)

    A.    Trial counsel's admissions regarding their deficient
           performance and their failure to prepare a case in mitigation.

The evidence developed by Petitioner during these habeas proceedings, including the recent evidentiary hearing, demonstrate the deficient performance of defense counsel. This deficient performance included the failure to prepare a defense strategy, the failure to develop a mitigation strategy or undertake any investigation, the failure to prepare defense witnesses introduced during the sentencing phase, and lead trial counsel's mental health issues and drug and alcohol abuse. As the excerpts below demonstrate, each member of Mr. Hodges' trial team performed deficiently. (A more thorough list of excerpts from the evidentiary record is contained in the accompanying appendix. Prejudice will not be addressed in this section of the memorandum, but instead in a later section.)

In addition to his substantial mental health issues (Petr. Ex. 8 at 39:16-44:25; 47:11-49:5; 49:24-51:1; 53:25-56:17; 82:22-83:2; 84:6-14), Mr. Miller testified that he had not formulated a trial strategy, no investigation had been conducted, and he had not prepared any witnesses to testify in mitigation, and in addition, he pled the Fifth Amendment with respect to his drug use:[6]

    Q:    Now, sir, because your motion for continuance was not successful, trial for Mr. Hodges' case in fact started on the 10th of September of 2001; is that correct?

    A:    Yes.

    Q:    By that time, did you – had you formulated the trial strategy?

---

[6]    This testimony is buttressed by the contemporaneous trial transcript wherein Mr. Miller stated that, as of seven days before trial, "[t]here's been very little background done into [Mr. Hodges'] own personal background." (Trial Tr. at 23.) A point trial counsel emphasized to the jury during closing argument at sentencing, stating "the defendant doesn't have a lot of mitigation to put forth before you today." (*Id.* at 1069.)

A:      Yes. Our trial strategy was to object to everything because we knew that we had no chance. There was nothing that we could do except try to preserve a record. That was all – the only – and I will say this, too. The only thing that we were trying to accomplish was to get a penalty less than death.

*       *       *

Q:      Now, sir, you indicated that your strategy, your sole goal was to obtain a penalty for Mr. Hodges of something less than death. Do you recall that?

A:      Yes, that, that was basically the strategy. We, we also looked at lesser included offenses in our jury instructions and what we might have been available to instruct the jury.
        But we had no time to prepare an adequate defense as far as alternate, alternate theories of the case. We had no time to put on any sort of defense.

(Petr. Ex. 8 at 75:15-76:3; 76:22-77:8.)

Q:      Now, is it fair to say that you didn't put on any witnesses or issue any subpoenas because you had not done any investigation – you didn't have time to do an investigation, and so you didn't even know who might be in the universe of possible witnesses?

A:      That's absolutely correct. We had, we had no idea who we might possibly call.

Q:      Okay. So it's fair to say that you didn't make an affirmative judgment not to put someone on, like a teacher or a counselor or a doctor; is that correct?

A:      That's fair to say.

(Petr. Ex. 8 at 97:2-14.)

Q:      Now, Mr. Miller, do you recall that during the mitigation phase of Mr. Hodges' trial, you did in fact put on a couple of family members as witnesses in mitigation?

A:      Yes. We, we basically put on who, who we had available. We didn't subpoena them. We had them available. They were trying to – they were trying to – the ones that were trying to help. We didn't really have much time to talk to them about what they might, what they might testify to or what, what sort of questions we might ask them. We didn't have time to discuss any of that.

5

Q: Okay. So is it – is it your – during that time, prior to the mitigation phase the trial, you and Mr. Rogers did not have time to prepare any of those people for their testimony.

A: Not at all.

(Petr. Ex. 8 at 111:5-24.)

Q: Now, during the August 2001 and September 2001 time frame, were you taking any illegal drugs?

A: I'm going to refuse to answer that question on the basis of the Fifth Amendment.

(Petr. Ex. 8 at 51:20-24.)

Mr. Rogers testified that he entered Mr. Hodges' case with the understanding that Mr. Miller would prepare the case for trial including all necessary investigation, that neither Mr. Miller or Mr. Rogers investigated or otherwise prepared the case, that neither of them prepared witnesses to testify in mitigation, and further, that Mr. Miller suffered from mental health issues exacerbated by drug and alcohol abuse:

When Mr. Miller asked me to work on Mr. Hodges' capital case, Mr. Miller was mentally unable to handle a capital case. I could see that Mr. Miller really wanted to help Mr. Hodges, and he kept referring to a grand theory that would refute the kidnapping charge. Mr. Miller, however, could not seem to accomplish even the most fundamental steps required for defending a capital murder case, and his grand theory was never coherent or clear. It was clear that Mr. Miller was not prepared to try the case . . . .

(Petr. Ex. 8P ¶ 3.)

Q: And you mentioned your role in the case. In the time between Miller contacting you and the actual trial, him contacting you in all of this, the trial beginning on September 10th, did you have time to investigate the case on your own?

A: Not one bit. No. There was no – there was no going out into the community or anything that would – I would have done. There was no – there was no interviewing of witnesses, of family, of ministers, of school personnel, of say any institutional personnel of hospitals, anything. I did – I did absolutely zero

in that regard. Because I – I was not expecting that to be my role. That was not what I was going to do.

(Petr. Ex. 10 at 12:6-19.)

> Q:      Now, you had said earlier that your participation in the case was contingent on Mr. Miller preparing and investigating both the guilt phase and the punishment phase. What you could tell, was the mitigation case ever investigated or prepared for Mr. Hodges?
>
> A:      No, it was not.

(Petr. Ex. 10 at 31:22-32:3.)

> At the last minute, Mr. Miller decided to put Mr. Hodges' family members on the stand to testify in support of Mr. Hodges during the sentencing phase. Because he failed to prepare Mr. Hodges' family members to testify at the penalty phase of Mr. Hodges' capital trial, Mr. Miller never reviewed their potential testimony in advance of the trial and thus opened the door to damaging evidence about Mr. Hodges' history. Further, Mr. Miller lacked the skills and the presence of mind to rehabilitate those witnesses on re-direct examination. Mr. Miller was not able to re-direct the jury's attention to the positive aspects of Mr. Hodges' character that might have convinced at least one juror to spare his life.

(Petr. Ex. 8P ¶ 7.)

> I mean, I don't – I know he's drinking. He's smoking marijuana. He's doing his Xanax. And his office, or so called office is out in some little trailer where I don't even know what he's got set up out there. I never even – I don't think – I never went to the trailer, I don't think. No, I didn't. I didn't want to go. I didn't want to –
>
> Mike – Mike was not stable. He was just not stable enough and not experienced enough to have taken on a case like this. Just not – not prepared.

(Petr. Ex. 10 at 27:12-22.)

> During the trial I was aware that Mr. Miller was taking Xanax for his nerves and smoking marijuana. When he became really agitated, Mr. Miller would become paranoid and declare that the Ku Klux Klan or other white supremacists were after him. I did my best to keep him calm and focused during trial.

(Petr. Ex. 8P ¶ 5.)

Ms. Wagoner, Mr. Miller's paralegal, testified that no investigation of Mr. Hodges' cases

was conducted, that Mr. Miller suffered from mental health issues, and that Mr. Miller abused

drugs and alcohol:

> Q:     Now, to your knowledge, from the time you were there working with
> Mike Miller up through the trial, to your knowledge, was any investigation done
> on the issue of mitigation for the penalty phase of the case?
>
> A:     No.

(Petr. Ex. 9 at 8:17-22.)

> During this time I knew Mike, he was using controlled substances. He came to
> my house one night with crystal methamphetamine in a small plastic bag. I had to
> ask him to leave and take his drugs with him. I was aware that Mike suffered from
> a bi-polar personality disorder, of which he tried to control by himself with illegal
> narcotics. I personally witnessed Mike using a variety of narcotics during this
> time period. Mike was also taking the prescription medication Xanax at the same
> time he was using street drugs. Mike's parents were also aware of Mike's
> substance abuse. Subsequently, his parents had him committed in a court
> proceeding to a psychiatric facility some time after the trial.

(Petr. Ex. 9A ¶ 3.)

Ms. Jourdan, Mr. Hodges' court-appointed attorney for the approximate two years

between his indictment and trial, testified that she did not conduct a mitigation investigation and

that the case was not prepared to go to trial:

> Q:     At that point, had a mitigation investigation been done?
>
> A:     Nothing had been done . . . .

(Tr. Vol. II at 80:10-18.)

> Q:     Okay. And just so I can be clear on this, did you tell him the mitigation
> investigation had not been done?
>
> A:     Absolutely.
>
> Q:     Okay.
>
> A:     I told him almost exactly what I've told you. "Mike, we've been messing
> around with a mental exam for over a year and a half. I was in the middle of this

other case. I was just now starting to really focus on Quintez Hodges. You need to
do a bunch of stuff, including the mitigation."

In the Hodges case, there was a – the guilt phase was – also needed some
significant investigation, obviously. But the most important thing to me, in my
mind, based on everything with the Hodges case was also the mitigation phase.

(Tr. Vol. II at 82:9-21.)

A:      But I will agree with you that the case had not been properly worked to go
to trial in September, no question about that.

(Tr. Vol. II at 87:7-9.)

B.      Opening the door to inadmissible evidence and failing to
        call the victim's mother even though the case file contained
        a victim impact statement in which she said that she did not
        want the defendant to be sentenced to death.

As Mr. Rogers and Mr. Miller testified, Mr. Miller decided at the last minute to call five

family members as witnesses at the penalty phase without any preparation. (Petr. Ex. 8 at

111:5-24; Petr. Ex. 8P ¶ 7.) During the course of his direct examination of the five family

members, Mr. Miller asked questions that led the prosecution on cross-examination to bring out

prior unadjudicated arrests for two jail escapes, burglary of a school, and the attempted sexual

battery of a woman named Latasha Martin. (Trial Tr. at 949-50, 960-61, 967.) Mr. Miller could

easily have prepared the witnesses and limited the questioning so as not to open the door to these

subjects. Instead, he asked questions about "problems with authorities" and generally allowed

the introduction of these inadmissible and prejudicial arrests. (*Id.* at 960.) These prior

unadjudicated arrests would not have been admissible had Miller properly prepared and confined

the testimony of the witnesses he called. *See Edwards v. State*, 737 So. 2d 275, 290 (Miss. 1999)

("[t]he eight statutory [aggravating] factors do not include arrests or incarcerations," but only

convictions that comprise one of the statutory factors, and the admission of a prior unadjudicated

9

arrest for rape requires reversal).

The court file contained Bessie Tatum's victim impact statement in this capital murder case. Ms. Tatum stated in her victim impact statement that "My wish is that he will be put away for life with no parol [*sic*] . . . ." (Petr. Ex. 5.) Mr. Rogers said that if he had been informed that the file contained a victim impact statement in which Ms. Tatum, the mother of the victim, had said that she wanted Mr. Hodges to get life without parole and not the death penalty, he would have subpoenaed her as a witness at the penalty phase. "That would have been – that would have been one of the biggest – the biggest evidence – piece of evidence or testimony that – that we probably would have even had in our favor." (Petr. Ex. 10 at 32:24-33:2.) Bessie Tatum was a witness at the guilt phase of the trial (Trial Tr. at 699-731), and easily could have been subpoenaed for the penalty phase. But this never happened.

In short, as previously demonstrated and more fully developed during the evidentiary hearing, trial counsel provided Mr. Hodges with deficient performance throughout his capital proceedings.

II.     The Introduction of False Evidence by the Prosecution

As the Court is aware, Mr. Hodges was convicted and sentenced to death for murdering Isaac Johnson, the brother of Mr. Hodges' girlfriend, Cora Johnson. Cora and Isaac were the children of Bessie Tatum. Mr. Hodges' one prior conviction involved the burglary of the Johnson/Tatum home.

As explained more fully in Petitioner's prior briefing (Dkt. No. 17 at 4-39), District Attorney Allgood asked Mr. Hodges on cross-examination in the capital penalty-phase about the plea and sentencing process in the prior burglary case: "[D]uring the course of that plea process

10

[on the prior burglary charge], at one point in time your lawyer stood up and told the judge that Ms. Tatum did not want you to go to the penitentiary, didn't he?" (Trial Tr. at 1016.) Mr. Allgood also asked, "Isn't it true that also the [ADA] who was handling the case, Jim Kitchens, stood up and affirmed that that was so; that that was, in fact, what Ms. Tatum requested?" (*Id.*) Finally, Mr. Hodges was asked, "Do you recall that the State . . . asked and sought that you be sent to the penitentiary for 15 years?" (Trial Tr. at 1017.) In response to the State's cross-examination, Mr. Hodges denied hearing each of these statements. (Trial Tr. at 1016-17.) Mr. Allgood then called Assistant District Attorney James Kitchens as a rebuttal witness, and Mr. Kitchens contradicted Mr. Hodges by testifying that these things did happen in court. (Trial Tr. at 1025-1027.) Mr. Allgood then repeated these assertions in closing argument, indicating that Mr. Hodges was refusing the acknowledge that he received a "huge measure of grace" from the intercession of Ms. Tatum. (Trial Tr. at 1077.)

The transcript of the prior plea and sentencing was subsequently obtained by Mr. Hodges' appellate counsel. (His trial counsel had no knowledge in advance that Mr. Allgood was going to make this an issue and had no reason to obtain the transcript). The transcript proved that no one said in open court that Ms. Tatum had asked for Mr. Hodges to be spared the penitentiary and no one said the State was seeking a 15-year sentence. In fact, the transcript indicated that Ms. Tatum wanted Mr. Hodges to be punished and that the State was making no recommendation. (Petr. Ex. 4 at 9-10.) Thus, the prosecution had presented the capital sentencing jury with false evidence that portrayed Mr. Hodges as a liar who was refusing to acknowledge what he supposedly had heard in open court—that Ms. Tatum, the mother of the victim in the capital murder case, had previously interceded to ask that he be spared prison when the State was

11

seeking a 15-year sentence in the prior burglary case.

At the evidentiary hearing before this Court, Mr. Kitchens confirmed that, contrary to his testimony at Mr. Hodges' capital sentencing, he did not perform the prior plea colloquy. (Tr. Vol. I at 53:18-21.) However, Mr. Kitchens insisted that the trial judge was informed of these things either in chambers or at the bench: "I recall we went back into chambers at one point, Bill Bambach, myself, Mr. Rogillio, and the judge." (Tr. Vol. I at 58:9-11.) "I've reviewed this [transcript]. I don't see where it's on this record where we said 15 years. Like I said, we talked to the judge at the bench. We talked to him in chambers." (*Id.* at 59:23-25.) He also stated that defense attorney Bill Bambach first told him that Ms. Tatum did not want Mr. Hodges to go to prison. (*Id.* at 59.)

This does not appear to be true. In the certified transcript of the sentencing hearing, the State makes no recommendation on a sentence, which seems to contradict the assertion that it recommended 15 years when meeting with the judge in chambers. Similarly, at the plea sentencing hearing, the State said in open court that Ms. Tatum "would like her victim's impact statement to speak for her" and "her anger towards him has somewhat subsided, but she still feels that . . . he should be punished." (Petr. Ex. 4 at 10.) If Ms. Tatum had specifically told the State that she did not want Mr. Hodges to go the penitentiary, the Assistant District Attorney would have said so when describing his conversation with her. At the hearing, defense attorney Bill Bambach said he had not spoken with Ms. Tatum at all, and he never claimed that she did not want to see Mr. Hodges go to prison. (*Id.* at 11-12.) If Mr. Bambach had learned that Ms. Tatum did not want Mr. Hodges imprisoned, he would have said so. So the transcript of the hearing on the burglary is at odds not only with Mr. Kitchens' testimony to the capital murder

12

jury, but it is also at odds with his testimony before this Court.

But even if Mr. Kitchens' testimony to this Court were accurate, and even if these things had been relayed to the state court judge in chambers or at the bench in the burglary sentencing proceeding, *they were not spoken in open court where Mr. Hodges could hear them*. The whole reason for Mr. Allgood to call Mr. Kitchens as a witness was to rebut Mr. Hodges' responses to Mr. Allgood's questions where Mr. Hodges denied having heard these things at his hearing in open court in the burglary case. Mr. Allgood's questions to Mr. Hodges were phrased in terms of the lawyers having "stood up" and told the judge that these things were so. (Trial Tr. at 1016.) Moreover, the entire tenor of Mr. Kitchens' testimony in the capital case was to the effect that this happened in open court in the burglary case. "At the plea hearing . . . [Hodges] put on a couple of witnesses to ask for something less . . . because we were asking that he go to the penitentiary . . . [f]or 15 years." (Trial Tr. at 1027.) "At the conclusion of that hearing, Mr. Bambach stated to the Court, Your Honor, Ms. Tatum . . . has indicated to me that she does not wish that Quintez Hodges be sent to the penitentiary . . . . The Court asked me if that was, in fact, the case, and I said, Yes, your Honor, it is. I have spoken with Ms. Tatum earlier this day and she, in fact, indicated that she did not want him to go to the penitentiary." (*Id.*) Clearly, this reference to the "conclusion of [the] hearing" related to proceedings in open court, and not a reference to a bench conference or a chambers conference. Indeed, the transcript of the plea sentencing hearing indicates no breaks for a bench or chambers conference from the beginning of the hearing all the way to end, when the judge pronounced sentence. (Petr. Ex. 4.)

The key point is this: Whatever bench or chambers conferences did or did not occur at the hearing, and whatever was or was not said at these alleged conferences, Ms. Tatum's alleged

intercession and the State's alleged request for a 15-year sentence were never stated in open court where Mr. Hodges could hear them. The portrayal by the prosecution – by Mr. Allgood through his questions and by Mr. Kitchens through his testimony – of this conversation happening in open court, where Mr. Hodges could hear it, was simply untrue. And the resulting portrayal of Mr. Hodges as a dishonest ingrate, unwilling to admit what he heard in open court, was also untrue.

Mr. Allgood testified before this Court that he knew he was going to call Mr. Kitchens as a rebuttal witness even "before the sentencing phase started." (Tr. Vol. I at 34:24-35:9.) As Mr. Allgood explained: "You see things coming. And I saw it coming. And I figured Jim was going to wind up being a witness." (*Id.*)

But even though Mr. Allgood was planning to rebut what he believed would be Mr. Hodges' denial of hearing about Ms. Tatum's intercession in the face of a 15-year recommended sentence from the State, Mr. Allgood did not go to the witness who could provide true testimony about what Mr. Hodges would have heard in open court—the court reporter at the burglary proceeding. Mr. Allgood did not subpoena the court reporter to testify before the capital jury, or ask her to prepare the very short transcript that would have been required, or ask her to read to him from her court reporter's notes. Similarly, even though Mr. Kitchens knew he would be asked about what happened in court, he did not go to the court reporter and ask for a transcript or ask her to read her notes to him so he could give an accurate account of what happened. (Tr. Vol. I at 32:18-33:3; 52:5-24; 65:4-19.)

Instead, Mr. Allgood took the highly unusual step of calling one of his own assistant district attorneys as a witness before a capital murder jury. In the evidentiary hearing before this

Court, Mr. Allgood was asked the following:

> Q:    Now, when something in the penalty phase of a capital case is so important that you call an assistant district attorney from your office as a witness under oath, shouldn't the judge and the defense lawyer and the jury be able to rely on it being true?
>
> A:    Well, if you would allow me to say so, it was true. And yes, they should rely on it being true.

(Tr. Vol. I at 42:5-11.) Unfortunately, what the jury heard was not true. But Mr. Allgood was right when he said the jury should have been able to rely on it being true.

This is not a situation where a prosecutor calls a witness unaffiliated with his office and through no fault of the prosecutor, the witness gives untrue testimony. This instead was a situation manufactured by Mr. Allgood himself, where he set Mr. Hodges up with a series of questions, and then rebutted them with sworn testimony from an attorney from his own office instead of calling the court reporter to read from her notes or prepare a certified transcript in order to provide an accurate account. Thus, the entire fault lies with the District Attorney's office.

The evidence here is sufficient to support a finding that Mr. Kitchens deliberately presented false testimony and that Mr. Allgood knew it was false. This is supported by the fact that not only was Mr. Kitchens' capital trial testimony at odds with the plea transcript, but so was his testimony before this Court.

But even if their deception was not deliberate, Mr. Allgood and Mr. Kitchens recklessly presented evidence that was untrue and left the jury with a misleading account of what happened. As Mr. Allgood testified before this Court, the jury has a right to rely on the truth of testimony given when a district attorney believes a subject is so important that he calls one of his assistant

district attorneys to testify under oath as the prosecution's witness. When that evidence is untrue, the due process clause of the Fourteenth Amendment has been violated.

This situation is akin to a *Brady* violation, where what is important is not the prosecutor's state of mind, but the fact that the defense was blind-sided because it was not told of evidence favorable to the defense. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (quoting *Brady v. Maryland*, 373 U.S. 83, 86 (1963) to the effect that the obligation to disclose exists "irrespective of the good faith or bad faith of the prosecution"). Here, the defense had no forewarning that the prior burglary proceeding would even be the subject of evidence. By contrast, Mr. Allgood *knew* that it would be an issue prior to the capital sentencing phase. Had he acted appropriately and asked the court reporter to read from her notes or prepare a certified transcript, he would have been given the accurate account of what happened, showing that Mr. Hodges did not hear about Ms. Tatum's alleged good will or the State's purported 15-year recommendation during the burglary sentencing. Mr. Allgood then could either have avoided putting on the false evidence, or at least informed the defense about what the court reporter said, so the defense could have called her as a witness or quickly obtained the short transcript and thereby impeached Mr. Kitchens' untrue testimony, setting the record straight before the capital jury retired to decide on the sentence.

In other words, the District Attorney's office turned a blind eye toward the potential source of truthful evidence, and instead called one if its own assistants, who gave an untruthful account. In so doing, the District Attorney's office either knowingly presented false evidence or did so with reckless disregard for the truth. But irrespective of their state of mind – whether they acted knowingly, recklessly, negligently, or otherwise – they presented evidence to Mr. Hodges'

capital jury that was untrue and that was unfairly prejudicial in the penalty-phase hearing in this capital case. They did not obtain or disclose to the defense the transcript or notes of the court report, which would have rebutted this prejudicial evidence. The damage was done independent of the prosecutors' states of mind. The damage resulted from the fact that his office presented untrue evidence through the District Attorney's misleading questions and through the sworn testimony of one of the assistant district attorneys. The introduction of this false testimony was a violation of the due process clause of the Fourteenth Amendment.

III.     The Erroneous Jury Instruction and Verdict Form

The jury was erroneously instructed that Mr. Hodges was eligible not only for death and life without parole, but also for a life sentence *with* parole. (Dkt. No. 16-69; *see also* Trial Tr. at 1049-54.) The verdict form set forth these three options, and more importantly, stated that if the jury could not agree on a verdict, a sentence of life *with* parole would be imposed. (Dkt. No. 16-69 at 1550.) The prosecutor, Forrest Allgood, highlighted this in his closing argument. (Trial Tr. at 1066.)

A.     The jury instruction and verdict form violated Mississippi
          law and the violation was not harmless.

In 1994 the Mississippi legislature amended the law so that life imprisonment with parole would no longer be an option in capital murder cases. Miss. Code 99-19-101 provides that upon conviction of capital murder, "the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, *or life imprisonment*." (Emphasis added). However, Miss. Code 47-7-3(1)(f) now provides that "*[n]o person shall be eligible for parole who is* charged, tried, convicted and *sentenced to life imprisonment under the provisions of Section 99-19-101*." (Emphasis added). In

17

other words, a sentence of "life imprisonment" for capital murder no longer carries the option of parole. Accordingly, even if a jury cannot reach agreement, life imprisonment with parole is not a sentence that can be imposed.

The Mississippi Supreme Court recognized this error in the present case, stating on direct appeal that "it was error for the verdict form to state that if the jury did not agree on a verdict that the court must sentence the defendant to a term of life imprisonment with the possibility of parole. It was also error for the State to comment on this during its closing argument." *State v. Hodges*, 912 So. 2d 730, 771 (Miss. 2005). However, the Court excused this as harmless error: "Even though this language in the verdict form was an improper statement of the law, such error was harmless since the jury, knowing that it had the life without parole option, chose death." *Id.* at 772.

But the error clearly was not harmless, and the Mississippi Supreme Court overlooked the obvious problem. If the jury was split between death and life without parole, as often happens in capital cases, unwarranted pressure existed for those favoring life without parole to abandon their position and vote for death in order to avoid a hung jury that would (according to the verdict form) lead to a sentence of life *with* parole.[7]

B.      The jury instructions and verdict form violated Constitutional law

This not only was error under Mississippi law, but also under federal constitutional provisions and case law requiring that the jury be provided accurate information about its options

---

[7]      On both direct appeal and post-conviction review, the Mississippi Supreme Court cited *Puckett v. State*, 737 So. 2d 322, 363 (Miss. 1999), and Assistant Attorney General Pat McNamara also cited *Puckett* in his closing argument at the conclusion of the evidentiary hearing in this Court. In *Puckett*, the jury was not given the option of life with parole, and more importantly, was never told that a failure to agree would result in a sentence of life with parole. Accordingly, that case is not relevant to what happened here.

in capital sentencing. Moreover, because the State argued to the jury that Mr. Hodges posed a future danger to society, the erroneous jury instruction and verdict form ran afoul of the United States Supreme Court's holding in *Simmons v. South Carolina*, that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. 154, 156 (1994). (*See* Dkt. No. 17 at 149-53.)

No procedural bar exists to preclude this Court's review of this federal constitutional violation. On direct appeal, the Mississippi Supreme Court mentioned that no objection was made to the verdict form and then said "[p]rocedural bar notwithstanding, this Court will consider this issue on the merits." *Hodges*, 912 So. 2d at 770. When the issue was raised again on post-conviction review, the Mississippi Supreme Court again denied the claim, *but addressed only the merits of the argument and never invoked a procedural bar*. The Court addressed the merits by quoting from its prior opinion on the merits, but never mentioned any procedural bar. *State v. Hodges*, 949 So. 2d 706, 722-23 (Miss. 2006).

"[A] federal claimant's procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default." *Harris v. Reed*, 489 U.S. 255, 262 (1989). "State procedural bars are not immortal, however; they may expire because of later actions by state courts. If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). Because the Mississippi Supreme Court "reache[d] the merits" in its post-conviction review of this case, and did not rest its judgment on the procedural bar, and because that post-conviction decision

19

was "the last explained state-court judgment" on the issue, *id.* at 805, it would be improper to impose a procedural bar and avoid federal habeas review of this federal constitutional claim.[8]

Alternatively, the failure of defense counsel to object to his fundamental error in the jury instruction and verdict form constitutes ineffective assistance of counsel, which itself provides cause and prejudice sufficient to require review of this federal constitutional claim despite defense counsel's omission. (Dkt. No. 17 at 154-55.) A basic understanding of Mississippi law on capital cases demonstrates that life with parole has not been a sentencing option since 1995. Yet in this case, the trial judge gave an instruction and submitted a verdict form completely at odds with the law. Neither the prosecutor nor the woefully unprepared defense counsel corrected the trial judge's misstatement of the law. The prosecutor took advantage of this opportunity and erroneously told that jury that if it could not agree on a verdict, a life sentence with parole would be imposed, thus increasing the chances that the jury would return a death verdict.

The trial judge, the prosecutor, and the defense counsel all should have known better and this should not have been allowed to happen. The person who suffered the consequences was the defendant, who received a death sentence from a jury that was misled into believing that a failure to agree would result in potential parole. This is a blatant violation of the federal constitution and the defendant should not be saddled with the consequences of this basic failure by each of these officers of the Court. Even if a procedural bar were otherwise proper, defense counsel's failure to raise this basic objection is so fundamentally ineffective as to constitute cause and prejudice. Unfortunately, defense counsel's deficiency in this regard is consistent with his overall

---

[8] Our memorandum in support of the federal habeas corpus petition mistakenly referred to the Mississippi Supreme Court's direct appeal decision as the last "explained" state court decision on this issue. (Dkt. No. 17 at 146.) That was an inadvertent error. Clearly, the last explained decision was that of

ineffectiveness in defending his client against the death penalty in this case.[9]

Accordingly, this Court should address the merits of this federal constitutional claim. Because of the paramount importance of accurate and proper jury instructions, this claim, by itself, requires that the death sentence be vacated. *See Simmons*, 512 U.S. at 171 (reversing death sentence because of improper instruction and requiring a new penalty-phase trial). Moreover, as explained in the next section of this brief, the harm from this error worked in combination with the prejudice from the other errors to produce an unfair trial that requires reversal.

IV.     Prejudice Resulting From The Errors

Whether considered singly or collectively, the prejudice from each of these federal constitutional errors requires that the death sentence be vacated. As a practical matter, prejudice operates collectively and cumulatively. The prejudice from each error compounds the existing prejudice from the other errors. The case law certainly indicates that prejudice should be examined collectively. *See Williams v. Taylor*, 529 U.S. 362, 399 (2000); *see also Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (*en banc*) (endorsing cumulative analysis of prejudice from constitutional errors on habeas review and stating that "the federal court must review the record as a whole to determine whether the errors more likely than not caused a suspect verdict"); *Mak v. Blodgett*, 970 F.2d 614, 617-25 (9th Cir. 1992) (granting habeas relief based on cumulative error, including counsel's deficient performance, the trial court's erroneous exclusion of evidence at the penalty

---

the Mississippi Supreme Court in its opinion denying post-conviction review.

[9]     In his closing argument at the conclusion of the evidentiary hearing, Assistant Attorney General Pat McNamara said that the Petitioner had never claimed ineffective assistance with respect to this failure to object. But that is incorrect. The memorandum in support of the petition specifically argues that this was ineffective and that it constitutes cause and prejudice to overcome any procedural bar. (Dkt. No. 17 at

phase, and the trial court's improper jury instructions that misstated the law with respect to unanimity as to mitigating factors). "The Supreme Court has repeatedly recognized that the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of conviction." *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008).

The prejudice here was extreme. First, the jury heard about alleged unadjudicated criminal activity of Mr. Hodges that would have been inadmissible had Mr. Miller not opened the door by putting unprepared witnesses on the stand at the penalty phase. Second, the jury did not hear about the extensive mitigating evidence that was presented at the evidentiary hearing in this Court, but was not presented at trial because none of the defense counsel ever investigated mitigation. Third, the defendant was falsely portrayed by the prosecution as someone who learned in open court during his prior burglary charge of Bessie Tatum's alleged beneficence in urging no penitentiary time on that charge, yet ungratefully refused to acknowledge it on the stand during his capital murder trial. Fourth, the jury was never told that Bessie Tatum did not want the death penalty in this case. Fifth, the jury was wrongly told that if it could not agree on a verdict, Mr. Hodges would be sentenced to life with parole, thus putting undue pressure on them to reach agreement, even if it required some jurors to abandon their position in favor of life without parole and join those who were voting for a death sentence.

    A.    Allowing the jury to hear aggravating evidence of
                 underlined: unadjudicated alleged crimes.

With respect to the allegations of prior unadjudicated criminal activity, the Mississippi Supreme Court has held that reversal is required where the jury at the sentencing phase of a

154-55.)

22

capital case is told of prior charges that did not result in convictions and are therefore inadmissible. As that Court said in *Edwards v. State*:

> In light of the fact that the imposition of death for capital murder is within the sole province of the jury, *it cannot be said that the introduction of this inflammatory testimony regarding a prior arrest for rape had no harmful effect. Irving v. State*, 618 So.2d 58, 59 (Miss.1992); *Clemons v. State*, 593 So.2d 1004, 1006 (Miss.1992). As a result, Edwards was not afforded the fundamental right to a fair trial in this case. Therefore, the admission of evidence of an arrest for rape over the objection of Edwards constituted reversible error.

737 So. 2d 275, 290 (Miss. 1999) (emphasis added). In the present case, the jury heard not only about a prior burglary for which Mr. Hodges had been convicted (and for which he was still under a sentence of parole, thereby making it arguably admissible under Miss. Code 99-19-101(5)(a)), but also about prior arrests for two escapes from the county jail, the burglary of a school, and the alleged attempted sexual assault of a woman named Latasha Martin.[10]

Just as it "cannot be said that the introduction of a prior arrest for rape had no harmful effect" in *Edwards*, the introduction of the prior arrests of Mr. Hodges – particularly the attempted sexual assault of Latasha Martin and the escapes – were equally prejudicial in this case. And just as the defendant in *Edwards* "was not afforded the fundamental right to a fair trial" because of the admission of the prior rape arrest in his case, Mr. Hodges did not receive a fair trial because of the introduction of the prior arrest for attempted sexual battery and the other crimes in the present case.

B.    <u>Failing to investigate and tell the jury of mitigating evidence</u>.

The evidence elicited at the hearing also amply demonstrated trial counsel's complete

---

[10]    Petitioner also made a proffer during the hearing that Ms. Martin would testify to the fact that the alleged sexual assault never occurred and that she does not know who made the report of such an assault. (Tr. Vol. II at 92:11-18.)

failure to prepare for Mr. Hodges' sentencing hearing. As Petitioner has shown in the course of the hearing, through extensive documentary evidence and particularly through the expert testimony of Dr. Antoinette Kavanaugh, a proper mitigation investigation would have led to importance evidence that should have been heard by the jury.[11]

There is a reasonable probability that, had it heard this extensive mitigating evidence during Mr. Hodges' capital trial, the sentencing jury (or at least one member of that jury) may have voted for a sentence less than death. This readily-available evidence in mitigation includes: family poverty; chaotic home environment; Mr. Hodges' mother's depression and alcoholism; parenting difficulties; limited education and substance abuse; individual development and lack of maturity; Mr. Hodges' relationship with Cora Johnson; and Mr. Hodges' mindset on the evening of the offense. This is all documented in more detail in Dr. Kavanaugh's report and testimony, but the following is a brief summary:

_Family Poverty_. First, there is the over-arching poverty in which Mr. Hodges was raised. As Dr. Antoinette Kavanaugh explained, when poverty exists in a household, "the caregiver's primary concern . . . is reduced to taking care of simple needs, such as providing shelter and food and more higher order, but equally important needs, their emotional development, really goes to the wayside." (Tr. Vol. II at 7:9-12.) Hospital records showed that Mr. Hodges' mother, Ms. Johnnie Pearl Hodges, supported a household of five people on less than $500 a month. (_Id._ at 9:3-17; Petr. Ex. 35J.) The family's poverty was so extreme that Mr. Hodges' life-threatening asthma and allergies could not be regularly treated and controlled; instead, his mother had to

---

11      Although the Mississippi State Hospital at Whitfield prepared a report prior to Mr. Hodges' capital trial, neither Carrie Jourdan nor anyone else provided the Hospital with the extensive mitigation documentation that was uncovered and provided to this Court at the evidentiary hearing in this case. (Tr. Vol. II at 48:14-49:10; 60:6-17; 80:17-18; 81:10-21; 82:9-21.)

resort to using the emergency room as a primary care facility. (Tr. Vol. II at 10:18-12:20; Petr. Exs. 35J, 35K.) Mr. Hodges' family so lacked resources that even when he had asthma attacks, they frequently went unaddressed and he was unable to routinely obtain his asthma medication. (Tr. Vol. II at 12:21-13:17; Petr. Ex. 35FF.)

*Chaotic Home Environment*. Next, the evidence demonstrates that Mr. Hodges was raised in a chaotic and unordered home environment. This is an important mitigating factor because, as Dr. Kavanaugh testified, "by examining his home environment I can obtain a better assessment of what demands are being placed on Ms. Johnnie Pearl Hodges . . . and whether or not those demands are so great they're preventing her from adequately caring for him." (Tr. Vol. II at 13:18-14:1.) The evidence demonstrates that Mr. Hodges' mother was under extreme stress as the primary caretaker not just for Mr. Hodges, but also, depending on the time frame, various of his older sisters, his nephew and niece(s) and Mr. Hodges' grandmother, who was stricken with Alzheimer's disease. (*Id*. at 14:2-15:1.) To make matters worse, Ms. LaKasha Hodges, Mr. Hodges' niece who was living in the household, was an extraordinarily disruptive force. Ms. LaKasha Hodges was diagnosed with dysthymia, a form of chronic depression, as an eight-year-old child and was taking both antidepressants and seizure medication. (*Id.* at 17:3-19; 23:2-14; 24:15-25:2; Petr. Ex. 35T.) Her counseling progress notes show that she set fires to the home and that her home environment, and thus Mr. Hodges' home environment, lacked "responsibility and consistency." (Tr. Vol. II at 20:1-14; Petr. Exs. 35HH, 35LL.)

A key theme noted in the counseling records for both Mr. Hodges and Ms. Lakasha Hodges was that of Ms. Johnnie Pearl Hodges' age and lack of desire to parent any more. Dr. Kavanaugh testified that by the time Mr. Hodges was born, Ms. Johnnie Pearl Hodges had

already raised seven children to adulthood. (Tr. Vol. II at 18:1-7.) The contemporaneous notes indicate that Ms. Johnnie Pearl Hodges "seem tired of raising children." (Petr. Exs. 35W, 35II; Tr. Vol. II at 18:10-11.) The chaos in the household was also noted by community counselors: "[t]he house has been full of children and grandchildren each time I've called to remind the mom of appointments. Today was no exception." (Tr. Vol. II at 20:15-21:7; Petr. Ex. 35U.)

The chaotic home environment and the time commitment necessary to deal with Ms. Lakasha Hodges as well as Mr. Hodges' Alzheimer's-stricken grandmother meant that Ms. Johnnie Pearl Hodges was unable to effectively parent Mr. Hodges. Moreover, the records repeatedly reflect that Mr. Hodges did not like to be at home due to the disruption caused by Ms. Lakasha Hodges. (Tr. Vol. II at 18:13-22.) His chaotic home environment left Mr. Hodges so deprived of attention that even a trip to the mall with his counselor was a source of enjoyment for Mr. Hodges because he experienced the trip as a meaningful interaction with another individual. (*Id.* at 21:8-25.)

*Mother's Depression and Alcoholism*. A further mitigating factor – one inextricably tied to the issue of the household environment – is Ms. Johnnie Pearl Hodges' chronic depression and alcohol abuse. An assessment of Mr. Hodges' mother is clearly important because "their mental state and their own needs and unmet needs impact their ability to provide for . . . and take care of their child's developmental needs . . . ." (*Id.* at 22:1-13.) Ms. Johnnie Pearl Hodges' medical records reflect a long-term depression largely derived from an unsettled family environment and the stress of having to take care of her mother who suffered from Alzheimer's. (*Id.* at 28:18-30:20.) Although psychiatric care was recommended, there no indication that Ms. Johnnie Pearl Hodges either sought or received such help. (*Id.* at 29:14-18.) In order to treat her

26

depression, Ms. Johnnie Pearl Hodges "chronically abused Valium throughout the course of her life." (*Id.* at 29:19-30:1.) However, Valium "taken over a long period of time, is addictive and increases symptoms of depression." (*Id.* at 30:2-31:11.)

Ms. Johnnie Pearl Hodges' depression was, in turn, one of the reasons for her alcoholism. (*Id.* at 25:10-22.) Medical records show that Ms. Hodges was hospitalized for alcohol abuse on a number of occasions. (*Id.* at 25:23-29:13; Petr. Exs. 35L, 35M, 35N, 35O.) The records reflect that Ms. Hodges complained of being "run down," suffering from "nervousness," that "she stated that she felt most of her problems were related to her home situation" and that "[s]he stated that she had been drinking quite heavily over the past 3-4 days in an effort to try to improve her general feeling and sense of well-being, unsuccessfully however." (Petr. Exs. 35N, 35O.) Her depression and alcohol abuse both contributed to neglect of Mr. Hodges and an inability to parent him during his formative years. (Tr. Vol. II at 25:12-22, 28:12-17.)

*Parenting Difficulties*. Dr. Kavanaugh also testified that Ms. Hodges was an inconsistent parent both in providing poor supervision and in her belittling behavior to Mr. Hodges. (*Id.* at 32:2-7.) Thus, for example, when Mr. Hodges returned from visiting his biological father, Wren Blair,[12] Ms. Hodges would say "you're going to end up a faggot like your father." (*Id.* at 32:8-14.) Or, when she did not like his friends, Ms. Hodges would tell Mr. Hodges that his

---

[12]     Another aspect of the lack of parenting experienced by Mr. Hodges is that Mr. Hodges' biological parents – Ms. Johnnie Pearl Hodges and Mr. Blair – did not get along. Ms. Johnnie Pearl Hodges continually informed Mr. Hodges' counselors that she thought Mr. Blair was a bad influence. (Tr. Vol. II at 34:16-35:12.) The two adults were unable to communicate and there was such enmity on Ms. Johnnie Pearl Hodges' part that she called the police on Mr. Blair during one of his visits with Mr. Hodges. (Tr. Vol. I at 100:4-102:5.) Ms. Hodges' negative feelings about Mr. Blair were shared in front of Mr. Hodges. (Tr. Vol. II at 33:24-34:5.) As Dr. Kavanaugh explained, when parents are not on the same page, it is difficult for a child – Mr. Hodges – to know what to expect. The role of parents is to provide a level of consistency to the child, something Mr. Hodges never experienced as a child. (*Id.* at 33:12-23.)

friends were trying to punk him out – "a colloquial term referring to forcing a person to engage in homosexual activities." (*Id.* at 32:15-19.) As Dr. Kavanaugh noted, these statements eat away at a person's self esteem and are not the kind of statements a parent says to a child when the parent is taking care of the child's developmental needs. (*Id.* at 32:20-23.) Ms. Lakasha Hodges, who lived in the same house as Mr. Hodges, testified that she never observed or heard Ms. Hodges express affection to Mr. Hodges or tell him that she loved him. (Tr. Vol. I at 122:25-123:2; Tr. Vol. II at 40:12-16.)

Similarly, Ms. Hodges' inconsistency as a parent resulted in the lack of a safe environment for Mr. Hodges. As Dr. Kavanaugh explained, inconsistency in parenting manifested itself in Mr. Hodges' caretaker not telling him what is expected of him and what he can expect from the world. Further, inconsistency in parenting means that Mr. Hodges was not taught to think through the consequences of his actions. (Tr. Vol. II at 32:24-33:11.) Examples of inconsistent parenting include Ms. Hodges' failure to enforce any curfew on Ms. Lakasha Hodges or Mr. Hodges. Further, Ms. Johnnie Pearl Hodges gave inconsistent messages to Mr. Hodges including about his relationship with Ms. Cora Johnson. Thus, although Ms. Hodges disliked Ms. Johnson and did not think Mr. Hodges should be in a relationship with Ms. Johnson, Ms. Hodges always let Ms. Johnson come to the house thus sanctioning the relationship. (*Id.* at 43:1-17.)

Lastly, Ms. Hodges failed to model lawful behavior as part of her parenting role. In an effort to make money to support the household, Ms. Hodges ran a boot-legging business from her home selling liquor to customers in the neighborhood. (*Id.* at 49:20-50:7.) This business existed until Mr. Hodges was about eight years old. (*Id.*) The bootlegging business not only

28

modeled illegal behavior for Mr. Hodges, it also was another reason for Ms. Hodges providing inadequate supervision for Mr. Hodges. (*Id.*)

Although counseling records demonstrate that these parenting issues were repeatedly raised to Ms. Hodges, she failed to implement any changes and failed to appreciate fundamental parenting that was needed. (*Id.* at 38:2-39:2; 50:12-15.)

*Limited Education and Substance Abuse*. To go along with his family difficulties, Mr. Hodges had extremely limited formal education, having failed out of school in the eighth grade. This was so despite the fact that he was quite a good student until he reached the sixth grade. (Petr. Ex. 35Z.) As Dr. Kavanaugh explained, the lack of formal education is important in several respects. First, the failure to complete his schooling is "yet another source of decreased self-esteem . . . and a sense of overall failure." (Tr. Vol. II at 37:13-22.) Second, by dropping out of school, Mr. Hodges experienced even less structure in his daily life because after he stopped attending school Ms. Hodges allowed him to not be at home and further failed to provide tasks for him with articulated expectations that he would perform those tasks. (*Id.* at 39:10-21.)

The counseling records also demonstrate that Mr. Hodges was a chronic user of alcohol and drugs. The records reflect that when Mr. Hodges was 16 years old, his mother sought to have him drug-tested at her own cost but her request was denied. (*Id.* at 36:7-20; Petr. Ex. 35Q.) Three years later, the Mississippi Department of Mental Health diagnosed Mr. Hodges with alcohol dependence and cannabis dependence. (Tr. Vol. II at 36:21-37:12; Petr. Ex. 35R.) The issue of Mr. Hodges' dropping out of school and his drug and alcohol use are intertwined. As Dr. Kavanaugh learned in her assessment and testified, "by dropping out of school he had more time to spend with his peers . . . . I learned that he spent that time using drugs and alcohol." (Tr. Vol.

29

II at 39:6-14.)

*Individual Development and Lack of Maturity.* Mr. Hodges' home life as well as the ongoing substance abuse had a dramatic impact on his individual development. As Dr. Kavanaugh testified, the frontal lobe is developing throughout a person's adolescence and into early adulthood. (*Id.* at 35:13-36:6.) The frontal lobe is the part of the brain that helps a person think sequentially, understand the events that could happen and weigh the pros and cons of various choices. (*Id.*) It is also the part of the brain that helps slow down emotion. (*Id.*) Chronically using drugs or alcohol during adolescence will impede the growth of the frontal lobe. (*Id.*) Dr. Kavanaugh opined that Mr. Hodges suffered from low self-esteem. (*Id.* at 39:22-40:16.) He was also highly impulsive and immature (*id.*); much more so than Mr. Hodges' chronological age would lead one to believe. (*Id.* at 41:8-14.) Mr. Hodges' curtailed development was attributable in part to his substance abuse and "in large part due to his mother's parenting style . . . ." (*Id.* at 40:6-11.) This lack of maturity and impulsiveness led Mr. Hodges into the most significant and most destructive relationship in his life.

*Relationship With Cora Johnson.* The combined circumstances of Mr. Hodges' upbringing made him particularly susceptible to Cora Johnson. His relationship with her highlighted his immaturity in that he was significantly older than she. (*Id.* at 42:12-25.) Nonetheless, Mr. Hodges not only carried on a romantic relationship with Ms. Johnson, he carried on the relationship even though Ms. Johnson was both belittling and inconsistent with him. (*Id.*) Ms. Johnson's inconsistency (and inconstancy) were amply demonstrated in her letters to Mr. Hodges. (Petr. Ex. 35 at 8-11; Petr. Ex. 35DD.) While Mr. Hodges was in the RID program, Ms. Johnson would write about her child and tell Mr. Hodges that he is the child's

30

father. (*Id.*)   She also demanded that after his release from the RID program, Mr. Hodges had to

get a job, get a car and get a house and that once he met these demands they would marry and

live together with their child. (*Id.*; Tr. Vol. II at 46:13-20.) Notwithstanding her demands, Ms.

Johnson would also write to Mr. Hodges belittling him, telling him that she had sexual

relationships with other men and telling him that he was not the father of her child. (Petr. Ex.

35DD; Tr. Vol. II at 45:22-25.)[13] The confusion and inconsistency of his relationship with Ms.

Johnson is part and parcel of what occurred the night of the offense.

*Mindset on the Evening of the Offense*. The evidence shows that after his release from the

RID program (less then four weeks before the instant offense), Mr. Hodges immediately found a

job as a first step to address Ms. Johnson's demands. (Tr. Vol. II at 46:21-47:4.) Mr. Hodges'

goal was to save money so that he could then get a house and a car – Mr. Hodges wanted to

marry Ms. Johnson and live with their child as a family unit. (*Id.*) The evidence shows, however,

that Mr. Hodges was having trouble adjusting to life after the RID program. Mr. Hodges was

having difficulty eating and sleeping and he was not communicating effectively. (*Id.* at 47:5-17;

Petr. Ex. 35EE at 008382.) Mr. Hodges was also experiencing a certain level of paranoia in that

he was hyper-vigilant. (Tr. Vol. II at 47:5-17.) Further, Mr. Hodges was working twelve-hour

shifts which required him to get up early, thus compounding his sleep deprivation. (*Id.* at

49:11-19.)

The mitigating factors discussed must be looked at in total rather than as individual

factors because, as Dr. Kavanaugh indicated, "what we have is many of these factors are chronic

---

[13]    Of the 18 letters from Cora Johnson to Mr. Hodges, only 4 were introduced at trial during the guilt phase,
(*compare* Trial Tr. 599-618 *with* Petr. Ex. 35DD), with many of the most important letters not being drawn to the
attention of the jury (Petr. Ex. 35 at 9-11). Moreover, none of these letters were used or introduced as part of trial
counsel's argument in mitigation.

and going on at the same time." (*Id.* at 51:7-10.) All of these circumstances came together on the night of the offense. Mr. Hodges was "trying to fulfill his need to feel loved and valued" and he wanted to "have a family and have fathered this child to increase his sense of value . . . ." (*Id.* at 51:11-25.) His lack of maturity and impulsiveness due to poor frontal lobe development combined with normal adolescent impulsiveness and bad judgment, his sleep deprivation and post-incarceration paranoia led to the shooting of Isaac Johnson. (*Id.*)

Although the mitigating factors do not excuse Mr. Hodges' actions in any way, they do assist in explaining why he acted as he did. All of these facts and the development of the mitigating factors were readily available to trial counsel. It is reasonable to conclude that had this evidence and expert testimony been presented to the jury, that at least one juror would have refused to impose the death penalty.

      C.    <u>Falsely portraying the defendant as a liar and an ingrate</u>.

The prosecution's false portrayal of Mr. Hodges as an ungrateful beneficiary of Bessie Tatum's beneficence was extremely damaging. Indeed, prosecutor Allgood took the unusual step of calling one of his own assistants as a witness because he knew it would be damaging. (Tr. Vol. I at 41:11-42:11.) This made the defendant look not only like a murderer, but a liar and an ingrate who was unwilling even to acknowledge that he heard in open court that Bessie Tatum, the mother of the victim, had asked the Judge to spare him the penitentiary in his prior burglary charge. But, of course, he had not heard that because it was never spoken in open court.

Jurors in penalty phases have already concluded that the defendant is a murderer. They are looking at other information to determine whether or not to sentence the murderer to death. When the prosecution also falsely portrays the defendant as a liar and an ingrate who is

unwilling during his penalty phase testimony to acknowledge the kindness of the victim's mother, that goes a long way toward convincing the jury to impose the death sentence. It is highly prejudicial.

> D. Failing to tell the jury that Bessie Tatum did not want the death sentence.

As co-counsel Guy Rogers testified, testimony from Bessie Tatum that she did not want Mr. Hodges to be sentenced to death "would have been . . . the biggest evidence – piece of evidence or testimony that – that we probably would have even had in our favor." (Petr. Ex. 10 at 32:24-33:2.) This evidence was admissible, *see Havard v. State*, 928 So. 2d 771, 791-92 (Miss. 2006); *Wilson v. State*, 21 So. 3d 572, 590-91 (Miss. 2009), and would have mitigated against the imposition of a death sentence. As it was, Mr. Hodges was falsely portrayed in the capital murder case as a liar and ingrate who refused to acknowledge Bessie Tatum's good will in the prior burglary case, but the capital jury never head that Bessie Tatum did not believe he should be sentenced to death. The false portrayal should never have been presented, but Bessie Tatum's testimony should. It could have made a huge difference and the failure to introduce it was highly prejudicial.

> E. The erroneous jury instructions and verdict form.

As noted earlier in this brief, this error by itself requires reversal. But when it is considered along with the other errors, the prejudice is compounded. One or more members of an accurately instructed jury, when presented with proper mitigating evidence by competent counsel, and when not infected by false portrayals and inadmissible prior unadjudicated allegations, could easily have believed that life without parole was a proper verdict. If not infected by the erroneous instruction that a hung jury would result in a sentence of life with parole, those jurors

may well have stuck to their belief in a life without parole sentence. Any disagreement among the jury, then, would have resulted in a life without parole sentence and not the death sentence that ultimately was imposed by the improperly instructed jury.

      F.      <u>Collective assessment of prejudice</u>.

Even if the prejudice from the separate constitutional violation is examined separately – the deficient performance of counsel, the false evidence introduced by the District Attorney's office, and the erroneous jury instruction and verdict form – each of them by itself constitutes a violation of due process that would require a new sentencing hearing. But as mentioned earlier, prejudice occurs cumulatively. A jury considers everything in combination and one error will exacerbate another. Thus, prejudice should be examined cumulatively and as stated earlier, the cumulative impact of the various errors here was quite devastating. This is sufficient to undermine confidence in the outcome of the penalty phase of this case and require a new trial.

## **CONCLUSION**

WHEREFORE, Petitioner respectfully requests that this Court grant habeas relief, set aside his sentence, and remand to the state court for a new trial.

Dated: May 7, 2010                                     Respectfully submitted,

                                                       /s/ Frances P. Kao_____
                                                       Robert B. McDuff
                                                       767 North Congress Street
                                                       Jackson, Mississippi 39202
                                                       (601) 969-0802

                                                              *and*

                                                       Frances P. Kao
                                                       Justin L. Heather
                                                       155 North Wacker Drive
                                                       Chicago, Illinois 60606
                                                       (312) 407-0700

                                                       *Attorneys for Petitioner*
                                                       *Quintez Wren Hodges*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been delivered via the court's electronic filing system to Pat McNamara (pmcna@ago.state.ms.us, pmcna2@juno.com) and Marvin L. White (swhit@ago.state.ms.us, mwhitejr@comcast.net), Office of the Mississippi Attorney General, P.O. Box 220, Jackson, Mississippi, this 7th day of May, 2010.

/s/ Frances P. Kao
Frances P. Kao
*Counsel for Petitioner*